**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NQ MOBILE, INC. SECURITIES LITIGATION | Civil Action No. 13-cv-7608-WHP<br><br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Court-appointed Lead Plaintiffs, the Allene E. Mossman Trust, EJ Partners, HR Volin IRA, AM Volin IRA, EM Volin Roth IRA, JE Volin Roth IRA, EM Volin Trust, EM Volin IRA, and JE Volin IRA ("Lead Plaintiffs" or the "Volin Group") bring this action pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of themselves and all persons other than Defendants who purchased or otherwise acquired the American Depositary Shares ("ADS shares" or "NQ shares") of NQ Mobile, Inc. ("NQ" or the "Company) between March 6, 2013 (the date of NQ's press release announcing its results for the fourth quarter and fiscal year ("FY") ending December 31, 2012) and July 3, 2014 (the "Class Period").[1]

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.   Lead Plaintiffs' information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of (i) NQ's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) NQ's other public statements, including press releases, audited and unaudited financial statements, and transcripts of investor conference calls; and (iii) reports of securities and financial analysts, news articles, and other commentary and analysis concerning NQ and the industry in which it operates.  Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.   Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

---

[1]      In addition to NQ, the Defendants include NQ's Chairman and co-CEO Henry Yu Lin ("Lin"), its co-CEO Omar Sherif Khan ("Khan"), its Chief Operating Officer ("COO") Wenyong "Vincent" Shi ("Shi"), its former Chief Financial Officer ("CFO") Suhai Ji ("Ji") (through September 20, 2013), and its current CFO, K.B. Teo ("Teo") (collectively, the "Officer Defendants"), as well its auditors PricewaterhouseCoopers Zhong Tian LLP ("PwC-ZT") and its affiliate, PricewaterhouseCoopers International Limited ("PwC-IL").

## I.   INTRODUCTION AND SUMMARY OF THE FRAUD

1.      Defendant NQ was founded in 2005 and is incorporated in the Cayman Islands and headquartered in Beijing, the People's Republic of China (with dual headquarters in Dallas, Texas since 2012).  It purports to provide mobile internet services in the areas of privacy, mobile security, personalized cloud, productivity, and family protection.

2.      On May 5, 2011, NQ's initial public offering ("IPO") of its ADS shares took place at an initial offering price of $11.50 per share.  Over the next 22 months, the price of NQ shares, which traded on the New York Stock Exchange ("NYSE"), generally traded below its IPO price, closing on March 5, 2013 at $8.50 per share.

3.      On March 6, 2013 – the first day of the Class Period – the Company announced record revenue of $91.8 million, with Defendant Lin asserting that "in our first full year as a public company, we grew our revenue by 126% from $41 million to over $92 million." Thereafter, in the following weeks and months, the Company announced further positive financial news, including more "record" revenue results for the second quarter of 2013.  As a result of these and other positive statements by Defendants, the price of NQ shares climbed to nearly $25 per share in the third week of October 2013.

4.      On October 24, 2013, however, equity research firm Muddy Waters, LLC ("Muddy Waters") issued an 81-page research report entitled "NQ Mobile: China Fraud 2.0" (the "October 2013 Report").  This Report described in detail how NQ had greatly overstated and exaggerated its financial performance.  For example, as the October 2013 Report found:

(i)      NQ has massively overstated its reported revenue from within China; for example, over 70% of NQ's 2012 reported revenue from its purported sales of mobile security applications in China was fraudulent, as NQ's actual revenue from such sales was only $2.5 to $7.7 million, rather than the $32.2 million that it reported;

(ii)     NQ's largest "customer" – an entity known as Tianjin Yidatong Technology Development Co. ("Yidatong" or "YDT") – is an empty shell that is controlled by NQ, and is owned and managed by a former NQ executive;

2

(iii)    NQ has grossly overstated its reported international (*i.e.*, non-Chinese) revenues;

(iv)    NQ has massively overstated its paid user base, as NQ's share of China's mobile internet services market is only about 1% or 2%, rather than the wildly inflated figures in the range of 55% that NQ has reported;

(v)    a material portion of NQ's reported cash and cash equivalent balances during the Class Period are phantom assets that were not actually on deposit in NQ's accounts; and

(vi)    NQ's main security software is more akin to malware than to protective security software.

5.    In response to these disclosures, on October 24, 2013, NQ shares plummeted 47%, falling $10.79 from its closing price of $22.88 per share the previous trading day to $12.09 per share, on record volume of 29.3 million ADS shares traded.   Indeed, the volume was so heavy that the NYSE temporarily suspended trading in NQ shares.

6.    On October 25, 2013, NQ issued multiple press releases denying that it had made any materially false or misleading statements concerning its business or operations, and its senior officers conducted a conference call to try to falsely reassure investors that NQ's previously reported financial results were accurate and reliable.  It also announced that its Board had formed a "Special Committee," chaired by the head of its Audit Committee, to investigate the findings of the October 2013 Report.   Despite these efforts, after NQ shares resumed trading later that afternoon, NQ's share price fell a further 12% to $10.63 per  share – representing a staggering two-day decline of roughly 56%.

7.    On November 1, 2013, NQ announced that its Special Committee had retained certain outside lawyers and accountants to assist it (collectively, the "Special Committee Team"). The Defendants also attempted to restore investor confidence by announcing that members of NQ's senior management would "use their personal funds" to buy up to $3 million worth of NQ shares over the next six months.   Thereafter, over the next several months the Defendants continued to try to assure investors that the previously reported financial results were accurate

3

and reliable, that the October 2013 Report was without merit, and that NQ was continuing to generate "record" revenues.   In response to these false assurances, the price of NQ shares partially recovered in the first quarter of 2014 to trade as high as $21.39 on March 4, 2014, and the fraud continued.

8.      In the spring of 2014, however, additional information regarding the true state of NQ's business became public.   For example, on Friday, April 11, 2014, NQ announced disappointing results for the 4Q 2013, which various market participants attributed to increased scrutiny of NQ's behavior in the fourth quarter of 2013 and to a resulting decrease in the amount of fraudulent revenue that NQ would have otherwise reported.   Accordingly, the price of NQ shares fell from $15.99 on April 10 to close at $11.05 on April 14 – a two-day decline of over 28% on heavy volume.

9.      On April 30, 2014, NQ announced that it would be unable to timely file its annual report for 2013 on Form 20-F, including its audited financial statements for 2013, but stated that it expected to file them in 15 days.  Upon the expiration of this 15-day period, on May 15, 2014, NQ announced that it was still unable to file its Form 20-F.   The market, which viewed NQ's inability to produce a timely annual report and audited financial statements for FY 2013 as confirmation that NQ's previous financial statements and reported financial results were materially inflated and could not be relied upon, reacted swiftly to this news.   Indeed, on May 15, 2014, the price of NQ shares fell a further 29%, from $10.23 to $7.27, on heavy volume of over 20 million shares.

10.     On June 4, 2014, NQ announced that its specially-hired Special Committee Team had purportedly not found evidence that NQ had engaged "in the fraudulent conduct alleged by Muddy Waters."   Nonetheless, NQ conceded that the Special Committee Team had found that NQ "had some lax internal controls and informal business practices," and further admitted as follows:

> Despite the [Special Committee] Investigation Team's extensive review of documents and data provided by sources both within and outside the Company,

4

the Investigation Team could not verify that the devices it collected and copied contained all responsive information at the time the copies were made. ***On many devices, the Investigation Team observed indications that some information might be missing, and the Company's management and staff were unable to provide a credible explanation for what the Investigation Team observed.*** [Emphasis added.]

Moreover, NQ declined to produce the Special Committee's actual report (even in redacted form), nor has NQ produced it as of the date of the filing of this Complaint.

11.     With its 2013 Form 20-F still unfiled, on July 3, 2014 – the last day of the Class Period – ***NQ announced that its Audit Committee and Special Committee chair, Ying Han, was resigning*** from those positions and also stepping down from NQ's Board of Directors.   In addition, NQ reported that (1) ***PwC-ZT had advised NQ that it would need to perform additional procedures and expand the scope of its audit*** in order to complete its work on its audit on NQ's 2013 financial statements, and (2) ***NQ (rather than agreeing to its auditor's request) was merely "considering" it***.   In response to this news, which investors interpreted as confirmation of previously voiced concerns about the truth and reliability of NQ's prior reports of its financial condition and performance, the price of NQ shares dropped 32%, from $6.76 to an all-time low of $4.58, on exceptionally heavy volume of over 35 million shares.

12.     On July 18, 2014, ***NQ announced that its Audit Committee had dismissed PwC-ZT as its independent auditor*** and appointed Marcum Bernstein Pinchuk LLP as its new auditor "with respect to the fiscal year 2013 and subsequent periods."   In the course of explaining its "justification" for firing PwC-ZT, NQ also announced:

> [PwC-ZT] advised the Company and the Audit Committee that the observations referred to in the Company's press release reporting on the Special Committee's Independent Investigation dated June 4, 2014 regarding questions related to electronic data collected by the Investigation Team would require it to expand its work and, if investigated further, ***may cause it to be unwilling to rely on management representations in connection with its audit work***. [Emphasis added.]

13.     As of the date of the filing of this Complaint, NQ has still not filed its Form 20-F or its audited financial statements for FY 2013, nor has it provided any assurances as to when (if ever) it will do so.

14.     As detailed below, NQ's Class Period statements regarding, among other things, its financial performance, assets, relationships with its "biggest customer," market share, user base, and the capabilities and functionality of its products all contained materially false information or omitted information necessary to make those statements not misleading.  The NQ Defendants also falsely represented that NQ's internal controls over its financial reporting were effective.  As a result, Lead Plaintiffs and other members of the Class purchased NQ shares at artificially inflated prices and have suffered significant damages.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.   In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the NYSE (a national securities exchange located in this District).

16.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Substantial acts in furtherance of the illegal conduct alleged herein occurred in this District.  Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation or assistance of Defendants occurred, at least in part, in this District.  Additionally, NQ's agent for service is located at 400 Madison Avenue, Fourth Floor, New York, NY 10017.

## III.    THE PARTIES

17.     The Court-appointed Lead Plaintiffs (collectively referred to herein as the "Volin Group"), consist of the Allen E. Mossman Trust, EJ Partners, HR Volin IRA, AM Volin IRA, EM Volin Roth IRA, JE Volin Roth IRA, EM Volin Trust, EM Volin IRA, and JE Volin IRA. The members of the Volin Group purchased NQ ADS shares at artificially inflated prices during

the Class Period, as set forth in their certification previously filed with the Court (ECF No. 42-2), and suffered damages as a result of the securities law violations alleged herein.

18.     Defendant NQ is a Cayman Islands corporation that purports to maintain "dual" headquarters in Beijing, China and (since 2012) Dallas, Texas.  NQ is primarily engaged in the business of mobile security, privacy, and productivity.   The Company was originally named NetQin Mobile Inc., and changed its name to NQ Mobile in April 2012.  NQ's ADS shares trade on the NYSE under the ticker symbol "NQ."

19.     Defendant NQ conducts most of its operations through Beijing NQ Technology Co. Ltd. ("Beijing NQ Technology"), a Chinese company that was founded by Defendant Lin, Defendant Shi, and NQ director Zhou Xu (collectively, the "Founders").  These three individuals are also the three founders of NQ.  Beijing NQ Technology continues to be owned by the three Founders (rather than by NQ) as Chinese laws restrict foreign equity ownership in Chinese companies that engage in certain telecommunications operations.   However, as part of a corporate reorganization undertaken in connection with NQ's IPO in May 2011, Beijing NQ Technology became a so-called "variable interest entity" ("VIE") affiliate of NQ.  The so-called "VIE Agreements" entered into among NQ Beijing (a wholly-owned subsidiary of NQ), Beijing NQ Technology (the VIE) and the Founders purportedly enable NQ, through NQ Beijing, to (i) exercise effective control over the VIE (Beijing NQ Technology); (ii) receive substantially all of the economic benefits and residual returns (subject to Chinese restrictions on transfers of capital), and absorb substantially all of the expected losses from the VIE, as if NQ were its sole shareholder; and (iii) have an exclusive option to purchase all of the equity interests in the VIE. NQ reports its financial performance and results of operations under United States Generally Accepted Accounting Principles ("GAAP") on a consolidated basis, which includes the results of operations, assets and liabilities of its own subsidiaries, of VIE, and its VIE's subsidiaries.

20.     Defendant Henry Lin is the Chairman and Co-CEO of NQ.  On information and belief, Lin is a resident of the People's Republic of China.  As alleged herein, during the Class

7

Period, Lin made materially false and misleading statements concerning NQ, its financial performance, market share, and products and attended press conferences at which he failed to correct materially false and misleading statements made by others.  Pursuant to §302 and §906 of the Sarbanes-Oxley Act of 2002 ("SOX"), and in accord with §§13 and 15(d) of the 1934 Act, Defendant Lin also executed certifications in conjunction with NQ's false and misleading annual report on Form 20-F for the FY 2012.

21.     Defendant Lin directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning NQ and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to NQ's course of conduct, and his access to material inside information about NQ during the Class Period, at all material times, Defendant Lin was a controlling person of NQ within the meaning of §20(a) of the 1934 Act.

22.      Defendant Omar Sharif Khan has been a Director and Co-CEO of NQ since January 5, 2012.  As alleged herein, during the Class Period, Defendant Khan made materially false and misleading statements concerning NQ, its financial performance, market share, and products.  Pursuant to §302 and §906 of SOX, and in accord with §§13 and 15(d) of the 1934 Act, Defendant Khan also executed certifications in conjunction with NQ's false and misleading annual reports on Form 20-F for the FY 2012.

23.     Defendant Khan directly participated in NQ's management and day-to-day operations and had actual knowledge of confidential proprietary information concerning NQ and its business, operations, growth, financial statements, and financial condition.  Because of this position of control and authority, his ability to exercise power and influence with respect to NQ's course of conduct, and his access to material inside information about NQ during the Class Period, Defendant Khan has been a controlling person of NQ within the meaning of §20(a) of the 1934 Act, at all material times, since January 5, 2012.

24.     Defendant Wenyong "Vincent" Shi is the COO of NQ.   On information and belief, Shi is a resident of the People's Republic of China.  As alleged herein, during the Class Period, Shi made materially false and misleading statements concerning NQ, its financial performance, market share, and products, and/or attended press conferences at which he failed to correct materially false or misleading statements made by others.

25.     Defendant Shi directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning NQ and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to NQ's course of conduct, and his access to material inside information about NQ during the Class Period, at all material times, Defendant Shi was a controlling person of NQ within the meaning of §20(a) of the 1934 Act.

26.     Defendant Ji was the CFO of NQ until September 20, 2013. On information and belief, Ji is a resident of the People's Republic of China.  As alleged herein, during the Class Period, Defendant Ji made materially false and misleading statements concerning NQ, its financial performance, market share, and products.  Pursuant to §302 and §906 of SOX, and in accord with §§13 and 15(d) of the 1934 Act, Defendant Ji also executed certifications in conjunction with NQ's false and misleading annual report on Form 20-F for the FY 2012.

27.     Defendant Ji directly participated in NQ's management and day-to-day operations and had actual knowledge of confidential proprietary information concerning NQ and its business, operations, growth, financial statements, and financial condition.   Because of this position of control and authority, his ability to exercise power and influence with respect to NQ's course of conduct, and his access to material inside information about NQ during the Class Period, at all material times, through September 20, 2013, Defendant Ji was a controlling person of NQ within the meaning of §20(a) of the 1934 Act.

28.      Defendant Teo has been CFO of NQ since September 20, 2013. On information and belief, Teo is a resident of the People's Republic of China.  As alleged herein, in the period since he became NQ's CFO, Defendant Teo made materially false and misleading statements concerning NQ, its financial performance, market share, and products.

29.      Defendant Teo directly participated in NQ's management and day-to-day operations and had actual knowledge of confidential proprietary information concerning NQ and its business, operations, growth, financial statements, and financial condition.  Because of this position of control and authority, his ability to exercise power and influence with respect to NQ's course of conduct, and his access to material inside information about NQ during the Class Period, at all material times, since September 2013, Defendant Teo was a controlling person of NQ within the meaning of §20(a) of the 1934 Act.

30.      Defendants Lin, Khan, Shi, Ji and Teo are collectively referred to herein as the "Officer Defendants."

31.      NQ and the Officer Defendants are collectively referred to herein as the "NQ Defendants."

32.      During the Class Period, the Officer Defendants, as senior executive officers and/or directors of NQ, possessed the power and authority to control the contents of NQ's financial statements, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the NQ reports and press releases alleged herein to be false or misleading prior to or shortly after their issuance, and/or participated in conference calls where they or other representatives of NQ made false or misleading statements, and had the ability and opportunity to prevent the issuance of the written and oral statements at issue herein or cause them to be corrected.  Because of their positions with NQ, and their access to material, non-public information available to them but not to the public, the Officer Defendants knew or recklessly disregarded that the material adverse facts specified herein had not been disclosed to and were being concealed from the public, and

10

that the positive representations being made were materially false or misleading when made.

33.    As officers and/or directors of a publicly-held company whose securities were, and are, registered with the SEC under the U.S. federal securities laws, each Officer Defendant had a duty to disseminate prompt, accurate, and truthful information with respect to NQ's financial condition and performance, growth, operations, business, markets, products, prospects and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of NQ's ADS shares would be based upon true and accurate information.   The Officer Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.    PricewaterhouseCoopers International Limited ("PwC-IL") is a network of accounting companies comprised of member firms located around the world,  including the United States and mainland China.   PwC-IL is headquartered at 300 Madison Avenue, New York, NY. 10174.

35.    Defendant PricewaterhouseCoopers Zhong Tian LLP ("PwC-ZT") is the China-based branch of the international accounting firm PricewaterhouseCoopers that serves as NQ's auditor.   PwC-ZT issued unqualified audit opinions on NQ's year-end financial statements for FYs 2011 and 2012, which were in turn incorporated into various NQ SEC filings complained of herein.   PwC-ZT is located at 26/F Office Tower A, Beijing Fortune Plaza, 7 Dongsanhuan Zhong Road, Chaoyang District, Beijing, 100020, People's Republic of China.

36.    PwC-ZT performed the audit services for NQ as a *de facto* agent of PwC-IL and provided those services on the authority of, at the direction of, under the control of, and for the sole benefit of PwC-IL.

37.    PwC-IL and its member firms market themselves worldwide under the brand name "PwC."  *See* http://www.pwc.com/gx/en/index.jhtml?ld=no (visited July 21, 2014).   PwC-ZT is a "member firm" of the PwC-IL global "network" of member firms.   According to PwC-IL's website, all of the member firms in the network operate with a "common purpose" and

under a single umbrella.  *See* http://www.pwc.com/us/en/about-us/index.jhtml (visited July 21, 2014) ("Imagine the power of 180,000 people with a common purpose — building relationships that create value for you and your business.  This is PwC.  Every day, our people work with you to build the value you are looking for.").  Silas S.S. Yang, the Chairman and Senior Partner of PwC-ZT, sits on the PwC "Network Leadership Team," which develops and implements "policies and initiatives to achieve a common coordinated approach" to "strategy, brand, and risk and quality" for the firm worldwide.  *See* http://www.pwc.com/gx/en/leadership/silas-yang.jhtml; http://www.pwc.com/gx/en/corporate-governance/network-structure.jhtml  (visited   July   21, 2014).

38.     PwC-IL exerts direct control over the firms in its network, including PwC-ZT, by enforcing policies to which each member firm must conform.   The Transparency Report sets forth this policy: "Member firms have agreed to abide by certain common policies and maintain the standards of the PwC network."  PricewaterhouseCoopers LLP, 2013 Transparency Report (the  "Transparency  Report"),  at  03,  available  at  http://www.pwc.com/en_US/us/about-us/assets/pwc-llp-fy13-transparency-report.pdf.

39.     In particular, audit quality is managed from the top down at PwC-IL, with PwC-IL overseeing the audit quality of its member firms.  Indeed, the audit services provided by PwC-ZT are dictated directly by PwC-IL.  *See* Transparency Report at 06 ("To promote consistent audit engagement performance, the PwC global network of firms . . . agree to follow a baseline audit methodology.").

40.       At the international level, the PwC-IL Accounting & Audit Practice Committee is charged with implementing and enforcing guidelines on professional standards throughout the global network.   *See* Transparency Report at 04 ("The [Accounting & Audit Practice Committee]'s scope of responsibility includes regulatory matters that affect our assurance practice and, as appropriate, other parts of the PwC global network, and accountancy licensing

and professional standards issues.  As part of its oversight of our assurance practice, it evaluates

and oversees the progress of our audit quality initiatives, including the status of actions taken in response to PCAOB inspection comments.").

41.     This same Audit Committee, which oversees audit practice throughout the PwC network also "approves [its member firms'] audit engagement and related audit fee and, when applicable, non-audit engagements and related fees."   As the Transparency Report states, "effective oversight of auditors by audit committees is one of the keys to promoting greater audit quality."   Accordingly, PwC-IL has essentially plenary authority over the audits performed by members of the global PwC network, including PwC-ZT China.

42.     Further, "certain audit activities," whether they apply to audits in China or elsewhere, occur in "one of three centralized service centers, two of which are outside of the United States."   *See* Transparency Report at 06.   As the Transparency Report explains, this centralized audit activity "promotes more consistent execution and provides our locally based audit teams with additional time to focus on other aspects of our audits."   *Id*.   As the report continues, in "fiscal year 2013, our service centers performed nearly 1 million hours of audit activities."   *Id*.

43.     PwC-IL member firms are expected to assist each other, including sharing resources and advising each other in order to provide professional services.       *See* http://www.pwc.com/gx/en/corporate-governance/network-structure.jhtml (visited July 21, 2014) ("Member firms of PwCIL can use the PwC name and draw on the resources and methodologies of the PwC network. In addition, member firms may draw upon the resources of other member firms and/or secure the provision of professional services by other member firms and/or other entities. In return, member firms are bound to abide by certain common policies and to maintain the standards of the PwC network as put forward by PwC-IL.").

44.     For these reasons, PwC-IL is a controlling person of its member firm, PwC-ZT, as well as of its employees, and is liable in that capacity for PwC-ZT's wrongful conduct as alleged herein.

13

IV.    THE FRAUDULENT SCHEME

45.    NQ, like several other companies in the mobile app field, uses a "freemium" business model.  Under this "freemium" model, NQ (i) gives away its basic security applications for free to end-users, *e.g.*, retail consumers (with NQ often paying a fee to third-party "partners," such as mobile phone manufacturers, for the ability to pre-load NQ's basic security apps on the manufacturers' mobile phones), but (ii) charges its end-users a fee if they choose to "upgrade" to any of NQ's premium mobile security apps (such as apps that are meant to protect users from newly discovered viruses on a going-forward basis, as opposed to protecting users only from those viruses that were known as of the date that NQ's "basic" apps were downloaded or installed).

46.    Prior to and during the Class Period, the NQ Defendants consistently portrayed NQ as a successful mobile internet services provider whose revenue and user base, both in China and internationally outside of China, was growing rapidly in response to strong demand for NQ's mobile security products.  For example, in a press release filed with the SEC on Form 6-K dated October 7, 2013, NQ represented that: (i) its total net revenues increased by 107.7% from $35.9 million in the six months ended June 30, 2012 to $74.6 million in the six months ended June 30, 2013; (ii) the number of its cumulative registered user accounts increased from 203.5 million as of June 30, 2012 to 372.2 million as of June 30, 2013; (iii) the number of average monthly active user accounts increased from 69.2 million for the three months ended June 30, 2012 to 122.2 million for the three months ended June 30, 2013; and (iv) revenue generated by overseas users accounted for 56.7% of consumer mobile security revenues in the six months ended June 30, 2013, compared with 51.0% in the six months ended June 30, 2012.

47.    On October 24, 2013, however, the securities research firm Muddy Waters released an 81-page report on NQ (the "October 2013 Report").  As the October 2013 Report detailed, NQ – unbeknownst to Lead Plaintiffs or the Class members – had been engaging in a massive fraud by, *inter alia*, routinely overstating its financial and operational performance,

while also concealing numerous material adverse facts concerning its business, operations, and core products.  As described in the October 2013 Report, as well as a subsequent Muddy Waters letter and accompanying 41-page report to PwC-ZT and PwC-IL dated January 14, 2014 (collectively, the "January 2014 Report"), NQ's fraud included at least the following elements as set forth in §§A-E.

### A.  NQ's Fraudulent Recognition of Revenue from Within China

48.    NQ purports to generate the bulk of its revenue from within China, and it attributes the sources of its China-generated revenues to three different revenue channels:  (i) "carrier billing" (consisting of NQ's receipt of payments from mobile carriers and mobile "service providers" ("SPs"), who collect payments and then pass them on, less the SP's own fees, to NQ); (ii) direct third-party payment (consisting of NQ's receipt of payments in China through third-party payment service providers such as Alipay, Tenpay, and Yeepay); and (iii) prepaid cards (which end-users can buy from third-party vendors and use to pay for NQ services).  NQ materially overstated its reported revenue from all three of these channels.

### (a)    NQ Materially Inflated Its Reported "Carrier Billing" Channel Revenue by Well over 50% by Recognizing Phony Revenue from a Shell Entity, YDT, that NQ Secretly Controlled

49.    For example, NQ reported that of its total 2012 China-generated revenues of $32.2 million, its "carrier billing" channel generated total revenues of $27.9 million.  NQ further attributed $20.2 million of its $27.9 "carrier billing" revenue in 2012 to a single Chinese service provider – YDT.  However, YDT – which is purportedly NQ's biggest customer – is actually a shell entity, with no discernible operations, that NQ secretly controls.    Accordingly, even assuming that NQ's other, non-YDT related carrier billing revenue is legitimate, roughly 70% of NQ's reported "carrier billing" revenue of $27.9 million (and roughly 62% of NQ's reported total security software revenue of $32.2 million) for 2012 was fraudulent.

50.    Indeed, a review of YDT's own financial statements filed with China's State Administration for Industry and Commerce ("SAIC") confirms that nearly all of the revenue NQ

reported receiving through YDT in 2012 is fraudulent.  For example, for NQ to have generated the claimed $20.2 million in revenue from YDT in 2012, YDT itself would have had to have generated at least that much gross revenue itself because (i) NQ receives its revenue from YDT net of YDT's fees, and (ii) People's Republic of China accounting standards mandate that YDT book as "revenue" *all* gross funds it receives from the carriers.[2]  According to its SAIC financials, however, YDT generated only $2.9 million in total gross revenue in 2012 – *which is only 14% of the $20.2 million that NQ fraudulently claimed to have generated in revenue from YDT in 2012.*  In other words, at least $17.3 million ($20.2 million less $2.9 million) of NQ's domestic carrier billing revenue was phony.

51.     Similarly, as reported in a supplemental Muddy Waters report dated October 29, 2013 (the "Supplemental October 2013 Report"), YDT's 2012 SAIC financial statements reported that YDT had *total* "accounts payable" of $3.4 million as of December 31, 2012 – a number  which does not come close to agreeing with NQ's stated "accounts receivable" of $9.3 million from YDT alone as of December 31, 2012 (as reported in NQ's Form 20-F for 2012), even if one were to assume that all of YDT's reported accounts payable were owed to NQ.

52.     NQ data showing that its "Days Sales Outstanding" ("DSO") from YDT stood at 167 days as of December 31, 2012 (as well as data showing that its DSOs were 158 in the first quarter of 2013 and 145 in the second quarter of 2013) constitutes another "red flag" indicative of fraudulent revenue recognition by NQ, especially since the purported contract between NQ and YDT – attached to NQ's 2012 Form 20-F at Exh. 10.11, p.6 – requires settlement within 30 days.

---

[2]     People's Republic of China Generally Accepted Accounting Principles, which is the basis on which SAIC financial statements are prepared, requires YDT to book revenue on a *gross* basis because NQ is not a party to the contracts between YDT and the mobile carriers.  An SP such as YDT will then separately record the portion of its [gross] revenues that it forwards to an entity such as NQ as "costs of sales."  That YDT records revenue on a gross basis is further confirmed by YDT's payment of business tax in 2012 – which is paid on gross revenue – as YDT's business tax payment of $97,000 for 2012 equaled its reported [gross] revenue of $2.9 million, multiplied by China's 3.3% business tax rate.

53.     It is also highly suspicious that NQ would ever retain YDT as an SP to facilitate NQ's collection of fees from carriers in China in the first place, given that NQ itself, through its NQ Beijing subsidiary, has been a licensed SP in China since 2007.  In other words, there is no good reason why NQ would retain a "third party" such as YDT to provide such services (let alone provide YDT with millions of dollars in interest-free loans, as discussed below) when NQ could have effectively "eliminated the middleman" and provided these services itself – unless, of course, NQ was looking to facilitate the fabrication of receivables from a dependent entity that it could use as a pawn in its fraudulent scheme.[3]

54.     Indeed, as the October 2013 and January 2014 Reports also describe, YDT does not appear to have any *bona fide* physical operations, let alone facilities that are capable of processing billing and collections on tens of millions of purported transactions for NQ.  For example, site visits to 10 locations across China at which YDT purportedly had an office (which were identified based on addresses provided in YDT's SAIC files, YDT's website, NQ's SEC filings and/or online research), revealed that:

- in five of ten cases – ***including in the case of the address given on YDT's "Contact Us" web page*** – the addresses did not physically exist (*i.e.*, there was no such building or office at the purported location);

- in four of ten cases, the address existed, but nobody there had ever heard of YDT; and

- at the remaining address, in Tianjin, building management confirmed that YDT currently rented "room 502-2," but the room (which was located off a narrow, dingy hallway) was vacant, there was no YDT signage

---

[3]     It is generally much easier to fool an auditor if one can produce "evidence" of a few receipts for relatively large amounts of revenue from a single cooperating "third party"; in contrast, it is much more burdensome for a fraudster to create and maintain phony paperwork to "document" the generation of an equivalent amount of revenue from thousands or millions of purported end-user transactions. Moreover, as stated in the October 2013 Report, it has become much harder for even legitimate SPs to compete on price in China since the late 2000s because of the recent proliferation in China of direct third-party payment processors such as Alipay, which generally allow content providers (such as NQ) to keep about 95% of the gross revenue from end-users (consumers), as compared to typical SPs, which allow content providers to keep only 80% or less of the gross revenue.

on the building, YDT was not listed in the building directory, no one in neighboring offices had ever heard of YDT, and the building manager confirmed that "nobody" from YDT worked there.

Because it is illegal to provide false information to China's SAIC, the most likely explanation for YDT's multiple "ghost" addresses is that they were used to create the false impression that YDT had meaningful business operations.

55.    In response to the October 2013 Report, *Bloomberg News* reported on November 3, 2013 that it had spoken to YDT's 75%-majority owner, Xu Rong, and that she had told *Bloomberg* that YDT's "main operating facility" was located at another site – not listed on YDT's website or filings – in a business park southwest of Beijing.  However, upon visiting the site of YDT's purported "main operating facility," *Bloomberg* reported that it found roughly 15 purported YDT "employees" who were "sharing space" with nearly 200 employees of a *different* company, Jiuhe Tianxia Beijing Technology Co. (commonly known as "9H"), which was also owned by Xu Rong.  ***Moreover, the building's office directory – which purportedly houses YDT's "main operating facility" – contained no listing for YDT, and the two guards at the first floor security desk told Bloomberg that "they'd never heard of [YDT]."***  [Emphasis added.]

56.    An investor who had touted NQ on an investor website in the U.S. later posted a photograph of nine purported YDT "employees" at "work" at this office.  However, as the January 2014 Report further noted: (i) of four computer screens visible in the photo, two were blank (*i.e.,* the YDT "employees" were staring into blank computer wallpaper); (ii) there were no telephones visible on any of the desks of the purported YDT "employees," and (iii) there were no visible paper files or filing cabinets in the YDT "office."  When Muddy Waters personnel visited the same site in November 2013, they found even fewer purported YDT "employees" (just four) manning YDT's purported "main operating facility."  As the January 2014 Report concluded, it defies credulity to believe that an entity such as YDT could (as NQ avers) process tens of

millions of dollars of transactions for NQ (or YDT's other alleged "customers")[4] out of a building where it is not listed, where the building's employees could not recall having ever received even a single visitor or package for YDT (even though the building requires visitors to check in with security and the elevators require a security pass for a visitor to operate), and where the four to 15 purported YDT "employees" that are displayed for visitors to the site do not have phones or filing cabinets, and spend time staring into blank computer screens.

57.      Although YDT's Xu Rong told *Bloomberg News* that she "[did]n't think it's difficult to find me," the January 2014 Report points out that YDT's own website listed a non-existent "ghost" address for YDT (rather than the address of the Potemkin "main operating facility" within 9H's offices, as discussed above), and did not even list a phone number for YDT.

58.      In addition, numerous additional factors confirm that YDT is a shell entity that is a related party of – and mere instrumentality of – NQ, and that it has no meaningful independent operations or infrastructure of its own.  For example, as described in the October 2013 and January 2014 Reports:

- Although YDT is supposedly NQ's largest service provider and processes roughly 72% of NQ's "carrier billing" in China, when Muddy Waters tried to sign up in the fall of 2013 for fee-for-use NQ mobile apps via carrier billing in 11 different Chinese provinces (including all four of NQ's largest provincial markets) YDT ***never*** came up as the "service provider."  Instead, NQ itself and two other Chinese SPs – UMPay and Unisk – came up as the SP;

- YDT's email server and NQ's email server are the ***same***;

- As of December 2011, the Guangdong branch of China Mobile showed that YDT and NQ were both based at NQ's Beijing office, with the same phone numbers and the same contact person;

- A list of SPs that China Mobile publishes for Fujian province shows that ***YDT's telephone and fax numbers are the <u>same</u> as those listed for NQ*** on the "contact us" page of NQ's Chinese website;

---

[4]      YDT owner Xu Rong told *Bloomberg News* that about 60% of YDT's sales involved NQ, with the other 40% of its revenues purportedly coming from other mobile app developers and game content providers that she declined to identify.

- The customer service phone number that YDT provided to China's Ministry of Industry and Information Technology ("MIIT") is the *same* as NQ's customer service number – *and NQ customer service representatives (rather than anyone identified as being with YDT) answered this number when dialed*;

- YDT and NQ both gave a Zhejiang government registry the name of the same employee, Wang Qiu, as their official contact person.  However, Wang Qui actually appears to be an *NQ* employee, as both YDT and NQ gave NQ's phone number as Mr. Wang's contact number;  and

- The YDT company information sheet contained in YDT's Shanghai SAIC files lists an NQ email address – xuying@netqin.com – as YDT's  email contact ("Net Qin" is NQ's former name).

59.     Significantly, to the extent that YDT has any operations at all, it seems likely that they exist only because of NQ's highly suspicious history of providing substantial financial support to YDT.   Indeed, according to NQ's own SEC filings, NQ provided YDT with significant "advances" from NQ every year from 2007  to 2011, inclusive, in an aggregate amount of roughly $5.0 million.

60.     Furthermore, YDT's 75% majority owner, Xu Rong, is a previous NQ executive.  NQ has gone to great lengths to convince investors that there was no overlap between Xu Rong's time at NQ and her time at YDT, but has repeatedly lied about the nature and timing of her relationships with both companies.  As recently as August 2013, NQ claimed that Xu Rong had served as a marketing "consultant" to NQ for only six months before leaving in mid-2007 to buy her stake in YDT (which echoed NQ's statement in its May 5, 2011 IPO Prospectus that stated only that YDT's principal shareholder was a paid "consultant" between 2006 and 2007).  However, a May 20, 2008 Sina.com news article about a Red Cross benefit for earthquake victims shows a picture of "NQ Senior Vice President Ms. Rong Xu" presenting a donation on behalf of NQ.  Moreover, *after* the publication of the October 2013 Report, NQ changed its story and belatedly admitted on a conference call that (i) Xu Rong had indeed been an NQ officer (and not a mere NQ "consultant"), and that (ii) she had left NQ not in mid-2007, but roughly 18 months later in December 2008.  In addition, although NQ avers that Xu Rong did not join *YDT*

until mid-2007, YDT's SAIC file states that Xu Rong became YDT's Executive Director in *February 2006*. In sum, far from having had no overlap at the two companies, Xu Rong was an executive at both entities for well over a year, including during the 2007 to 2008 period when NQ began to make its highly suspicious loans to YDT.

61.     YDT's 75% majority owner and Executive Director, Xu Rong, is also entangled with NQ "co-founder" (and Board of Directors member) Zhou Xu. For example, Zhou Xu and Xu Rong co-own 9H – YDT's purported landlord – and they apparently both have offices there. Xu Rong and NQ director Zhou Xu also co-founded Yiteng Beijing Technology Co. Ltd. ("Yiteng"), an entity which came to own 25% of NQ's VIE (Beijing NQ Technology) in 2006. Xu Rong continues to serve as a supervisor (director) of Yiteng – where one of her fellow Yiteng directors and shareholders is Ma Jun, who is also a part-owner of YDT. The January 2014 Report further cites to a November 3, 2013 *Phoenix New Media* (China) article titled "Getting to the Bottom of NQ's Bizarre Road to Riches," which concludes that Zhou Xu – in addition to being an NQ director and beneficial owner of 19.9% of NQ's outstanding common stock (with total voting power of 42.1% per NQ's 2012 Form 20-F) – is the real power behind the throne at both NQ and YDT.

62.     In sum, YDT is (and has been since at least mid-2007) a shell entity, run by a former NQ executive and crony of powerful NQ insiders, whose primary purpose is to facilitate NQ's efforts to inflate NQ's reported revenues and purported financial performance.

### (b)     NQ Materially Inflated Its Chinese Third-Party Payment and Prepaid Card Channel Revenues

63.     Historically, NQ has not separately reported the amounts of revenue it purportedly receives from its "third-party payment" and "prepaid card" channels in China, although NQ management has stated that NQ's combined third-party payment and prepaid card revenue was between $4 million and $10 million in 2012. In reality, however, neither of these two channels has provided significant revenue to NQ.

64.     For example, according to the October 2013 Report, Muddy Waters personnel made 59 attempts to make payments to NQ through third-party payment services via NQ's payment portal (http:/pay.nq.com), including through Alipay and Tenpay (China's two largest third-party payment services) and several Chinese banks, between September 26 and October 18, 2013.  They were unsuccessful each time.   Moreover, when they called Alipay and Tenpay customer service for assistance, neither was able to make NQ's payment portal work, and these customer service personnel confirmed that the problem was with NQ (rather than with Alipay or Tenpay).  It thus appears that the primary purpose of NQ's payment portal has been to create a false appearance of legitimacy for a portal that does not actually process payments.

65.     Similarly, NQ generates only marginal revenue from its prepaid card channel. Prepaid cards consist of scratch-off cards and activation codes.   However, NQ's prepaid cards have not been widely available in China during the Class Period and, of the few locations that have actually sold them, sales appear to be marginal at best.

66.     For example, after Muddy Waters personnel made four calls to NQ customer service in the fall of 2013 to try to identify places where one could purchase prepaid NQ cards in Beijing, Shanghai, and Guangzhou (three of China's largest cities), NQ's customer service ***did not even know*** whether there were ***any*** NQ card sellers in those cities, let alone who they might be or where they were located.   Nonetheless, through mid-October 2013, NQ customer service went to the effort of following up with later text messages or phone messages that (i) identified the location of a vendor in Guangzhou, (ii) identified what it described as the ***only*** vendor of NQ prepaid cards in Beijing, and (iii) confirmed that NQ had ***no*** card vendors in Shanghai.

67.     Moreover, according to the October 2013 Report, visits to the sole identified NQ vendors  in Beijing and Guangzhou confirmed the lack of  any meaningful demand for  NQ prepaid cards.  For example, the Beijing vendor, who operated out of a kiosk in the basement of a computer mall, stated that he did not sell many cards and that he only sold them because NQ personnel were old friends of the family and he wanted to "help them out."    Similarly, NQ's

Guangzhou card vendor, who operated a roughly 100 square foot stall in a mall that sold scarves and jewelry as well as cell phone accessories, reported that he sold only a few cards. That vendor also stated that he did not think that many other retailers would be interested in selling them because the profit margin on them was so low. In addition, many of the cards for sale at both the Guangzhou stall and the Beijing kiosk bore NQ's old corporate logo (as opposed to the current NQ logo, which has been in use since June 2011), thereby further evidencing the low sell through rate for NQ cards in these locations.

68.     In response to the October 2013 Report, NQ claimed in its October 25 conference call that it sells 600,000 prepaid cards per month at an average net monthly revenue of $0.60 each (which would equate to annual revenue of roughly $4.3 million), through roughly 5,000 stores. However, as noted in the January 2014 Report, NQ has never published a list of those stores, and in October 2013, it provided only a list consisting of the names of three of its purported "leading retailers" in each of five different cities. Tellingly, as the January 2014 Report further noted, the three Beijing locations were all located in kiosks in the same Beijing mall, and the three Guangzhou locations were all located in kiosks in the same Guangzhou mall. Moreover, several of the photos that NQ provided of its alleged NQ vendors again showed pictures of NQ cards bearing NQ's old logo or showed oddly hung NQ signage that suggested that it had only been recently (and temporarily) installed (*e.g.*, signage hung in front of an illuminated sign immediately behind the NQ sign).

69.     In addition, according to both the October 2013 and January 2014 Reports, there are only three stores on China's Taobao Marketplace (which is owned by Alibaba, a large Chinese website similar to eBay and Amazon) that even sell NQ cards. The combined sales for those three stores showed sales for the first 10 months of 2013 of only about 40 NQ cards, for total revenue of only about $115 – thus further belying the notion that there is any meaningful demand for NQ prepaid cards in China.

70.     Finally, the October 2013 Report found that, even if one is able to locate a prepaid NQ card, NQ only allows an account holder to use a prepaid card once before being converted to carrier billing – thus further assuring that NQ's actual prepaid card revenue is insignificant.

**B. NQ Also Materially Inflated Its Reported International (*i.e.,* Non-China) Revenue**

71.     NQ reported international security app revenue of $35.7 million in 2012.  As the October 2013 Report concluded, NQ's purported international revenue is "absurd[ly]" overstated.

72.     Although NQ does not report its revenue by specific international markets, it has generally stated that it derives most of its international revenue from Southeast Asia and the Middle East, and in response to the October 2013 Report, it published a list of its purported "higher performing" international SPs.  That list included SPs for six listed Middle Eastern countries:  Saudi Arabia, the United Arab Emirates, Qatar, Egypt, Jordan, and Turkey.  However, as per the January 2014 Report, NQ's Saudi Arabian website is NQ's ***only*** Arabic website – there were ***no*** NQ websites in the UAE, Qatar, Egypt, Jordan, or Turkey as of the end of 2013.  Moreover, even NQ's Saudi Arabian website did not appear to have been updated for several years, as it (i) prominently featured an outdated version of NQ's antivirus software that was no longer being marketed anywhere else, (ii) used the old NQ logo that had been replaced more than two years earlier in June 2011, and (iii) had no news releases dated later than 2011.

73.     NQ's list of "higher performing" SPs also included SPs for seven listed Southeast Asian countries:  Thailand, Malaysia, Vietnam, Singapore, India, Indonesia, and the Philippines.  However, as the January 2014 Report pointed out, Vietnam was the only Southeast Asian country on this list that had an NQ website as of the end of 2013, as none could be found in Thailand, Malaysia, Singapore, India, Indonesia, or the Philippines.

24

74.     In sum, without spending any money in building and maintaining local language websites for its highly touted Middle Eastern and Southeast Asian markets (other than possibly Vietnam), NQ nonetheless purported to have developed a robust market for its products in numerous, diverse international markets.  As the January 2014 Report stated:

> NQ's emerging market customers are evidently so well informed about NQ's products and so desirous of them that they flock to pay for NQ apps regardless of whether there is a website.

> On the other hand, NQ's [2012] 20-F states that its website is an integral part of its "viral" marketing, rendering it unclear as to how NQ could have become so successful overseas (other than by reporting fraudulent revenues):

>> "Viral Marketing:   A significant percentage of our users come from our own user acquisition channel, namely our Internet and mobile Internet website.  These users learn of our services through existing user referrals.  We expect the viral marketing channel to continue to account for a significant portion of our user acquisition in the foreseeable future." [quoting NQ Form 20-F at p. 45]

75.     NQ's purported success in emerging markets is all the more suspect and not credible in that NQ is an outlier in terms of its purported ability to sell into such markets, as compared to its more established competitors.  For example, the January 2014 Report points out that leading mobile security app companies such as McAfee, Lookout, AVG, and Kaspersky have all been unable to generate revenues of more than $10 million in annual mobile security app revenues *globally*, despite two of those companies having sizable existing user bases of PC antivirus software.   Tellingly, NQ also reports that it has zero long-lived assets outside of China and had only $5.5 million of its $149.5 million in cash (as of September 30, 2013) located outside of China.

76.     As for NQ's revenue generation in the U.S. – where NQ has apparently had a much harder time generating profits than in emerging markets – the October 2013 Report also concluded that NQ's reported revenues were overstated.  For example, Muddy Waters' site visits

or calls to 84 NQ retail locations in the U.S. that purportedly sell NQ products indicated that NQ's "attachment rates" (*i.e.*, the percentage of the retailers' new phone-buying customers who actually bought an NQ product or app) are only in the range of 2%-3%, with many such retailers reporting that no more than one customer per month actually bought any NQ products.

### C. NQ Materially Inflated Its Reported Share of the Chinese Market for Mobile Security "Apps"

77.     NQ claims that its security apps are on approximately 55% of smart phones in China.   However, two independent market research firms, iiMedia and RedTech, have both pegged NQ's market share to be far below what NQ represents.  According to Muddy Waters, its surveys have found that NQ had a market share close to 1%, meaning that its paying user base in China is estimated to be less than 250,000 versus the approximately six million claimed by NQ.

78.     Although NQ claims that its market share of the China security app market is approximately 55%, one of NQ's well-known competitors, Qihoo 360, reports that its market share is 70%.  A survey of over 800 respondents from five Chinese cities also shows that NQ's share of the China mobile security app market is far lower than the 55% publicly touted by NQ. The results of that survey showed that Qihoo 360 had a 73.5% market share, Tencent Holding had a 15.7% market share, Kingsoft Corp. had a 4.9% market share, and all "others" combined (including NQ) had in aggregate a 3.8% market share.

79.     As the October 2013 Report stated, the 800-respondent survey is large enough to reject with 95% confidence an alternative null hypothesis that NQ's market is anywhere near the levels that NQ has claimed.  Moreover, the survey focused on cities where NQ should have its strongest market share, such as Beijing, Ningbo, and Huzhou.  Beijing is NQ's hometown, and Ningbo and Huzhou are both in the Zhejian province of China – an area where NQ previously announced its first major nationwide sales promotion and where it had allegedly established an

agreement with the Zhejiang branch of China's National Postal and Telecommunications ("PTAC") to pair up NQ software with 3G cell phones that PTAC was distributing.

80.     As the October 2013 Report found, visits to retailers also confirm that NQ's market share is far lower than what Defendants have publicly represented.  For example, Muddy Waters' examination of 113 cell phones at various stores across five cities in China concluded that NQ's market share of pre-installed or "bundled" software is nearly non-existent, as 54.0% of phones examined did not have any anti-virus software on them, and only four of 113 phones (3.5%) had NQ's basic security software installed.  Moreover, two of those four phones, which were for sale in Beijing, had originally been display phones – and ***none*** of the other phones of the same model (a Samsung model) that were offered for sale in that store had any NQ software "bundled" with it.  Significantly, all of the NQ-bundled phones (with one exception) were also loaded with Tencent's antivirus software – an entity that (as the data cited above in this section shows) has a vastly higher market share than NQ.

81.     Data obtained by Muddy Waters from two of China's largest independent app stores, representing over 200 million downloads of security apps, also confirm that NQ has a far lower market share than NQ claims.   For example, NQ's percentage of total mobile security downloads on Chinese app store Wandoujia, as of October 20, 2013, was a mere 0.42% (in addition, out of 25 different security apps, NQ had some of the worst user feedback, with "Likes" (as a percentage of all comments) of  only 29.66%).  Data from another Chinese app store, 91 Zhu Shou, similarly showed that NQ's true market share is a fraction of what NQ has claimed, as NQ's security app accounted for only 1% of the mobile security app downloads as of October 20, 2013.

82.     Additional sources identified by Muddy Waters further confirm that NQ has misrepresented its market share.  For example, a recently released mobile security market share report in China for Q1 of 2014 conducted by CNIT Research shows that NQ has very little, if any, market share.   The report stated that competitors Qihoo 360 had market share of 34.6%, Tencent had 27.6%, Baidu had 18.20%, and Cheetah Mobile had 5.20% market share.  NQ is nowhere to be found in the top seven in this market share report, meaning NQ's market share for mobile security apps in China could be no greater than 3% based on that report.

**D.  NQ's Has Materially Inflated Its Reported Cash Balances**

83.     As the October 2013 and January 2014 Reports also concluded, NQ's reported cash balances have been materially overstated and materially less than the $127.9 million in cash, cash equivalents, and short-term investments that NQ reported having as of December 31, 2012 were actually in the Company's accounts.

84.     In particular, the January 2014 Report concluded that NQ's VIE's cash balance had been overstated by at least $47 million.    Although NQ claims to have transferred approximately $47 million in IPO proceeds directly to its VIE, such a transfer would contravene China's capital controls. Given the implausibility of NQ's assertions that roughly $47 million of its May 2011 IPO proceeds have been transferred to the accounts of its VIE, as the January 2014 Report concluded, it appears to be much more likely that a material portion of NQ's  IPO proceeds have been diverted to friendly third parties who have "round-tripped" off-the-books cash payments received *from* NQ back *to* NQ in the form of phony "payments" for NQ services (which NQ has fraudulently reported as "revenue").

85.     As the January 2014 Report found, the earlier October 2013 Report's conclusion that NQ had manipulated and inflated its reported cash/short term investment balances is also

confirmed by the purported "evidence" that NQ produced in response to the October 2013
Report in an effort to "prove" that its VIE (Beijing NQ Technology) did in fact hold
approximately $114 million (¥758 million) in short term "term deposits" with two banks
(Industrial Bank Co. Ltd. Beijing and Bank of Jiangsu) in China.  More specifically, on October
25, 2013, NQ produced the following table, which included a listing – by depositary bank,
amount, interest rate, term length, and maturity date – for each of its VIE's purported term
deposits:

**Table of Major Term Deposits:**

| | Bank Name | Company Name | Account NO. | Balance | Interest Rate | Term Deposit Type | Maturity Date |
|---|---|---|---|---|---|---|---|
| 1 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX349 | ¥ 44,700,000.00 | 2.50% | One-year term deposit | 2013/10/29 |
| 2 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX662 | ¥ 90,000,000.00 | 3.30% | One-year term deposit | 2013/11/9 |
| 3 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX447 | ¥ 85,000,000.00 | 3.30% | One-year term deposit | 2014/1/24 |
| 4 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX121 | ¥ 31,000,000.00 | 3.30% | One-year term deposit | 2014/3/8 |
| 5 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX382 | ¥ 40,000,000.00 | 3.30% | One-year term deposit | 2014/4/17 |
| 6 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX133 | ¥ 90,000,000.00 | 3.50% | One-year term deposit | 2014/4/18 |
| 7 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX319 | ¥ 40,000,000.00 | 3.30% | One-year term deposit | 2014/5/6 |
| 8 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX148 | ¥ 55,300,000.00 | 3.575% | One-year term deposit | 2014/6/28 |
| 9 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX262 | ¥ 44,700,000.00 | 3.575% | One-year term deposit | 2014/6/28 |
| 10 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX981 | ¥ 57,300,000.00 | 3.30% | One-year term deposit | 2014/7/19 |
| 11 | Industrial Bank Co. Ltd Beijing Dongdan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXXXXXX347 | ¥ 100,000,000.00 | 3.30% | One-year term deposit | 2014/9/16 |
| 12 | Bank of Jiangsu Xisanhuan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXX089 | ¥ 30,000,000.00 | 3.30% | One-year term deposit | 2014/6/21 |
| 13 | Bank of Jiangsu Xisanhuan Branch | Beijing NQ Technology Co., Ltd(PRC) | XXXXXXXXXX949 | ¥ 50,000,000.00 | 3.30% | One-year term deposit | 2014/10/9 |
| 14 | Standard Chartered Bank Hong Kong Branch | NQ MOBILE INC | XXXXXXXX997 | $166,462,493.00 | 0.36% | One-month term deposit | 2013/11/18 |

86.     However, the stated interest rates for five of the 14 term deposits (or roughly 35%
of the entries) on the list provided by NQ have material anomalies that are strongly indicative of
fraud.  In particular, the stated "interest rate" for the "term deposits" listed at items 1, 6, 8, 9, and
12 do not agree with the listed rates offered by the banks in question as of the dates on which the
deposits were purportedly made.  For example, as of 10/29/12 when NQ's VIE purportedly made
a ¥44.7 million one-year term deposit with the Industrial Bank Co, Ltd. Beijing, the interest rate

for such deposits was not 2.5% as stated on NQ's chart, but was, according to the bank's website, 3.3%.  *See also* article dated April 7, 2014 entitled "NQ's Term Deposits:  Too Many Problems to Be Believable" (hereafter "April 2014 article").[5]

87.     In addition, the April 2014 article also describes how each of the two sample "term deposit" vouchers (one form for each bank) that NQ made available on October 26, 2013 are highly irregular and appear to be forgeries.  First, the purportedly "official" bank stamps on the vouchers appear to be of poor quality, with the text of the stamp enclosed in an irregular circle (rather than a clean, crisp circle as would be expected on an authentic bank-quality stamp in China).  Second, the sample Bank of Jiangsu bank voucher for ¥50,000,000 that NQ produced is not a customer copy, but states on its face in Chinese that it is a "bank copy" when, according to the April 2014 article it would be "totally impossible" for a customer to have a "bank copy" of a legitimate deposit receipt absent fraud.  Third, even if it is authentic, the Bank of Jiangsu bank voucher is not of the form used when making an unencumbered term deposit at a Chinese bank, but is instead the form (or, more specifically, the bank's copy of the form) used when a depositor makes a term deposit at one bank and then pledges that deposit as security for a loan at another bank.   But that begs the question of why (assuming *arguendo* the Bank of Jiangsu deposit voucher is legitimate) the cash-rich NQ VIE would be borrowing ¥50,000,000 at all, and, if so, why the need for such a loan was not disclosed.

E.     **NQ's Security Software Makes Users' Phones Susceptible to Malware**

88.     As the October 2013 Report also found, one of NQ's main products, Antivirus 7.0, is unsafe for sale to consumers and is more aptly considered spyware than security software.

---

[5]     Available at http://seekingalpha.com/instablog/25120193-julianne-cao-hushmail-com/2810733-nqs-term-deposits-too-many-problems-to-be-believable at 4 (visited July 21, 2014).

The October 2013 Report stated that Muddy Waters had hired specialized software engineers to review the application's code and had found that the application created serious vulnerabilities, making users' phones prone to data compromise and cyber-attack by hackers or the Chinese government.  In other words, users' phones are much more susceptible to compromise or attack with NQ's Antivirus 7.0 than with nothing at all.  One way NQ's software makes users' phones more susceptible to attacks is that the applications send far more data than necessary to their server in China.   This data includes information on all URLs a user visits and location information (among other sensitive items).  The uploaded data is not sent securely (let alone in accordance with industry standards), despite passing through the Chinese government's firewall, which is believed to view and store all passing data.  NQ sends this data to a third-party analytics firm in China.  Downloads are even less secure with NQ's applications.  The application does not require signatures, making the phone highly vulnerable to third parties uploading malware.  The engineers who reviewed NQ's application code successfully staged such an attack.  After their analysis, the engineers noted that these vulnerabilities could be deliberate because the techniques vary so widely from industry standards.

89.     However, as detailed in §VII below, rather than disclose the truth concerning NQ's financial performance and condition, business, and core products, throughout the Class Period the Defendants consistently painted a materially false and misleading picture of NQ's affairs.

90.     Similarly, *Bloomberg News* reported on November 4, 2013 that it had obtained a copy of the independent software engineers' report, which it identified as having been prepared by Via Forensics.  *Bloomberg* also quoted Via Forensics' director of research and development as stating: "The concern is the security [on NQ's app] is very poor."

31

## V.   THE PUBLICATION OF THE OCTOBER 2013 REPORT AND SUBSEQUENT DISCLOSURES CONCERNING THE TRUTH ABOUT NQ

91.     On October 24, 2013, and as discussed in the immediately preceding section, Muddy Waters released its 81-page October 2013 Report describing how NQ had engaged in massive fraud by, among other things:

(i)     reporting grossly inflated revenue from its purported sales of mobile security applications in China;

(ii)    reporting grossly inflated revenue from its purported sales of mobile security applications outside of China;

(iii)   massively overstating the size of its paid user base and NQ's share of the Chinese mobile internet services market;

(iv)    reporting inflated and falsified cash, cash equivalent, term deposits and short-term investment balances of $127.9 million as of December 31, 2012; and

(v)     fraudulently touting the allegedly positive characteristics of NQ's mobile security software without disclosing that its security apps are more akin to malware than actual security software.

92.     In response to these stunning disclosures, on October 24, 2013, the price of NQ shares plummeted, falling $10.79 (or more than 47% from its closing price of $22.88 on October 23, 2013) to only $12.09 at the close on October 24, 2013, on record volume for the stock of over 23 million shares traded.   Indeed, the volume was so heavy that the NYSE temporarily suspended trading in NQ shares.

93.     On October 25, 2013, NQ issued multiple press releases denying that it had made any materially false or misleading statements concerning its business or operations, and its senior officers conducted a conference call to try to falsely reassure investors that NQ's previously reported financial results were accurate and reliable.  It also announced that its Board had formed a "Special Committee," chaired by the head of its Audit Committee, to investigate the findings of the October 2013 Report.   Despite these efforts, after NQ shares resumed trading later that afternoon, NQ's share price fell a further 12% to $10.63 per  share – representing a staggering two-day decline of roughly 56%.

94.     On November 1, 2013, NQ announced that its Special Committee had retained certain outside lawyers and accountants to assist it (collectively, the "Special Committee Team"). The Defendants also attempted to restore investor confidence by announcing that members of NQ's senior management would "use their personal funds" to buy up to $3 million worth of NQ shares over the next six months.   Thereafter, over the next several months, the Defendants continued to try to assure investors that its previously reported financial results were accurate and reliable, that the October 2013 Report was without merit, and that NQ was continuing to generate "record" revenues.   In response to these false assurances, the price of NQ shares partially recovered in the first quarter of 2014 to trade as high as $21.39 on March 4, 2014, and the fraud continued.

95.     In the spring of 2014, however, additional information regarding the true state of NQ's business became public.   For example, on Friday, April 11, 2014, Defendants issued a press release that again falsely attempted to reassure investors that its operations were healthy. That press release announced, *inter alia,* that NQ's revenue for the 4q 2013 had risen 126% year over year, to $67.9 million, and that its "adjusted net income" had grown 20.8% year over year to $14.9 million (or $0.22 per diluted share).   At the same time, NQ's press release announced that overall NQ had had negative operating cash flow and a net loss for the quarter – and the press release also left investors uncertain as to state of NQ's as-yet unreleased audited financial statements for 2013.   Accordingly, on April 11, 2014, the price of NQ stock declined roughly 20%, from $15.99 to $12.70, on heavy volume.

96.     On April 14, 2014, Muddy Waters published a research report entitled "NQ: You Can't Fool All of the People All of the Time" (the "April 2014 Report") which – like a prior comment by Muddy Waters reported by *Bloomberg* on April 11, 2014 – attributed the disclosure of a GAAP loss and negative operating cash flow for the fourth quarter to significantly increased scrutiny by NQ's auditors in the wake of the evidence of fraud that had engulfed NQ since the issuance of the October 2013 and January 2014 Reports.   As the April 2014 Report stated: "[t]o

understand why NQ's results were much worse than expected, investors need to realize that prior audits of the company were likely not as rigorous, and the extra scrutiny made it harder to fake profits and cash flow in Q4."

97.     In response to the April 2014 Report, the price of NQ stock dropped from $12.70 to $11.05, or approximately 13%, on heavy volume.

98.     On April 30, 2014, NQ filed a notice with the SEC that it was unable to timely file its annual report for 2013 on Form 20-F.  The filing stated that the "Company plans to file the 2013 Form 20-F on or before the extended deadline permitted under Rule 12b-25 under the [1934 Act]."

99.     On May 15, 2014, NQ's extended deadline for it to file its annual report on Form 20-F expired without NQ filing its annual report.  Analysts immediately expressed dismay and renewed concern that the continuing delay in NQ's filing of its annual report was confirmation that NQ had indeed engaged in improper, fraudulent conduct.  As a result, NQ's shares plunged from $10.23 on May 14, 2014 to close on May 15 at only $7.27 on heavy volume – representing a one-day decline of 28.9%, and a total decline since October 24, 2013 of over 68.2%.

100.    On June 4, 2014, NQ announced that its specially-hired Special Committee Team purportedly had not found evidence that NQ had engaged "in the fraudulent conduct alleged by Muddy Waters."  However, the announcement conceded that the Special Committee Team had found that NQ "had some lax internal controls and informal business practices," and further admitted that:

> Despite the [Special Committee] Investigation Team's extensive review of documents and data provided by sources both within and outside the Company, the Investigation Team could not verify that the devices it collected and copied contained all responsive information at the time the copies were made.  ***On many devices, the Investigation Team observed indications that some information might be missing, and the Company's management and staff were unable to provide a credible explanation for what the Investigation Team observed.***  [Emphasis added.]

Moreover, NQ declined to produce the Special Committee's actual report (even in redacted form), nor has NQ produced it as of the filing of this Complaint.

101.    Less than a month later, on July 3, 2014 – the last day of the Class Period and with its Form 20-F still unfiled – NQ issued a press release announcing that the chair of its Audit Committee, Ying Han, was stepping down from her positions on the Board and the Audit Committee.   In addition, the press release stated that PwC-ZT had advised NQ that PwC-ZT would need to perform additional auditing procedures and expand the scope of its work in order to complete the 2013 audit.  In response, the price of NQ shares dropped 32%, from $6.76 to an all-time low of $4.58, on heavy volume of over 35 million shares.

102.    On July 18, 2014, NQ announced that the Company's Audit Committee had "dismissed" PwC-ZT and had retained new auditors, Marcum Bernstein Pinchuk LLP ("MBP") to replace PwC-Zt "with respect to the fiscal year 2013 and subsequent periods."   As the press release further stated:

> PwC[-ZT has] advised the Company and the Audit Committee that the observations referred to in the Company's press release reporting on the Special Committee's Independent Investigation dated June 4, 2014 regarding questions related to electronic data collected by the Investigation Team would require it to expand the scope of its work and, if investigated further, may cause it to be unwilling to rely on management representations in connection with its audit work.

> The Audit Committee has carefully considered the additional procedures proposed by PwC[-ZT].  The Audit Committee notes that PwC[-ZT] informed the Company and Audit Committee that as part of those procedures it would seek among other things information that is not in the possession, custody or control of the Company.  For example, PwC[-ZT] has requested that the Company provide PwC[-ZT] with access to multiple third parties' original bank statements and financial records.

> Furthermore, PwC[-ZT] has advised the Company and the Audit Committee that, depending upon what PwC[-ZT] learns from the procedures performed pursuant to its expanded audit scope, there may be other or additional information that it would need….

The press release further announced that the Audit Committee had decided to retain still further counsel, DLA Piper US LLP, "to advise the Audit Committee in fulfilling its duties."

## VI.   THE   NQ   DEFENDANTS'   MATERIALLY   FALSE   AND   MISLEADING STATEMENTS

103.   During the Class Period, the NQ Defendants made a series of materially false and misleading statements that misrepresented NQ's actual financial performance and condition, concealed Defendants' improper practices and artificially inflated the value of NQ's publicly traded ADS shares.   Among other things, Defendants made statements concerning NQ's financial results, including, *inter alia,* its revenue, income, retained earnings, and earnings per share, which were materially false and misleading due to Defendants' fraudulent revenue recognition scheme, as alleged herein.   Defendants also made materially false and misleading statements concerning NQ's market share and products.

### A. Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's Fourth Quarter and Full Year 2012 Financial Results

104.   After the close of U.S. markets on March 6, 2013, NQ issued a press release (the "3/6/2013 Press Release") announcing its financial results for the Fourth Quarter and FY 2012 (the year and quarter ending December 31, 2012), which was subsequently filed on Form 6-K filed with the SEC on March 8, 2013.   In these materials, NQ reported that its net revenues for FY 2012 had increased 125.6% year-over-year to $91.8 million and that its operating income had increased 52.7% year-over-year to $4.9 million.   It also quoted Defendant Lin as stating "In our first full year as a public company, we grew our revenue by 126% from $41 million to over $92 million."

105.   These statements concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and

improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76); and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

106.    NQ's March 6, 2013 press release further reported that, as of December 31, 2012, the Company had: (i) 5.9 million paying user accounts in China, plus 3.0 million paying user accounts overseas (outside of China); and (ii) combined cash, cash equivalents and term deposits of $120.4 million.

107.    These statements concerning NQ's user base and combined cash, cash equivalents, and term deposits were materially false and misleading because, for the reasons detailed in §§IV.C and D above, they reflected (i) grossly overstated figures concerning the Company's market share and user base (*see* ¶¶77-82) and (ii) grossly inflated combined cash, cash equivalent and term deposits (*see* ¶¶83-87).

108.    Also on March 7, 2013, NQ conducted an investors' conference call to discuss the fourth quarter 2012 results, in which Defendants Lin, Khan, and Ji participated.  Defendants Lin and Khan stated that revenues grew to over $92 million in 2012.  Defendant Khan further stated that the international market accounted for 54% of the Company's consumer security business in the fourth quarter.

109.    These statements concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and

improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

110.    Defendant Ji stated further that the Company's: (i) cumulative registered user accounts reached about 283 million at the end of 2012; (ii) overseas users accounted for 42% of the total registered users; and (iii) the number of average monthly active user accounts was about 98 million for the fourth quarter of 2012.

111.    These statements concerning the Company's user base were materially false and misleading for the reasons detailed in §IV.C above (¶¶77-82), in that they materially overstated the Company's market share and user base.

112.    In response to the false and misleadingly positive information from NQ's 3/6/13 Press Release and related commentary, on March 7, 2013 the price of NQ ADS shares increased 14.1%, to close at $10.01.

113.    On April 19, 2013, NQ filed its Annual Report for 2012 with the SEC on Form 20-F.  The accompanying Sarbanes-Oxley certifications for the 20-F were signed by Defendants Lin, Khan, and Ji.   NQ's 2012 Annual Report reiterated the positive information stated in its March 6, 2013 press release, including that: (i) NQ's revenue in 2012 had increased year-over-year by 126% from $41 million in 2011 to over $92 million in 2012, and that its operating income had increased 52.7% year-over-year in 2012 to $4.9 million; (ii) NQ's net revenues

collected through NQ's largest mobile payment service provider, YDT, accounted for 22.1% of NQ's total net revenues for 2012; (iii) NQ had 5.9 million paying user accounts in China and 3.0 million paying user accounts overseas as of December 31, 2012; (iv) NQ had combined cash, cash equivalents and term deposits of $120.4 million as of December 31, 2012; and (v) NQ had captured a "dominant market share in China's mobile security market."

114.     The foregoing statements from NQ's 2012 Annual Report were materially false and misleading for the same reasons as stated in ¶¶105 and 107 above.

115.     In addition, NQ's 2012 Form 20-F also represented that "[NQ] provides mobile security, privacy and productivity services that are designed to protect users from mobile malware threats, data theft and privacy intrusion, as well as increase productivity."  However, for the reasons set forth in §IV.E above, this statement was materially false and misleading, as it failed to disclose that NQ's primary antivirus software was riddled with security and privacy defects, such that NQ's own "security" software could be described as "malware."

**B. Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's First Quarter 2013 Financial Results**

116.     On May 15, 2013, NQ issued a press release (the "5/15/13 Press Release") entitled "NQ Mobile Inc. Announces First Quarter 2013 Results," which it subsequently filed with the SEC on a Form 6-K on May 20, 2013.  The 5/15/13 Press Release and subsequent May 20 Form 6-K represented that NQ's: (i) net revenues had increased to $33.2 million for the first quarter 2013; (ii) cumulative registered user accounts had increased to 326.6 million; (iii) the number of average monthly active user accounts for the first quarter had increased to 111.1 million; and (iv) the number of average monthly paying user accounts for the quarter had increased to 9.2 million.  It also reported that its combined cash, cash equivalents, and term deposits as of the end of the quarter was $121.8 million.

117.    The 5/15/13 Press Release also quoted Defendant Lin as stating: "I am pleased to report that we started 2013 with a solid first quarter.  We again achieved ***record revenue*** . . ." Defendant Khan was also quoted as stating: "In the first quarter, our consumer mobile security business in the international markets continued its strong growth and accounted for approximately 56% of the total consumer mobile security revenues."

118.    On May 16, 2013, NQ held an investor conference call discussing the first quarter results for 2013 in which Defendants Lin, Khan, and Ji participated.  Defendant Lin reiterated several of the statements made in the 20-F Annual Report, specifically stating that the Company had revenues of $33.2 million for the first quarter 2013 and that the Company had 125 million monthly active users in its consumer business.   Defendant Khan stated that the international markets outside of Greater China account for approximately 56% of the total mobile consumer mobile revenues.    Defendant Khan further reiterated claims that NQ Mobile Security applications maintained a 56% share of accumulative registered users and a 36% market share of active users in the China market in the first quarter of 2013.   Defendant Ji reiterated that the Company's: (i) total net revenues were $33.2 million in the first quarter; (ii) revenue contribution from overseas users accounted for almost 56% of the total consumer mobile security revenues in the first quarter of 2013; (iii) cumulative registered user accounts reached 327 million at the end of the first quarter 2013; (iv) overseas users account for 43% of the total registered users; (v) monthly paying user accounts were $9.2 million for the first quarter; and (vi) overseas paying users account for about 34.4% of the total paying users.

119.    However, the foregoing statements from NQ's 5/15/13 Press Release and May 16, 2013 conference call concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and improperly

40

recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

120.    In addition, the Defendants' statements in the 5/15/13 Press Release and subsequent conference call concerning NQ's user base and combined cash, cash equivalents, and term deposits were materially false and misleading because, for the reasons detailed in §§IV.C and D above, they reflected (i) grossly overstated figures concerning the Company's market share and user base (*see* ¶¶77-82) and (ii) grossly inflated combined cash, cash equivalent and term deposits (*see* ¶¶83-87).

**C.  Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's Second Quarter 2013 Financial Results**

121.    After the close of the market on August 12, 2013, NQ issued a press release (the "8/12/13 Press Release") announcing its Second Quarter 2013 financial results, which it subsequently filed with the SEC on a Form 6-K on August 15, 2013.  The Company's 8/12/13 Press Release and subsequent Form 6-K reported that net revenues for the quarter had increased 107.4% year-over-year to $41.4 million.  The Company also reported that its combined cash, cash equivalents and term deposits amounted to $128.4 million as of June 30, 2013.  The release further reported that for the second quarter (i) NQ's cumulative registered user accounts had increased to 372.2 million; (ii) the number of NQ's average monthly active user accounts for the second quarter had increased to 122.2 million; and (iii) the number of average monthly premium (or "revenue generating") user accounts for the quarter was 11.3 million.

41

122.    The 8/12/13 Press Release quoted Defendant Lin as stating: "I am pleased to report that *we again achieved record revenues in the second quarter of 2013. . . .*" [Emphasis added.]

123.    Later that evening on August 12, 2013, NQ also held an investors conference call to discuss NQ's second quarter results for 2013, in which Defendants Lin, Khan and Ji participated.    During the call, those Defendants reiterated the revenue figures that NQ had previously reported in its press release earlier that day.    For example, Defendant Lin summarized NQ's reported financial results, reiterating that total revenues reached $41.3 million, and stated that "we engaged alone 27 million new user accounts."

124.    In response to these positive announcements, the price of NQ ADS shares was further artificially inflated, as the price of NQ shares surged 22.7% from $15.90 at the close on August 12 to $19.51 at the close on August 13, 2013.

125.    However, the foregoing statements from NQ's 8/12/13 Press Release and subsequent conference call concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

42

126.    In addition, the Defendants' statements in the 8/12/13 Press Release and subsequent conference call concerning NQ's user base and combined cash, cash equivalent, and term deposits were materially false and misleading because, for the reasons detailed in §§IV.C and D above, they reflected (i) grossly overstated figures concerning the Company's market share and user base (*see* ¶¶77-82) and (ii) grossly inflated combined cash, cash equivalent and term deposits (*see* ¶¶83-87).

### D.   Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's Third Quarter 2013 Financial Guidance

127.    On September 20, 2013, NQ issued a press release (the "9/20/13 Press Release"), which it filed with the SEC on Form 6-K on September 24, entitled "NQ Mobile now expects revenues to exceed the top end of its guidance range of $50-51mm for Q3 2013; appoints KB Teo as Chief Financial Officer."  The press release represented that NQ's revenues for the third quarter of 2013 would exceed its previous estimate, and quoted Defendant Khan as stating that "[o]ur business momentum continues and we are excited by the performance of our businesses up to this point in the quarter leading to a better than expected forecast."

128.    However, the foregoing statements concerning NQ's revenue guidance was materially false and misleading because, for the reasons detailed above and in violation of GAAP, they reflected (i) grossly inflated and improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

**E.  NQ's Materially False and Misleading Statements in Connection with the Release of NQ's Financial Results for the First Six Months of 2013**

129.    On October 7, 2013, NQ filed with the SEC a Form 6-K signed and authorized by Defendant Lin attaching NQ's unaudited interim condensed and consolidated (i) balance sheets as of December 31, 2012 and June 30, 2013; (ii) statements of comprehensive income for the six months ended June 30, 2013; (iii) statements of shareholders' equity for the six months ended June 30, 2012 and 2013; (iv) statements of cash flows for the six months ended June 30, 2012 and 2013, and (v) financial statements for the six months ended June 30, 2012 and 2013, which were certified by Defendant Lin.

130.    However, the foregoing balance sheets and statements of cash flows were materially false and misleading because, for the reasons detailed above and in violation of GAAP, they reflected (i) grossly inflated and improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

**F.  Defendants' Materially False and Misleading Denials of the Findings of the October 2013 Muddy Waters Report**

131.    As noted above, Muddy Waters issued its October 2013 Report on October 23, 2013.  In response, NQ embarked on a public relations offensive, which denied all of the October 2013 Report's charges in their entirety.  For example, On October 25, 2013, NQ issued a press release (the "10/25/13 Press Release") which stated that:

44

> The company believes that the allegations and accusations set forth in the Muddy Waters report (the "Report") are false and inaccurate and contain numerous errors of facts, misleading speculations and malicious interpretations of events. Further, the allegations fail to take into account various factors necessary to understand the matters addressed. Finally, the Report makes many misrepresentations about the company, its management team, as well as misrepresentations about its products, business practices and how it interacts with its partners. The company intends to take all appropriate legal actions to defend itself against these charges and to protect the interest of shareholders.

The 10/25/13 Press Release also announced the formation of an independent "Special Committee," chaired by NQ's Audit Committee chair (Ying Han) and three other NQ directors, to review the findings of the Muddy Waters Report

132.    The 10/25/13 Press Release also set forth a table (substantively identical to that reproduced at §IV.D above) which attempted to reassure investors by purporting to list 14 of NQ's major term deposits at banks in China and Hong Kong.

133.    Also on October 25, 2013, NQ held an investor conference call in an attempt to limit the damage from the October 2013 Report, in which Defendants Lin, Khan, Shi and Teo participated.  On this call, NQ representatives categorically denied the findings of the October 2013 Report.  NQ's VP of Capital Markets, Matt Mathison, described the bank accounts set forth in the press release of the same day, and stated, *inter alia,* that NQ clearly and completely disclosed the relationship with YDT in its public disclosures and that the allegations regarding ghost addresses and the SAIC financials were without merit.   During the conference call, Defendant Khan similarly attempted to rebut the allegations regarding NQ's overstated market share, and user base.  Similarly, on October 25, Defendant Khan also appeared on *Bloomberg TV*, where he told *Bloomberg* viewers that Muddy Water's allegations were "completely false."

134.    However, for all of the reasons set forth in §IV above, Defendants' denials of the findings of the October 2013 were materially false and misleading.

### G. Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's Third Quarter 2013 Financial Results

135.    On November 12, 2013, NQ issued a press release (the "11/12/13 Press Release"), which it also filed with the SEC on Form 6-K on November 13, 2013, announcing its financial results for the Third Quarter of 2013.  The 11/12/13 Press Release represented that: (i) NQ's total net revenues were $54.2 million; (ii) NQ's cash, cash equivalents, and term deposits totaled $149.5 million as of September 30, 2013; and (iii) NQ's cumulative registered user accounts and average monthly premium user accounts were 426.6 million and 14.8 million, respectively, as of September 30, 2013.  The 11/12/13 Press Release also quoted Defendant Lin as stating: "We are pleased to report that we once again achieved ***record revenues*** in the third quarter of 2013[.]"

136.    Also on November 12, 2013, NQ held an investor conference call to discuss NQ's 3dQ results for 2013, in which Defendants Lin, Khan, and Teo participated.  During the call, those Defendants reiterated the revenue figures that NQ had previously reported in its press release earlier that day.  For example, Defendant Teo repeated that total revenues reached $54.2 million in the 3dQ.  Defendant Khan reiterated NQ's user base figures, stating that NQ's average monthly premium user accounts totaled 14.8 million in the 3dQ.  Defendant Teo reiterated that: (i) NQ had a combined cash, cash equivalents and term deposits position of $149.5 million, (ii) total net revenues in the third quarter were $54.2 million; and (iii) cumulative registered user accounts grew to 426.6 million at the end of 3dQ 2013.

137.    However, the foregoing statements from NQ's 11/12/13 Press Release and subsequent conference call concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material

46

portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

138.   In addition, the Defendants' statements in the 11/12/13 Press Release and subsequent conference call concerning NQ's user base and combined cash, cash equivalent and terms deposits were materially false and misleading because, for the reasons detailed in §§IV.C and D above, they reflected (i) grossly overstated figures concerning the Company's market share and user base (*see* ¶¶77-82) and (ii) grossly inflated combined cash, cash equivalent and term deposits (*see* ¶¶83-87).

139.   Also on November 12, 2013, NQ issued another press release stating that its senior management, including Defendants Lin, Khan, Shi and Teo, among others, "intend to use their personal funds to purchase up to an aggregate of $3 million worth of the Company's American depositary shares ("ADSs") within six months from November 15, 2013."  However, this statement was materially false and misleading because Defendants actually had no intention of making such purchases, and indeed made no such purchases.

### H. Defendants' Materially False and Misleading Statements in Connection with the Release of NQ's Fourth Quarter 2013 Financial Results

140.   On April 10, 2014, NQ issued a press release (the "4/10/14 Press Release"), which it also filed with the SEC on Form 6-K on April 11, 2014, announcing its unaudited financial results for the Fourth Quarter of 2013 and for the FY ended December 31, 2013.  The 4/10/14 Press Release represented that: (i) NQ's total net revenues for the quarter and year were $67.9 million and $196.7 million, respectively; (ii) NQ's cash, cash equivalents, and term deposits totaled $283 million as of December 31, 2013; and (iii) NQ's cumulative registered user accounts and average monthly premium user accounts were 480.9 million and 15.6 million, respectively, as of December 31, 2013.

141.   The 4/10/14 Press Release also quoted Defendant Lin as stating: "I am pleased to report that we once again achieved record revenues in the fourth quarter of 2013 and for the full year[.]"

142.     Also on April 10, 2014, NQ held an investor conference call to discuss NQ's 4Q results for 2013, in which Defendants Lin, Khan, and Teo participated.  During the call, those Defendants reiterated the revenue figures that NQ had previously reported in its press release earlier that day.  For example, Defendant Teo reiterated that total net revenues in the 4Q were $67.9 million.

143.     However, the foregoing statements from NQ's 4/10/14 Press Release and subsequent conference call concerning NQ's revenue were materially false and misleading because, for the reasons detailed in §§IV.A to IV.B above, they reflected (i) grossly inflated and improperly recognized revenue from NQ's Chinese "carrier billing" channel, including millions of dollars of phony revenue from YDT (*see* ¶¶49-62); (ii) grossly inflated and improperly recognized revenue from its Chinese "third-party payment" and "prepaid card" channels (*see* ¶¶63-70); and (iii) grossly inflated and improperly recognized revenue from its international (non-Chinese) markets (*see* ¶¶71-76), and because they also failed to disclose that a material portion of NQ's "revenue" was generated by a shell entity, YDT, that NQ dominated and controlled (*see* ¶¶49-62).

144.     In addition, the Defendants' statements in the 4/10/14 Press Release and subsequent conference call concerning NQ's user base and combined cash, cash equivalent and terms deposits were materially false and misleading because, for the reasons detailed in §§IV.C and D above, they reflected (i) grossly overstated figures concerning the Company's market share and user base (*see* ¶¶77-82) and (ii) grossly inflated combined cash, cash equivalent and term deposits (*see* ¶¶83-87).

## VII.   DEFENDANT LIN'S AND KHAN'S MATERIALLY FALSE AND MISLEADING SOX AND INTERNAL CONTROLS CERTIFICATIONS

145.     Sections 302 and 906 of SOX require that a public company's principal officers certify their responsibilities for financial reports in each quarterly and annual filing.  Likewise, §404 of SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually.

146.    In an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, §302 of SOX, entitled "Corporate Responsibility for Financial Reports," requires, in relevant part, that

for each company filing periodic reports under section 13(a) or 15(d) of the [1934 Act] . . . the principal executive officer or officers and the principal financial officer or officers . . . [shall] certify in each [such] annual or quarterly report . . . that:

(1)    the signing officer has reviewed the report;

(2)    based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3)    based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4)    the signing officers-

(A)    are responsible for establishing and maintaining internal controls;

(B)    have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

(C)    have evaluated the effectiveness of the issuers internal controls as of a date within 90 days prior to the report; and

(D)    have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date.

(5)    the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)-

(A)    all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

49

(B)    any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6)    the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

147.    Similarly, §906 of SOX, entitled "Failure of corporate officers to certify financial reports" requires, in relevant part, that "each periodic report containing financial statements filed by an issuer with the [SEC] pursuant to 13(a) or 15(d) of the [1934 Act]" be accompanied by a written statement by the issuer's CEO and CFO (or equivalent thereof) of the issuer certifying that such periodic report "fully complies with the requirements of section 13(a) or 15(d) of the [1934 Act] and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer."

148.    In addition, pursuant to §404 of SOX, on June 5, 2003, the SEC issued a final rule and amended Item 307 of Regulations S-K and S-B. *See In re Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 2003 WL 21294970, at *11 (S.E.C. Release No. 8238) (June 5, 2003).  Specifically, as part of a company's corporate governance obligations, management is required to include an internal control report of management that contains the following in its annual report:

(1)    a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

(2)     a statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

(3)     management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective.  ***The assessment must include***

50

*disclosure of any "material weaknesses" in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting*; and

(4)     a statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting. [Emphasis added.]

149.     During the Class Period, Defendants Lin and Khan, in accordance with §§302 and 906 of SOX, periodically executed certifications stating, *inter alia,* that (i) NQ's financial statements did not contain any untrue statement or omissions; (ii) NQ's financial statements fairly presented NQ's financial condition, including results of operations and cash flows; (iii) NQ had controls and procedures related to financial reporting in place that provided reasonable assurances regarding the reliability of financial reporting and the preparation of NQ's financial statements in accordance with GAAP; and (iv) they had evaluated the effectiveness of NQ's disclosure controls and procedures.

150.     More specifically, Defendants Lin and Khan executed certifications pursuant to §302 of SOX in conjunction with NQ's Form 20-F for the year ended December 31, 2012, which were filed with the SEC on April 19, 2013 as Exhibits 12.1, 12.2, 13.1, and 13.2 to the Form 20-F.  In these §302 certifications, Defendants Lin and Khan each certified as follows:

1.  I have reviewed this annual report on Form 20-F of NQ Mobile Inc.,

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

51

4.   The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

151.    NQ's April 19, 2013 Form 20-F also contained, as Exhibit 12.2, §302 SOX certifications executed by Defendant Ji, which were substantially similar to Defendant Lin's and Defendant Khan's §302 certifications quoted above.

152.    NQ's April 19, 2013 Form 20-F also contained, as Exhibit 13.1, the following false and misleading SOX §906 certifications by Defendants Lin and Khan, wherein they each falsely certified that, in connection NQ's Annual Report on Form 20-F for the year ended December 31, 2012, to their knowledge:

       (a) "The Report fully complies with the requirements of Section 13(a) or 15(d) of the [1934] Act;" and

       (b) "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

153.    NQ's April 19, 2013 Form 20-F also contained, as attachment 13.2, SOX certifications executed by Defendant Ji pursuant to §906 of SOX, which were substantially similar to Lin's and Khan's SOX certifications quoted above.

154.    However, each of the foregoing certifications was materially false and misleading. Indeed, the nature and magnitude of the fraudulent scheme is itself compelling evidence that NQ's internal reporting controls were actually grossly inadequate.    Moreover, as NQ itself admitted on June 4, 2014, the Special Committee Team found evidence that information had been deleted or was otherwise missing from "many" of NQ's "electronic devices," and that "the Company's management and staff were unable to provide a credible explanation for what the Investigation Team observed" in this regard.  Similarly, as NQ announced on July 18, 2014, the inadequacies in NQ's internal controls – as identified by the Special Committee Team – had (i) caused the Company's auditors to request NQ's permission to expand its audit procedures to seek information "that is not in the possession, custody or control of the Company" (including "access to multiple third parties' original bank statements and financial records") and to express concerns about its ability to rely on NQ management's representations absent such additional materials, and (ii) in response, NQ had *fired* its then-auditors (PwC-ZT) rather than agree to an expansion of the scope of its audit work.

## VIII.   NQ MOBILE'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS AND VIOLATIONS OF GAAP

155.    Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") "as the source of authoritative generally accepted accounting principles ("GAAP") recognized by the FASB to be applied by nongovernmental entities.   Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants." ASC Topic 105-10-05-1.

156.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. §210.10-01(a).

157.    ASC Topic 605-10, Revenue Recognition, provides guidance regarding the proper application of GAAP to revenues recorded in financial statements.  In general, the recognition of revenue and gains of an entity involves the consideration of two factors; whether the revenue is realized or realizable and whether the revenue has been earned.  ASC Topic 605-10-25-1.  The SEC believes that revenue generally is realized or realizable and earned when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.  Staff Accounting Bulletin Topic 13, Revenue Recognition.

158.    In addition, ASC Topic 275-10-50 requires that companies disclose risks and uncertainties existing in the following areas: (1) nature of operations; (2) use of estimates in the

preparation of financial statements; (3) certain significant estimates; and (4) current vulnerability due to certain concentrations.

159.    As alleged herein, each of NQ's Class Period financial statements violated, *inter alia*, the foregoing GAAP standards with respect to, *inter alia*, the reporting of NQ's purported revenue, the disclosure of related party transactions, and the reporting of NQ's cash, cash equivalents and term deposits. *See also* §IX, below.

## IX.    PwC-ZT'S FALSE AND MISLEADING STATEMENTS AND VIOLATIONS OF GAAS

160.    PwC-ZT served as the independent auditors and registered public accounting firm for NQ throughout the Class Period, including for FY 2012. During this engagement, PwC-ZT violated Generally Accepted Auditing Standards ("GAAS") and acted recklessly in conducting audits of NQ's financial statements and in issuing unqualified audit reports on NQ's financial statements for FY 2012.

161.    PwC-ZT, as NQ's auditor, had a responsibility to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud," and "express an opinion on the financial statements." AU §§110.02-110.03. Auditors, including PwC-ZT, are required to perform their audits in accordance with Public Company Accounting Oversight Board ("PCAOB") standards and GAAS.

162.    As detailed below, PwC-ZT's audits were so deficient that they amounted to no audits at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which it made were such that no reasonable accountant would have made the same decisions if confronted with the same facts. Moreover, the allegations of red flags, when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of PwC-ZT's scienter, as detailed herein.

163.    SOX authorized PCAOB to establish auditing and related professional practice standards to be used by registered public accounting firms. PCAOB Rule 3100, Compliance

with Auditing and Related Professional Practice Standards, requires the auditor to comply with all applicable auditing and related professional practice standards of PCAOB.    PCAOB has adopted as interim standards, the GAAS standards described in the American Institute of Certified Public Accountants' ("AICPA") Auditing Standards Board's Statement on Auditing Standards No. 95, Generally Accepted Auditing Standards, in existence on April 16, 2003.

164.    The general, field work, and reporting standards approved and adopted by AICPA members, as amended by the AICPA Auditing Standards Board, are as follows:

*General Standards*

1.   The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.   In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.   Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*

1.   The work is to be adequately planned and assistants, if any, are to be properly supervised.

2.   A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

3.   Sufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

1.   The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2.   The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.   Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.   The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

AU §150.02

165.   An unqualified opinion represents the auditor's opinion that the financial statements fairly present an entity's financial position, results of its operations, and its cash flows in conformity with generally accepted accounting principles.  AU §508.7.   An auditor may only express an unqualified (or "clean") audit opinion when the auditor has formed such an opinion on the basis of an audit performed in accordance with GAAS.  *Id*.

166.   NQ's financial statements for FY 2012 violated GAAP in a number of ways, including by: (1) failing to accurately account for revenues by recognizing such revenues only when NQ satisfied a performance obligation by transferring a promised good or service to a customer under ASC Topic 605-25; (2) misclassifying and/or misreporting cash and cash equivalents under FAS 95; (3) failing to account for loss contingencies which are both probable and reasonably possible under FAS 5; and (4) failing to disclose related party transactions with YDT, as required under FAS 57.  Through its audit procedures, PwC-ZT should have uncovered evidence of the Company's failure to comply with GAAP.  PwC-ZT's failure to do so constituted an extreme departure from GAAS.   Absent recklessness, PwC-ZT could not have issued the unqualified audit reports, given the severity of GAAP violations at NQ.

167.   In addition to the egregious red flags discussed above, NQ's lack of internal controls over financial reporting is well documented.   From no later than 2010 when it was working on its audit of NQ's FY 2009 financial statements, PwC-ZT knew that NQ did not have the staff, knowledge or ability to comply with GAAP rules, and that this in turn posed a significant risk that NQ's Class Period financial statements were materially misstated.   For example, as NQ's statements in its 2011 Annual Report (filed March 30, 2012) describe, PwC-

ZT identified material weaknesses and deficiencies in NQ's financial reporting controls for fiscal 2011 (which were never adequately corrected) as follows:

> Prior to our initial public offering, we had operated as a private company and had had limited accounting personnel and other resources with which to address our internal control over financial reporting. In preparing our consolidated financial statements for the years ended December 31, 2009, 2010 and 2011, we and our independent registered public accounting firm *[PwC-ZT] identified one material weakness and other deficiencies in our internal control over financial reporting.*
>
> *The material weakness identified related to the lack of sufficient staff with U.S. GAAP knowledge to address complex U.S. GAAP accounting issues and to prepare and review financial statements and related disclosures under U.S. GAAP.* Following the identification of the material weakness and other control deficiencies, we have taken measures and plan to continue to take measures to remedy these deficiencies. For details of our proposed remedies, see "Item 15. Controls and Procedures — Internal Control Over Financial Reporting." *However, the implementation of these measures may not fully address these deficiencies in our internal control over financial reporting, and we cannot conclude that they have been fully remedied.* Our failure to correct these control deficiencies or our failure to discover and address any other control deficiencies could result in inaccuracies in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, our business, financial condition, results of operations and prospects, as well as the trading price of our ADSs, may be materially and adversely affected. *Moreover, ineffective internal control over financial reporting may significantly hinder our ability to prevent fraud.*

2011 Annual Report at 15. [Emphasis added.]

168.    A history of lax internal controls should put an auditor on high alert for financial fraud, both in the current year and subsequent years. *See* AU 316.85 (citing, *e.g.*, heightened risk of fraud where there is "[i]neffective board of directors or audit committee oversight over the financial reporting process and internal control"); *see also* Auditing Standard No. 5, ¶47 ("Factors that affect the risk associated with a control include . . . Whether the account has a history of errors.").

169.    Moreover, as Auditing Standard No. 5 states, as part of reasonably planning an audit, the auditor should specifically take into consideration a previously documented lack of

internal controls, as well as public information concerning the potential for material misstatements:

> The auditor should properly plan the audit of internal control over financial reporting and properly supervise the engagement team members. When planning an integrated audit, the auditor should evaluate whether the following matters are important to the company's financial statements and internal control over financial reporting and, if so, how they will affect the auditor's procedures –
>
> * * *
>
> Control deficiencies previously communicated to the audit committee or management;
>
> Legal or regulatory matters of which the company is aware;
>
> The type and extent of available evidence related to the effectiveness of the company's internal control over financial reporting;
>
> Preliminary judgments about the effectiveness of internal control over financial reporting;
>
> Public information about the company relevant to the evaluation of the likelihood of material financial statement misstatements and the effectiveness of the company's internal control over financial reporting . . .

Auditing Standard No. 5, ¶9.   Accordingly, a material weakness in controls in one period necessarily increases the amount of scrutiny that an auditor should place on the following year's analysis of controls.

170.   Despite this severe and documented risk of fraud, PwC-ZT ultimately issued unqualified audit opinions on NQ's financial statements for 2012.

171.   Specifically, on April 19, 2013, PwC-ZT issued a clean audit opinion stating that NQ's financial statements presented fairly, in all material respects, the financial position of NQ and its subsidiaries as of December 31, 2012 (and the results of its operations and cash flows for each of the three years in the period ended December 31, 2012) in conformity with GAAP – and that NQ maintained adequate internal controls.  More specifically, PwC-ZT represented:

> **In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of comprehensive income, shareholders' (deficit)/equity and cash flows present fairly, in all material respects, the financial position of**

*NQ Mobile Inc. (the "Company") and its subsidiaries at December 31, 2012 and, 2011, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2012 in conformity with accounting principles generally accepted in the United States of America*. Also in our opinion, the Company maintained, in all material respects, *effective internal control* over financial reporting as of December 31, 2012, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). . . .

Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our audits which was an integrated audit in 2012. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used  and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

These false and misleading opinions were communicated to investors as part of NQ's Form 20-F for FY 2012 at F-2.

172.    PwC-ZT's 2012 audit opinions were, however, materially false and misleading as issued because (1) NQ's consolidated financial statements for the relevant time frame were materially misstated and, therefore, not in conformity with GAAP, (2) NQ did not maintain "in all material respects" effective internal controls over its financing reporting, and (3) NQ's audits could not have been conducted in accordance with GAAS and/or the standards of PCAOB.

173.    Had PwC-ZT performed its 2012 audit in accordance with PCAOB standards and GAAS, maintaining independence in mental attitude, exercising due professional care, and gaining a sufficient understanding of internal control to determine the nature, timing, and extent of tests to be performed and analyzing competent audit evidence, PwC-ZT would not have issued a clean opinion and would have: (1) modified the nature and extent of audit procedures; (2) recommended significant adjustments to financial statements and disclosures; and/or (3) issued a qualified or adverse opinion, disclaimed its opinion, or issued no audit opinion at all.  In light of the information known to PwC-ZT, its failure to conduct a proper audit in accordance with GAAS and issue a clean opinion, knowingly or recklessly,  resulted in the issuance of false and misleading financial statements by NQ.

174.    Had PwC-ZT performed its 2012 audit according to applicable standards, it would have reported that: (1) NQ was overstating its reported revenues, including from its purportedly unrelated "customer" YDT, and (2) NQ's management and staff lacked both sufficient competency in GAAP and adequate controls to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S GAAP.  If it had performed an audit in accordance with GAAS, PwC-ZT would not have issued an unqualified audit.  A prudent and non-reckless auditor could not have conducted an audit of NQ in accordance with GAAS and concluded that NQ's financial statements were free of material misstatement and presented fairly the financial condition of NQ.

Therefore, PwC-ZT acted at least recklessly, if not knowingly, in issuing two clean audit and internal control opinions that contained material misstatements and in consenting to their incorporation in NQ's annual reports for 2011 and 2012.

## X.    CLASS ACTION ALLEGATIONS

175.    Lead Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired NQ ADS shares between March 6, 2013 and July 3, 2014 (the "Class Period"), inclusive.

176.    Excluded from the Class are NQ and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

177.    Because NQ had millions of ADS shares outstanding during the Class Period, and because its ADS were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiffs believe that there are, at a minimum, thousands of Class members.  Members of the Class may be identified from records maintained by NQ or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

178.    Lead Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

179.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

180.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  These common questions include:

(a)    Whether Defendants violated the federal securities laws as alleged herein;

(b)    Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about NQ's business and operations;

(c)    Whether the price of NQ shares was artificially inflated during the Class Period; and

(d)    The extent to which members of the Class have sustained damages and the proper measure of damages.

181.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

182.    As alleged herein, NQ and the Officer Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued and disseminated to the investing public in the name of the Company or in their own names during the Class Period were materially false and misleading.    These Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.    The Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding NQ, their control over and/or receipt and/or modification of NQ's allegedly materially misleading misstatements, and/or their associations with NQ which made them privy to confidential information concerning NQ, were active and culpable participants in the fraudulent scheme alleged herein.  That scheme could not have been perpetrated without the knowledge of, or at least the reckless disregard of, NQ personnel at the highest levels of the Company, including the Officer Defendants.

183.    The Officer Defendants, because of their positions with NQ, controlled the contents of NQ's public statements during the Class Period.  Each such Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected.    Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.   As a result, each of these Defendants is responsible for the accuracy of NQ's corporate statements and liable for the representations contained therein.

184.    The Officer Defendants engaged in this scheme to inflate the price of NQ shares in order to protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby.    In addition, NQ and the Officer Defendants were further motivated to engage in this scheme in order to enable NQ to raise over $172.5 million in capital through an offering of NQ convertible notes (convertible into NQ ADS shares) in October 2013, at artificially inflated prices.   Moreover, by maintaining an artificially inflated price for NQ shares, NQ and the Officer Defendants were better able to utilize NQ equity shares as currency in several corporate acquisitions which closed during the Class Period, including the following:

(a)    The payment of 2,828,511 common shares in connection with NQ's acquisition on March 21, 2013 of a 51% majority stake in Beijing Fanyue Information Technology Co., Ltd. ("Beijing Fanyue");

(b)     The payment of 1,152,013 common shares in connection with NQ's acquisition in May 2013 of a 35.22% stake in Asia Smart Media Inc.;

(c)    The payment of 1,150,387 common shares in connection with NQ's acquisition in June 2013 of a 20% stake in Beijing Century Hebu Software Technology Co., Ltd.;

(d)     The payment of 1,314,815 common shares in connection with NQ's acquisition on June 8, 2013 of NQ Shenzhen;

(e)    The payment of 12,058,824 restricted shares in connection with NQ's acquisition on July 15, 2013 of the remaining 45% stake in  Beijing Nationsky Network Technology, Inc. ("Nationsky"), that it did not already own;

(f)     The payment of 10,250,570 restricted shares in connection with NQ's acquisition on July 24, 2013 of Best Partner Limited;

(g)    The payment of 287,150 restricted shares in connection with NQ's acquisition on August 12, 2013 of an 85% stake in NQ Mobile KK;

(h)     The payment of 5,865,703 restricted shares in connection with NQ's acquisition on August 30, 2013 of Beijing Tienya Co., Ltd.;

(i)     The payment of 1,409,666 restricted shares in connection with NQ's acquisition on August 30, 2013 of an additional 36.1% stake in Shanghai Yinlong Information and Technology Co., Ltd. Beijing Tienya Co., Ltd.;

(j)     The payment of 7,656,410 common shares in connection with NQ's acquisition on September 13, 2013 of the remaining 49% of Beijing Fanyue that it did not already own;

(k)     The payment of 2,753,831 restricted shares in connection with NQ's acquisition on September 19, 2013 of Chengdu Ruifeng Technology Co., Ltd.; and

(l)     The payment of 3,900,000 restricted shares in connection with NQ's acquisition in 2013 and the first quarter of 2014 of a 58% stake in Tianjin HuaYong Wireless Technology Ltd.

185.    The scienter of the Officer Defendants is underscored by the Sarbanes-Oxley-mandated certifications signed by Defendants Lin, Khan, and Ji, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about NQ was made known to them and that NQ's disclosure-related controls were operating efficiently.

186.    The additional allegations below, *inter alia,* provide further strong support for finding that NQ and the Officer Defendants acted with scienter:

(a)     When NQ released the results of the Special Committee investigation on June 4, 2014, NQ's press release admitted that its investigative team "could not verify that the devices it collected and copied contained all responsive information at the time the copies were made," and that "[o]n many devices, the Investigation Team observed indications that some information might be missing," and "the Company's management and staff were unable to provide a credible explanation for [the missing information]."

(b)     Shortly thereafter, on July 3, 2014, NQ announced that Ying Han -- the chair of both its Audit Committee and its Special Committee -- was resigning from all her positions with NQ, and that PwC-ZT had advised NQ that it would need to perform

additional procedures and expand the scope of its audit in order to complete its work on its audit on NQ's 2013 financial statements.  Tellingly, ***rather than agreeing to PwC-ZT's request, NQ stated that it was merely "considering" it,*** and just 15 days later NQ announced that it was ***dismissing PwC-ZT*** because "the observations referred to in [NQ's June 4 press release] reporting on the Special Committee's Independent Investigation … regarding questions related to electronic data collected by the Investigation Team would require [PwC-ZT] it to expand its work" – and because PwC-ZT had belatedly concluded that these matters "if investigated further" could "cause it to be unwilling to rely on management representations in connection with its audit work."

(c)    Throughout the Class Period, the mobile security app business was NQ's core business and critically important to the Company.  When a senior officer of a company makes public statements regarding ***core*** operations of a company, and those statements are materially false or misleading, the fact that the statements relate to the company's core operations supports a strong inference that the officer knew the statement was materially false or misleading when made.

(d)    Prior to and during the Class Period through at least October 25, 2013 (when NQ was forced to change its story in response to the October 2013 Report), the NQ Defendants repeatedly lied to investors about the nature and extent of the Company's relationship with the owner and executive director of NQ's purported biggest customer, Yidatong's Xu Rong.  For example, in NQ's May 2011 IPO prospectus, the NQ Defendants stated that "[t]he principal shareholder of Yidatong [Xu Rong] was [NQ's] consultant in 2006 and 2007," and further stated on July 31, 2013, that Xu Rong had joined NQ "as an advisor" in 2007 and that she "was with NQ for less than six months before leaving and buying her [75%] interest in Yidatong."  On October 25, 2013, however – following the publication of the October 2013 Report – an NQ spokesman

66

belatedly admitted that Xu Rong had become an *employee* of NQ on September 1, 2006, and that she did not resign from NQ until December 31, 2008.

(e)     Given (i) the importance of Yidatong as NQ's largest customer and source of revenue, (ii) the history of the close interrelationships between Yidatong's executive director (Xu Rong) and NQ insiders, and (iii) the fact that NQ director and controlling shareholder, Zhou Xu, has an office at the site of Yidatong's purported "main facility" (which is actually occupied by a different company, 9H, that Zhou Xu and Xu Rong own and control), it defies credulity to believe that NQ or the Officer Defendants were not aware of, or at least recklessly indifferent to, the phony nature of the "revenue" that Yidatong purported to generate for NQ, and Yidatong's status as a controlled instrumentality and/or related party of NQ.

(f)     As stated by an analyst from CFRA, a New York-based forensic accounting firm, in an article published by *Bloomberg News* about NQ on November 4, 2013, "[a]ccounts-receivable balances that dwarf the stated payment terms, that's always a red flag, it always increases the risk of fraud or misstatement."  Similarly, as Professor James Angel, a finance professor at Georgetown University, stated in the same article, "[A high DSO] to me sounds like a red flag with a siren going off.  This is one of the classic signs of a fraud.  You can easily manufacture sales with the stroke of a pen, but if you don't have cash, what you have is [only] a receivable."  Here, although NQ reported that it offered its Chinese customers 30- to 90-day payment terms, and Yidatong's contract with NQ provided for 30-day payment terms, it took 167 days, on average, for NQ to collect payments from Yidatong as of December 31, 2012.  As the *Bloomberg* article also pointed out, in contrast, two of China's leading mobile security app providers – Qihoo 360 and Tencent – reported having DSOs of only 22.4 and 18.2 days, respectively, in fiscal 2012.

67

(g)     When asked to provide the names of NQ's second and third largest customers during the course of NQ's October 25, 2013 conference call, NQ lied. Specifically, when asked to provide the names of NQ's second and third largest customers as referenced in NQ's 2012 Form 20-F (which were identified only as customers "D" and "F" on p. F-17 of NQ's 2012 Form 20-F, and which were listed as having generated 11% (or $10.1 million) and 8% (or $7.3 million), respectively, of NQ's total reported net revenue of $91.8 million in 2012), Defendant Lin identified them as UMPay and Info2Cell.   However, both of these entities are, like Yidatong, wireless carriers and/or mobile payment SPs.  Moreover, according to other information reported in the 2012 Form 20-F, (i) 30.4% of NQ's total net revenue (or $27.9 million) was "collected from wireless carriers and mobile service providers"), (ii) of that $27.9 million, Yidatong (NQ's biggest customer) accounted for $20.2 million; and (iii) NQ's remaining wireless and mobile SPs **combined** could not have generated more than a total of $7.7 million in net revenue ($27.9 less $20.2 million).  Given these figures, it is not possible for UMPay and Info2Cell to be NQ's second and third largest customers, because there is no room for the combined $17.4 million ($10.1 million plus $7.3 million) that is attributable to these entities to "fit" into the wireless carrier/SP revenue category (based on the Form 20-F's representation that total wireless carrier/SP net revenue, after adjusting for Yidatong's share of that revenue, was not more than $7.7 million).

(h)     In addition, the suspicious timing and nature of the resignation of NQ's former CFO, Defendant Ji, further supports a strong inference of scienter.  NQ reported that Ji had been replaced as its CFO on September 20, 2013, barely a month before the release of the October 2013 Report and at around the same time that NQ shares were hitting new Class Period trading highs.  Moreover, NQ never publicly gave a reason why Ji was leaving or being replaced as CFO, nor did Ji himself offer the kind of positive

comments (such as how he enjoyed working with the company, the future of the company remains bright, etc.) that are customary for departing senior executives to make. Also, if NQ had really been the rapidly growing, legitimate company with a bright future that it claimed to be, it is hard to see why Ji would have wanted to leave NQ. *See also* sub-paragraph (b) above (discussing the suspicious timing of the resignation of the chair of NQ's Audit Committee and Special Committee on July 3, 2014).

(i)     NQ has also previously been caught in other lies to investors about its misconduct. For example, on March 15, 2011 (which is "Consumer Rights Day" in China), a live broadcast by China Central Television's Channel 1 ("CCTV") – the flagship channel of the Chinese central government's national broadcasting network – reported on various fraudulent practices of NQ and its then-33% owned (and now 100% owned) subsidiary, Beijing Feiliu (FL Mobile). These fraudulent practices included, among other things, having NQ and its subsidiary pay phone refurbishers in China install FL Mobile software which would (i) cause the phone to start uploading and downloading data without being commanded to do so shortly after the new end-user had installed a new SIM, (ii) delete any non-NQ security apps on the phone – but would (iii) allow the unsuspecting user to deal with the "unexpected" malware attacks by going to their surviving NQ mobile security app, which would, in turn, instruct the end-user how to sign up – for a fee – for the premium NQ services that would fix the problem. Moreover, when the October 2013 Report referenced this CCTV1 exposé, NQ tried to falsely discredit the CCTV broadcast by telling investors on October 26, 2013 that CCTV had "retracted" the story the day after it had first aired (*i.e.*, on March 16, 2011). However, as an article posted on *Seeking Alpha* reported on November 7, 2013, not only is there no evidence that CCTV ever "retracted" its original March 15, 2011 broadcast, but that broadcast was ***still*** available as of November 2013 on CCTV's website at http://jingji.cntv.cn/20110315/116707.shtml. In fact, the original CCTV report on NQ's

69

consumer fraud tactics has remained on CCTV's website through the filing of this Complaint in July 2014. *See id.*, accessed on July 19, 2014.

## XII. LOSS CAUSATION

187.    During the Class Period, as detailed herein, the NQ Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of NQ ADS shares to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein.  As Defendants' misrepresentations and fraudulent conduct were gradually disclosed and became apparent to the market, the artificial inflation in the price of NQ ADS shares was removed, and the price of NQ ADS shares fell.

188.    As a result of their purchases of NQ ADS shares during the Class Period at artificially inflated prices, Lead Plaintiffs, and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

189.    The declines in the price of NQ ADS shares, including those in response to the partial disclosures of, *inter alia,* October 24-25, 2013 and April 11-14, May 15, and July 3, 2014, were a direct result of the nature and extent of the NQ Defendants' fraudulent misrepresentations being gradually revealed to investors and the market.  The timing and magnitude of the price decline in NQ ADS shares negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## XIII. PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE

190.    At all relevant times, the market for NQ ADS shares was efficient because, *inter alia*:

(a)    NQ ADS shares met the requirements for listing on, and were listed and actively traded on, the NYSE, a highly efficient market – if not the most efficient stock market in the world;

(b)    As a regulated issuer, NQ filed periodic public reports with the SEC and the NYSE;

70

(c)    NQ regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases through major newswire services and other widely disseminated media, such as communications with the financial press and other similar reporting services; and

(d)    NQ was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to their sales force and which were publicly available and entered the public marketplace.

191.    As a result of the foregoing, the market for NQ ADS shares promptly digested current information regarding NQ from all publicly available sources and reflected such information in the price of NQ ADS shares.  Under these circumstances, all purchasers of NQ ADS shares during the Class Period suffered similar injury through their purchase of NQ ADS shares at artificially inflated prices, and a presumption of reliance applies.

## XIV.   NO SAFE HARBOR

192.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Moreover, to the extent that any statements alleged herein are arguably "forward-looking," they were not identified as "forward-looking statements" when made and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially.  Alternatively, to the extent that the statutory safe harbor might otherwise apply to any forward-looking statements pleaded herein, the NQ Defendants remain liable for them because they knew that they were false when made, or were authorized or approved by an executive officer of NQ who knew that those statements were false when made.

### COUNT I

**Violations of §10(b) of the 1934 Act and Rule 10b-5 Against
NQ and Officer Defendants Lin, Khan, Ji, Shi, and Teo**

193.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

194.    During the Class Period, NQ and the Officer Defendants Lin, Khan, Shi, Ji, and Teo participated in the preparation of, and/or caused to be disseminated, the actionable

statements specified above, which they knew or recklessly disregarded were materially false and misleading, in that they contained material misrepresentations and/or failed to disclose material facts necessary to render the statements, in light of the circumstances under which they were made, not misleading.

195.    NQ and the Officer Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

   **(a)**    Employed devices, schemes, and artifices to defraud;

   **(b)**     Made untrue statements of material fact or omitted to state material facts necessary to render the statements made, in light of the circumstances under which they were made, not misleading; and/or

   **(c)**    Engaged in acts, practices, and/or a course of conduct that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of NQ securities during the Class Period.

196.    NQ and the Officer Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations, and future prospects of NQ as specified herein.

197.    NQ and the Officer Defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary to render the statements made about NQ, its financial condition and performance, business, and products not misleading.

198.    As a result of these Defendants' materially false and misleading statements and failure to disclose material facts, the market price of NQ shares was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of NQ shares were artificially inflated, and relying directly or indirectly on the false and misleading statements and/or upon the

integrity of the market in which NQ shares traded, Lead Plaintiffs and other Class members acquired NQ shares during the Class Period at artificially high prices and were damaged thereby.

199.    At the time of these Defendants' misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were unaware that these Defendants' statements were materially false, misleading, and/or incomplete, and believed them to be true and materially complete.  Had Lead Plaintiffs, the other Class members, and the marketplace known the truth as alleged herein, they would not have purchased or otherwise acquired their NQ shares during the Class Period or would not have done so at the artificially inflated prices that they paid.

200.    By virtue of the foregoing, NQ and Officer Defendants Lin, Khan, Shi, Ji, and Teo have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

201.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class have suffered damages.

## COUNT II
### Violations of §20(a) of the 1934 Act Against
### Officer Defendants Lin, Khan, Shi, Ji, and Teo

202.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203.    Each of the Officer Defendants -- Lin, Khan, Shi, Ji and Teo -- was a  controlling person of NQ within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions, agency, participation in and/or awareness of NQ's operations, and/or intimate knowledge of the false statements disseminated to the investing public, each of them had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of NQ, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  Each Officer Defendant was provided with, or had unlimited access to, copies of NQ's press releases and other statements alleged to have been misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of those statements or cause them to be corrected.

204.     In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of NQ and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and to have exercised the same.

205.     By virtue of their positions as controlling persons, pursuant to §20(a) of the 1934 Act, each Officer Defendant is liable for NQ's violations of §10(b) and Rule 10b-5.

**COUNT III**

**Violations of §10(b) of the 1934 Act and Rule 10b-5 Against PwC-ZT**

206.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207.     This Count is being brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of Lead Plaintiffs and all members of the Class against PwC-ZT.

208.     Throughout the Class Period, PwC-ZT directly and indirectly, by the use of means and instrumentalities of interstate commerce of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about NQ, including its true financial results.

209.     PwC-ZT made untrue and misleading statements of material fact and omitted to state material facts necessary in order to make its statements not misleading. Specifically, PwC-ZT knew, or but for its reckless disregard of the truth should have known, that NQ had fundamentally misrepresented the nature of its business, including its revenues, and that NQ's financial statements for 2011 and 2012 were materially misstated and were not presented in conformity with GAAP.  As set forth above, as to both NQ's 2011 and 2012 financial statements, PwC-ZT stated that it performed its audits in "accordance with the standards of the Public Company Accounting Oversight Board (United States)," and PwC-ZT expressed an unqualified opinion that those financial statements were presented "in conformity with accounting principles generally accepted in the United States of America."  Such statements were false and misleading

because PwC-ZT's audits represented an extreme departure from the standards of PCAOB and GAAS and, therefore, PwC-ZT had no reasonable basis to support its opinion that NQ's 2011 and 2012 financial statements fairly presented NQ's results of operations in conformity with GAAP.

210.    As NQ's long-time auditor, PwC-ZT had access to all of NQ's books and records, and it certainly had knowledge of GAAP and the requirements of GAAS, as detailed above. Had PwC-ZT conducted its audits in accordance with PCAOB standards, it would have reacted to the numerous, obvious "red flags" set forth above, including *inter alia,* (i) the fact that YDT, which was purportedly NQ's single biggest customer and the source of at least 20% of its revenue throughout the Class Period, was a sham entity that NQ dominated and controlled; (ii) the absence of any credible basis for concluding that NQ was generating, or capable of generating, millions of dollars of revenue from within China through its "prepaid" card channel, or tens of thousands of dollars of revenue from foreign countries where, *e.g.*, NQ lacked even a functional website and much better-known competitors had failed to generate significant sales; (iii) YDT's extraordinarily high DSO levels throughout the Class Period; (iv) the lack of adequate documentation of NQ's cash and cash equivalent deposits; (v) the fact that not only had PwC-ZT itself previously found that NQ had suffered from continuous internal control problems before it had gone public, but that, as NQ's Special Committee found, there was significant evidence that relevant information had been deleted from NQ's electronically stored records and NQ personnel could not satisfactorily explain why the missing information no longer existed.   In so doing, PwC-ZT would have discovered that NQ's financial statements for which it had provided unqualified audit opinions contained material misstatements and omissions. Instead, PwC-ZT (i) ignored those red flags and knowingly or recklessly failed to adhere to GAAS procedure designed to detect fraud and/or ensure that the financial statements were free from material misstatement, and (ii) knowingly or recklessly issued unqualified audit opinions as to NQ's

materially false and misleading FY 2012 financial statements, and as to the state of NQ's internal financial controls.

211.    As a result of the dissemination of the materially false and misleading financial statements and related audit opinions thereon, the market price of NQ shares was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of NQ shares were artificially inflated, and relying directly or indirectly on PwC-ZT's false and misleading audit opinion, or upon the integrity of the market in which NQ shares traded, Lead Plaintiffs and the members of the Class acquired NQ shares during the Class Period at artificially inflated prices and were damaged thereby.

212.    By virtue of the foregoing, PwC-ZT violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT IV
### Violations of §20(a) of the 1934 Act Against PwC-IL

213.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a), on behalf of Lead Plaintiffs and the Class against PwC-IL.

214.    PwC-ZT and its employees committed primary violations of §10(b) of the 1934 Act and Rule 10b-5.

215.    PwC-IL acted as a controlling person of PwC-ZT and its employees within the meaning of §20(a).  By virtue of the unified international structure of the auditing firm and the relationships among member firms as alleged above, PwC-IL had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of its member firms and their partners. PwC-IL's actual control of PwC-ZT's conduct is demonstrated by, among other things, PwC-IL's centralized global network leadership structure, which sets the audit and compliance policies and standards for the firm on a global scale, including for PwC-ZT.  Through this relationship with PwC-ZT, PwC-IL possessed the power to direct and/or cause

the direction of the management of PwC-ZT's affairs, including PwC-ZT's conduct of its audits and preparation of its audit reports.

216.    PwC-IL was provided with, or had unlimited access to, copies of its member firms' audit work-papers (such as PwC-ZT's work-papers for its audits of NQ), as well as copies of internal documents, reports, memoranda, communications, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading and used in furtherance of NQ's fraudulent scheme and course of conduct as alleged herein, and had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected, as well as prevent the scheme and fraudulent course of conduct from being perpetrated.

217.    PwC-IL had direct oversight and involvement in its members firms' audits of NQ and therefore is presumed to have had the power to control or influence the particular conduct giving rise to the securities law violations.  By virtue of its position as a controlling person of its member firms and their employees, and based on its conduct alleged herein, PwC-IL is liable pursuant to §20(a) of the 1934 Act.   As a direct and proximate result of PwC-IL's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of NQ shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated:  October 24, 2014

*/s/ William C. Fredericks*
William C. Fredericks (Bar No. WF-1576)
Joseph P. Guglielmo (Bar No. JG-2447)
SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Tel: (212) 223-6444
Fax: (212) 223-6334
wfredericks@scott-scott.com
jguglielmo@scott-scott.com

John T. Jasnoch (admitted *pro hac vice*)
SCOTT+SCOTT, Attorneys at Law, LLP
707 Broadway Suite 1000
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508

David R. Scott
SCOTT+SCOTT, Attorneys at Law, LLP
156 South Main Street
Colchester, CT 06415
Tel: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com

*Lead Counsel*

Gregory M. Nespole
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 545-4653
nespole@whafh.com

Charles Piven
Yelena Trepetin
BROWER PIVEN, A PROFESSIONAL
CORPORATION
1925 Old Valley Road
Stevenson, Maryland 21153
Tel: (410) 332-0030
Fax: (410) 685-1300
piven@browerpiven.com
yelena@browerpiven.com

*Additional Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of October, 2014 at New York, New York.

/s/ *William C. Fredericks*
William C. Fredericks
SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Tel: (212) 223-6444
Fax: (212) 223-6334
wfredericks@scott-scott.com