**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE NQ MOBILE, INC. SECURITIES
LITIGATION

Civil Action No. 13-cv-7608-WHP

---

**LEAD PLAINTIFFS' CORRECTED CONSOLIDATED OPPOSITION TO THE
MOTIONS TO DISMISS OF (1) NQ MOBILE, INC., OMAR SHERIF KHAN, HENRY
YU LIN, WENYONG "VINCENT" SHI, SUHAI JI AND KIAN BIN "K.B." TEO, AND
(2) PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED**

William C. Fredericks (WF-1576)
Joseph P. Guglielmo (JG-2447)
SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Tel: (212) 223-6444
Fax: (212) 223-6334
wfredericks@scott-scott.com
jguglielmo@scott-scott.com

John T. Jasnoch
SCOTT+SCOTT, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: (619) 233-4565

David R. Scott
SCOTT+SCOTT, Attorneys at Law, LLP
156 South Main Street
Colchester, CT 06415
Tel: 860-537-5537
david.scott@scott-scott.com

*Lead Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ iii

CITATION CONVENTIONS ...................................................................... x

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ........................................................................... 5

    A.    Defendant NQ ............................................................................ 5

    B.    The Fraudulent Scheme ............................................................. 6

        (1)    NQ's Fraudulent Recognition of Revenue from Within China ............................... 6

        (2)    NQ's Materially Inflated International (Non-China) Revenue ............................. 10

        (3)    The Phony Inflation in NQ's Reported Market Share ........................................... 11

        (4)    NQ's Materially Inflated Cash Balances ................................................................ 11

        (5)    The Serious Undisclosed Vulnerabilities in NQ's Security Software ................... 12

    C.    The Market's Swift Response to the October 2013 Report ......................................... 13

    D.    NQ Fails to Issue Its Annual Report, Refuses PWC-ZT's Belated Demand that It Be Allowed to Expand the Scope of Its Audit Work, and Announces the Resignation of the Chair of NQ's Audit and Special Committee ............................... 14

    E.    Post Class-Period Events: NQ's Chairman and Co-CEO, Two More Directors and NQ's CFO All Resign, and NQ *Fires* Its Auditors ............................................. 16

ARGUMENT .............................................................................................. 17

    I.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION UNDER RULE 8 ..... 18

    II.    PLAINTIFFS ADEQUATELY PLEAD FRAUD UNDER RULE 9(b) ...................... 25

    III.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER ................................................. 28

        A.    Plaintiffs' Motive Allegations Further Support a Strong Inference of *Scienter* .......... 29

B.    NQ's Related-Party Transactions with YDT Shows Defendants' Scienter ................ 30

C.    NQ's Unexplained Data Deletions and the Firing of Its Auditor, Plus the Resignations of Multiple Top NQ Officers and the Chairs of Its Audit, "Special" and Corporate Governance Committees, Further Supports a Finding of Scienter .................................................................................................... 33

D.    The Core Operations Doctrine Further Supports a Strong Inference of *Scienter* ........ 35

E.    The Fraud's Magnitude and Scope Further Supports Inferring *Scienter* .................... 35

IV.    THE COURT HAS JURISDICTION OVER DEFENDANT SHI BASED ON HIS ACTIONABLE MISCONDUCT DIRECTED TO NQ INVESTORS IN THE U.S. .... 36

V.    PLAINTIFFS ADEQUATELY ALLEGE §20(A) CLAIMS AGAINST PWC-IL ....... 37

A.    Culpable Participation ................................................................................. 37

B.    Control .......................................................................................................... 39

C.    Underlying Violation of §10(b) ................................................................... 40

CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,*
    357 F. Supp. 2d 712 (S.D.N.Y. 2005)................................................................26

*Barrie v. Intervoice-Brite, Inc.,*
    409 F.3d 653 (5th Cir. 2005) ...........................................................................36

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................17

*Brown v. China Integr. Energy,*
    875 F. Supp. 2d 1096 (C.D. Cal. 2012) .................................................23, 31, 32

*Brown v. Enstar Grp., Inc.,*
    84 F.3d 393 (11th Cir. 1996) ...........................................................................38

*Campo v. Sears Holdings Corp.,*
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)..............................................................26

*Carpenters Pens. Tr. Fund of St. Louis v. Barclays PLC,*
    750 F.3d 227 (2d Cir. 2014)............................................................................21

*Carpenters Pens. Tr. Fund of St. Louis v. Barclays PLC,*
    No. 12-cv-5329, 2014 WL 5334053 (S.D.N.Y. Oct. 20, 2014)........................37

*Central States, SE & SW Areas Pens. Fund v. FHLMC,*
    543 F. Appx. 72 (2d Cir. 2013)........................................................................22

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989)................................................................................35

*Dean v. China Agritech, Inc.,*
    No. 11-cv-1331, 2011 WL 5148598 ................................................................33

*Dobina v. Weatherford In'l Ltd.,*
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)..............................................................38

*Dura Pharma. Inc. v. Broudo,*
    544 U.S. 336 (2005)........................................................................................18

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
    343 F.3d 189 (2d Cir. 2003)............................................................................21

*Floyd v. Lichtung,*
    No. 10 Civ. 4254, 2013 WL 1195114 (S.D.N.Y. 2013) ....................................40

*Fouad v. Isilon Sys. Inc.*,
   No. C07-1764, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)............................................35

*Freudenberg v. E\*Trade Fin'l Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................................36

*Ganino v. Citizens Util. Co.*,
   228 F.3d 154 (2d Cir. 2000)........................................................................................................22

*G.A. Thompson & Co. v. Partridge*,
   636 F.2d 945 (5th Cir. 1981) ......................................................................................................37

*Gelfer v. Pegasystems, Inc.*,
   96 F. Supp. 2d 10 (D. Mass. 2000) ............................................................................................34

*Hall v. Children's Place Ret. Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)...................................................................................34, 39

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014)................................................................................................................22

*Harrison v. Dean Witter Reynolds, Inc.*,
   974 F.2d 873 (7th Cir. 1992) ......................................................................................................37

*Henning v. Orient Paper, Inc.*,
   No. 10-cv-5887, 2011 WL 2909322 (C.D. Cal. July 20, 2011)....................................... *passim*

*Ho v. Duoyuan Global Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................................4, 23, 26

*Hollinger v. Titan Cap. Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ....................................................................................................38

*In re Adv. Battery Techs., Inc. Sec. Litig.*,
   No. 11-cv-2279, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)..................................................32

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ......................................................................................33

*In re Asia Pulp & Paper Sec. Litig.*,
   293 F. Supp. 2d 391 (S.D.N.Y. 2003)..........................................................................................39

*In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)..........................................................................................35

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)..........................................................................................21

*In re Check Point Software Techs. Ltd. Sec. Litig.*,
    No. 03-cv-6594(RMB), 2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006)...................................35

*In re China Educ. All., Inc. Sec. Litig.*,
    No. CV 10-9239, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ................................27, 31, 33

*In re Countrywide Fin'l Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................................36

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    2003 WL 230688 .......................................................................................................33

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    No. MDL-1446, 2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)..................................24

*In re Interpublic Secs. Litig.*,
    No. 02-cv-6527, 2003 WL 21250682 (S.D.N.Y. May 29, 2003) ...........................30

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..........................................................................38

*In re IPO Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008)..........................................................................30

*In re L&L Energy, Inc.*,
    No. C11-1423, 2013 WL 6244654 (W.D. Wash. Dec. 3, 2013)...........................29

*In re LaBranche Sec. Litig.*,
    405 F. Supp. 2d 333 (S.D.N.Y. 2005)..........................................................................38

*In re Longwei Petro. Inv. Hldgs Ltd. Sec. Litig.*,
    No. 13-cv-214, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .....................................23, 26, 29

*In re Maxwell Tech., Inc. Sec. Litig.*,
    18 F. Supp. 3d 1023, 1039-40 (S.D. Cal. 2014) ......................................................33

*In re Medicis Pharma. Corp. Sec. Litig.*,
    No. 08-cv-1821, 2010 WL 3154863 (D. Ariz. Aug. 9, 2010) .................................30

*In re Merck & Co. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005).........................................................................................22

*In re Montage Tech. Grp Ltd. Sec. Litig.*,
    No. 14-cv-722, 2015 WL 392669 (N.D. Cal. Jan. 29, 2015)...........................24, 33

*In re Omnicom Grp., Inc., Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).........................................................................................3, 23

*In re Omnicom Grp., Inc. Sec. Litig.,*
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) ........................18, 22

*In re Omnicom Grp, Inc. Sec. Litig.,*
No 02-cv-4483, 2005 WL 735937 (S.D.N.Y. Mar. 30, 2005) .................................................30

*In re Parmalat Sec. Litig.,*
414 F. Supp. 2d 428 (S.D.N.Y. 2006) ....................................................................................39

*In re Parmalat*
594 F. Supp. 2d 444 (S.D.N.Y. 2009) ....................................................................................40

*In re Par Pharm. Secs. Litig.,*
No. 06-CV-3226, 2009 WL 3234273 (D.N.J. Sept 30, 2009) ................................................35

*In re Reserve Fund Sec. & Deriv. Litig.,*
732 F. Supp. 2d 310 (S.D.N.Y. 2010) ....................................................................................35

*In re Schering-Plough Corp./Enhance Sec. Litig.,*
No. 08-CV-397, 2009 WL 1410961 (D.N.J. May 19, 2009) ..................................................26

*In re Scottish Re Grp. Sec. Litig.,*
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ........................................................................34, 36, 39

*In re Top Tankers, Inc. Sec. Litig.,*
528 F. Supp. 2d 408 (S.D.N.Y. 2007) ....................................................................................34

*In re Tronox, Inc. Sec. Litig.,*
No. 09 Civ. 6220, 2010 WL 2835545 (S.D.N.Y. June 28, 2010) ..........................................38

*In re Winstar Commc'ns,*
No. 01 CV 3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ..............................................24

*In re WorldCom, Inc. Sec. Litig.,*
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ....................................................................................38

*Independent Energy Hldgs PLC Sec. Litig.,*
154 F. Supp. 2d 741 (S.D.N.Y. 2001) ....................................................................................38

*Inst. Inv. Grp v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009) ............................................................................................25, 35

*Janbay v. Canadian Solar, Inc.,*
No. 10 cv 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ............................................26

*Katz v. Image Innov. H'ldgs, Inc.,*
542 F. Supp. 2d 269 (S.D.N.Y. 2008) ..............................................................................36, 40

*Lewin v. Lipper Convertibles, L.P.*,
    No. 03 Civ. 1117, 2004 WL 1077930 (S.D.N.Y. May 13, 2004)...........................................36

*Litwin v. Blackstone Grp, L.P.*,
    634 F.3d 706 (2d Cir. 2011)........................................................................................................26

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. Appx. 400 (2d Cir. 2009) ....................34

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011).................................................................................................................29

*McCurdy v. S.E.C.*,
    396 F.3d 1258 (D.C. Cir. 2005)..................................................................................................32

*McIntire v. China MediaExpress Hldgs., Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013).......................................................................................26

*Metge v. Baehler*,
    762 F.2d 621 (8th Cir. 1985) ......................................................................................................37

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .........................................................................................18, 20

*N.Y. City Employees' Ret. Sys. v. Berry*,
    616 F. Supp. 2d 987 (N.D. Cal. 2009) ......................................................................................36

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. Appx. 10 (2d Cir. 2011)..................................................................................................35

*Pirelli Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*,
    631 F. 3d 436 (7th Cir. 2011) .....................................................................................................27

*Plumbers & Pipef'rs Local No. 630 Pens.-Ann. Trust Fund v. Arbitron Inc.*,
    741 F. Supp. 2d 474 (S.D.N.Y. 2010)........................................................................................22

*Plumbers Union Loc. No. 12 Pens. Fund v. Ambassadors Grp.*,
    717 F. Supp. 2d 1170 (E.D. Wash. 2010)..................................................................................36

*Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)..................................................................................24, 25

*Pub. Empl. Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ......................................................................................................25

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................................................25

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................29

*S.E.C. v. China N.E. Petro. Hldgs Ltd.*,
    No. 12-cv-8696, 2014 WL 2767121 (S.D.N.Y. Mar. 27, 2014)................32

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...............................................................38

*Scott v. ZST Digital Networks, Inc.*,
    No. 11-cv-3531, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ................30

*Sennett v. Rodman & Renshaw*,
    414 U.S. 926 (1973)............................................................................38

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) .................................................32

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..............................................................35

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014)...............................................................17

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988)...............................................................26

*STMicroelectronics v. Credit Suisse Grp.*,
    775 F. Supp. 2d 525 (E.D.N.Y. 2011) .................................................39

*Stoneridge Inv. Ptnrs. LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)............................................................................17

*Stratte-McClure v. Morgan Stanley*,
    No. 13-cv-0627, 2015 WL 136312 (2d Cir. Jan. 15, 2015).....................32

*Suez Equity Inv., L.P. v. Toronto-Dom. Bank*,
    250 F.3d 87 (2d Cir. 2001)..................................................................38

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ..............................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*,
    551 U.S. 308 (2007)............................................................................28

*Toussaint v. JJ Weiser & Co.*,
    No. 04 CV 2592, 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005) ...............27

viii

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78u–4(b)(1) .................................................................................................25

Federal Rules of Civil Procedure
    Rule 8 ....................................................................................................5, 18
    Rule 9(b) ...................................................................................................25
    Rule 12(b)(6) .............................................................................................17

17 C.F.R.
    §229.10(f) ..................................................................................................32
    §240.10b-5 ...................................................................................................1

## CITATION CONVENTIONS

"¶__" refers to paragraphs of the Corrected Consolidated Amended Class Action Complaint (the "Complaint") filed on October 24, 2014 (ECF No. 123).

> *Note:* The original "Consolidated Amended Complaint" was filed on July 21, 2014 (ECF No. 86). The subsequently filed "Corrected" Complaint was filed by permission of the Court solely for the limited purpose of correcting certain typographical errors that, according to Plaintiffs' translation service, needed to be corrected to avoid potential delays in getting the original Amended Complaint served in China under the Hague Convention. *See* ECF No. 116. Aside from those corrections, the July 21, 2014 Complaint is therefore identical to the "corrected" October 24, 2014 Complaint.

"Jasnoch Ex. ___"    refers to exhibits to the accompanying Declaration of John T. Jasnoch, dated February 6, 2014 (filed concurrently with this brief).

"Musoff Ex. ___"    refers to exhibits to the Declaration of Scott D. Musoff, dated December 16, 2014 (ECF No. 130).

All ***emphases*** in quotations from cited cases and documents are added, and all internal quotation marks and internal case citations are omitted, unless otherwise noted.

Lead Plaintiffs respectfully submit this memorandum of law in response to the motions to dismiss filed by (1) the "NQ Defendants," consisting of NQ Mobile, Inc. ("NQ" or the "Company") and certain of its senior officers and directors (the "Officer Defendants") consisting of Henry Yu Lin ("Lin") (NQ's former Chair and co-CEO); Omar Sherif Khan ("Khan) (NQ's co-CEO); Suhai Ji ("Ji") (NQ's former CFO, through September 20, 2013); Kian Bin "K.B." Teo ("Teo") (NQ's former CFO, from September 20, 2013 through August 15, 2014); and Wenyong "Vincent" Shi ("Shi") (NQ's Chief Operating Officer ("COO") and, since August 15, 2014, NQ's CFO); and (2) PricewaterhouseCoopers International Limited ("PwC-IL"), the controlling U.S. affiliate of NQ's former auditors, PricewaterhouseCoopers Zhong Tian LLP ("PwC-ZT").

## PRELIMINARY STATEMENT

Lead Plaintiffs bring this action pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 (17 C.F.R. §240.10b-5), on behalf of themselves and all persons other than Defendants who acquired the American Depositary Shares ("ADS shares" or "NQ shares") of NQ from March 6, 2013 through July 3, 2014 (the "Class Period").

Throughout the Class Period, NQ purported to be one of China's leading providers of mobile internet security and privacy services, and consistently reported increasing "record revenue" and "dramatic customer growth."  Unbeknownst to investors, however, NQ's core mobile security and privacy business was built on fraud, and its Class Period statements regarding (*inter alia*) its financial performance, its purported biggest customer (YDT), its market share, and its security products' functionality were materially false or misleading.

NQ's fraud began to unravel on October 24, 2013, when equity research firm Muddy Waters, LLC ("Muddy Waters") issued an 81-page report entitled "NQ Mobile: China Fraud 2.0" (the "October 2013 Report").  As that Report found, and as further detailed in Muddy

1

Waters' 41-page follow-on report to PwC-IL of January 14, 2014 (the "January 2014 Report"):

- NQ had massively overstated its reported revenue from within China; for example, over 70% of NQ's 2012 reported revenue from its purported sales of mobile security applications in China was fraudulent, as NQ's actual revenue from such sales was only $2.5 to $7.7 million, rather than the $32.2 million that it reported (¶¶48-70);

- NQ's "biggest customer" – an entity known as Tianjin Yidatong Technology Development Co. ("Yidatong" or "YDT") – was actually an empty shell controlled by NQ and owned and managed by a former NQ executive (¶¶49-62);

- NQ had massively overstated its reported revenue from outside of China (¶¶71-76);

- NQ had grossly overstated its paid user base, as NQ's share of China's mobile internet market was only about 1-2%, rather than the roughly 55% that NQ reported (¶¶77-82);

- A material portion of NQ's reported cash and cash equivalent balances during the Class Period were phantom assets (¶¶83-87); and

- NQ's leading mobile security software and "apps" were actually more akin to "malware" or "spyware" than protective security software (¶¶88-90).

In response, on October 24, 2013 NQ shares fell 47% (from $22.88 to $12.09) on record volume.  ¶5.  NQ's subsequent denials and other false reassurances temporarily stemmed the decline in NQ's share price, so that the fraud continued into 2014.  However, in the wake of NQ's admission that it would be unable to timely file its 2013 annual report, its disclosure that its "Special Investigative Committee" had found evidence of unexplained missing data, and the news (on the last day of the Class Period) that its Audit and Special Committee chair had resigned and that NQ's auditors (PwC-ZT) were demanding to expand the scope of their audit work, the price of NQ shares suffered further sharp declines, falling to a then all-time low of $4.58 on July 3, 2014 (the last day of the Class Period).  Two weeks later, after confirming that PwC-ZT had advised that it might be unwilling to rely on NQ management representations and had demanded "access to multiple third parties' original bank statements and financial records," NQ announced that it had fired PwC.  ¶¶6-12, 93-94, 98-102.  Plaintiffs now bring this action seeking a recovery for the huge losses caused by Defendants' fraud.

2

None of NQ's three grounds for dismissal pass muster.  First, it asserts that Plaintiffs fail to allege loss causation because the October 2013 Muddy Waters Report that caused NQ's stock price to fall **47%** merely contained "negative opinions," but no "new news."  NQ's position is based on a cherry-picked snippet from boilerplate in the Report stating that "all information contained herein has been obtained from public sources."  When read in context, however, the cited text simply confirms that the Report was not based on improperly obtained "insider information" from NQ, and the Report's prior sentence (which NQ also artfully omits) expressly states that it is based on both "generally available information" **and** on Muddy Waters' independent "field research" and "due diligence."  Moreover, the Report's text shows that it consists overwhelmingly of never-before-published information reflecting the findings of, *inter alia,* Muddy Waters' own site visits to the "offices" of NQ's "biggest customer" (YDT), its private surveys of (and site visits to) stores in both China and the U.S. that allegedly sold NQ products, and its privately commissioned analysis of NQ's software.  This case is thus easily distinguished from cases such as *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010), where the facts at issue had previously been published in several leading trade publications.  *See* Argument §I below.

Second, NQ asserts that the Complaint is impermissibly pled on conclusory "information and belief" rather than on "Plaintiffs' own knowledge."  However, as case law and the PSLRA both make clear, plaintiffs may (and routinely do) base fraud claims on information and belief where (as here) their complaint sets forth a statement of the factual allegations upon which their belief is based.  Indeed, courts routinely sustain complaints based on "secondhand" information derived (as here) from analyst reports and other "hearsay" sources, and efforts by Chinese companies to get courts to disregard allegations based on reports by the very analyst that NQ

attacks here (Muddy Waters) have been uniformly rejected.  *See, e.g., Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547 (S.D.N.Y. 2012) (sustaining §11 and §10(b) fraud claims); *Henning v. Orient Paper, Inc.,* 2011 WL 2900322, at *4 (C.D. Cal. July 20, 2011) (same, and noting that "the truth of the Muddy Waters report … is a factual dispute not appropriate for resolution at [the pleadings]").  NQ simply ignores the non-Muddy Waters sources that Plaintiffs also properly cite as further support for their claims of fraud.  *See* Argument §II below.

Third, the NQ Defendants assert that Plaintiffs fail to adequately allege scienter. However, their contention that Plaintiffs raise no "cognizable" motive allegations ignores how all Defendants had a powerful incentive to inflate NQ's share price to facilitate NQ's efforts to (1) raise $172 million from an offering of NQ notes (that were convertible into NQ shares), and (2) consummate an extraordinary corporate acquisition spree, whereby Defendants used roughly *50 million* NQ shares as inflated "currency" to buy up a dozen companies during the Class Period.  ¶185.  Moreover, Defendants ignore the mass of additional allegations that, in their totality, easily allege their scienter, especially given the pervasiveness of the fraud and the fact that it permeated NQ's core mobile security business.  Indeed, it defies credulity that Defendants were unaware of the phony nature of the "revenue" that its "biggest customer" (YDT) purported to generate for NQ (or were unaware of YDT's status as an instrumentality of NQ), especially given that YDT's sham "main facility" was located at the offices of another entity where NQ's controlling shareholder has an office, and given that YDT and NQ shared the same email server, phone numbers, contact addresses, and contact persons.  When combined with the allegations of data tampering, NQ's firing of its auditors in the face of their demands to expand the scope of their audit work, and the resignations of three Defendants and three other NQ directors, the inference of scienter is compelling.  *See* ¶186(a-i); Argument §III.

Finally, PwC-IL seeks dismissal of the §20 claims asserted against it.  The Complaint, however, meets the Rule 8 standard for pleading PwC-IL's "control" over its Chinese affiliate (PwC-ZT), and this Court should follow the weight of circuit authority by finding that a plaintiff need not plead "culpable participation" to state a §20(a) claim.  Its motion should also be denied.

## STATEMENT OF FACTS

### A.   Defendant NQ

NQ was founded in 2005 and has its main headquarters in Beijing, China.  During the Class Period, its core operations allegedly consisted of providing mobile internet services in the areas of privacy, mobile security, productivity, and family protection.  ¶¶1, 18.  NQ conducts most of its business through Beijing NQ Technology Co. Ltd. ("Beijing NQ Tech"), a Chinese entity founded by Defendants Lin, Shi, and NQ director Zhou Xu (collectively, the "Founders").  NQ exercises control over Beijing NQ Tech under China's variable interest entity ("VIE") rules, which allow substantially all of the economic benefits (or losses) of Beijing NQ Tech to flow through to NQ.  NQ went public on May 5, 2011, and its ADS trade on the NYSE.  NQ reports its financial statements under U.S. Generally Accepted Accounting Principles ("GAAP") on a consolidated basis, which includes all NQ subsidiaries.  ¶19.

NQ has relied primarily on a "freemium" business model, under which NQ (1) gives away its basic security applications for free to end-users, *e.g.,* consumers (with NQ paying fees to third-party "partners," such as mobile phone makers, to pre-load NQ's basic security apps on the makers' mobile phones), but (2) charges its end-users fees if they ever "upgrade" to one of NQ's "premium" mobile security apps (such as apps intended to protect users from new viruses on a going forward basis, as opposed to protecting users only from viruses that were known when NQ's "basic" (and free) apps had been installed).  ¶45.  Unbeknownst to investors,

however, the performance of NQ's core mobile internet security services business was massively inflated, as it was "built" largely on phantom customers and phony financial reporting.

### B.    The Fraudulent Scheme

NQ's ADS shares went public in May 2011 at $11.50 per share.  Over the next 22 months, NQ shares generally traded lower, closing on March 5, 2013 at $8.50 per share.  ¶¶2-3.

Beginning on March 6, 2013 – the first day of the Class Period – NQ announced record revenue for 2012, with Defendant Lin stating that "[i]n our first full year as a public company, we grew our revenue by 126% … to over $92 million."  ¶¶6, 104.  In the following months, NQ announced further positive news, including more "record" revenue in the 2nd quarter of 2013. For example, on October 7, 2013, NQ stated that (i) its total net revenues rose 107.7%, from $35.9 million for the first half of 2012 to $74.6 million for the first half of 2013, and (ii) the number of average monthly active user accounts rose from 69.2 million for the second quarter of 2012 to 122.2 million for second quarter of 2013.   ¶46.   Due to these and other false or misleading statements by the NQ Defendants concerning NQ's purported performance (*see* ¶¶113-130), NQ's shares climbed to nearly $25 per share by mid-October 2013.  ¶3.

Investors, however, were in for a shock.  On October 24, 2013, Muddy Waters released its October 2013 Report, which detailed how NQ had engaged in a massive fraud by overstating its performance and concealing adverse facts concerning its business, operations, and core product.  As the Report described, NQ's fraud included the following elements:

### (1)    NQ's Fraudulent Recognition of Revenue from Within China

NQ, which claimed to generate most of its revenue from within China, attributed its China-generated revenues to three different channels: (a) "carrier billing" (consisting of NQ's receipt of payments from mobile carriers and "service providers" ("SPs"), who collect end-user

payments and pass them on, less the SPs' fees, to NQ); (b) direct third-party payment (consisting of NQ's receipt of fees through Chinese third-party payment service providers such as Alipay and Yeepay); and (c) prepaid cards (which end-users can buy from third-party vendors and use to pay for NQ services).  ¶48.  NQ overstated its revenue from all three of these channels.

**_YDT and NQ's Inflated "Carrier Billing" Channel Revenue_**.  NQ reported that "carrier billing" generated $27.9 million of its total 2012 China-generated revenues of $32.2 million.  NQ further attributed $20.2 of its $27.9 million "carrier billing" revenue in 2012 to a single Chinese SP – YDT.  However, YDT was actually a shell entity, with no *bona fide* operations, that NQ secretly controlled.  Thus, even if NQ's other, non-YDT related carrier billing was legitimate, roughly 70% of NQ's reported 2012 "carrier billing" revenue of $27.9 million (and 62% of NQ's reported total security software revenue of $32.2 million) was fraudulent.  ¶¶49-51, 54-62.

For example, the October 2013 Report describes how, based on Muddy Waters' own site visits, it found that YDT lacked any *bona fide* physical operations, let alone facilities able to process billing and collections on tens of millions of purported transactions for NQ.   For example, site visits to 10 locations across China at which YDT purportedly had offices (based on addresses listed in YDT's SAIC files, YDT's website and other sources), revealed that:

- in 5 of 10 cases – **_including in the case of the address given on YDT's "Contact Us" web page_** – the addresses did not physically exist;

- in 4 of 10 cases, the address existed, but no one there had ever heard of YDT; and

- at the remaining address, YDT's "office" was a vacant room, YDT was not listed in the building directory or signage, no one in neighboring offices had ever heard of it, and building management confirmed that "nobody" from YDT worked there.  ¶54.

*Bloomberg News* later reported that it had spoken to YDT's 75%-majority owner, Xu Rong, and that she had identified another site – not listed on YDT's website or filings – as YDT's "main operating facility."  *Bloomberg*, however, also reported that even though it found

roughly 15 purported YDT "employees" at that site, they were "sharing space" with 200 employees of a different company, known as "9H", that was also owned by Xu Rong.  Tellingly, the site's office directory (which purportedly housed YDT's "main operating facility") contained no listing for YDT, and guards at the first floor security desk told Bloomberg that "they'd never heard of [YDT]."  ¶¶55, 57.  Later site visits only provided further evidence that YDT's "main operating facility" was a phony "Potemkin" office, without visible phones, files, or filing cabinets, manned by sham employees staring into blank computer screens.  ¶56.

Numerous other facts confirm that YDT was not only a shell entity, but was also a related party and instrumentality of NQ, with no meaningful independent infrastructure.  For example:

- Although YDT was supposedly NQ's largest SP and processed roughly 72% of NQ's "carrier billing" in China, when Muddy Waters tried to sign up for NQ apps via carrier billing in a wide sample of Chinese provinces, YDT *never* came up as the SP;

- YDT's email server and NQ's email server are the ***same***;

- The Guangdong branch of China Mobile shows that YDT and NQ were both based at NQ's Beijing office, with the ***same*** phone numbers and contact person – and China Mobile's list of SPs for Fujian province showed that YDT's phone number is the ***same*** as that listed for NQ on the "Contact Us" page of NQ's Chinese website;

- The customer service phone number that YDT provided to China's Ministry of Information Industry and Telecommunications ("MIIT") is the ***same*** as NQ's customer service number – ***and NQ customer service representatives (rather than anyone identified as being with YDT) answered this number when dialed***; and

- YDT's data sheet in YDT's Shanghai SAIC files lists an NQ email address (xuying@netqin.com) as YDT's email contact ("Net Qin" is NQ's former name) – and YDT and NQ also listed the same person, with the same phone number, as their contact person in a Zhejiang government registry.

¶58.  Moreover, YDT's 75% majority owner, Xu Rong, is not only a previous NQ executive but, as the October 2013 Report disclosed, she is also entangled with NQ co-founder (and Board member) Zhou Xu.  For example, Zhou Xu and Xu Rong co-own 9H (YDT's purported landlord), and both of them have offices there.  Xu Rong and NQ director Zhou Xu also co-

8

founded Yiteng Beijing Technology Co. Ltd. ("Yiteng"), an entity which came to own 25% of NQ's VIE (Beijing NQ Technology) in 2006. Indeed, just days after the October 2013 Report came out, *Phoenix New Media* (China) published an article, "Getting to the Bottom of NQ's Bizarre Road to Riches," that concluded that Zhou Xu – in addition to being an NQ director and beneficial owner of 19.9% of NQ's outstanding common stock (with voting power of 42.1% per NQ's 2012 Form 20-F) – is the real power behind the throne at both NQ and YDT. ¶61.

The October 2013 Report also detailed how a review of YDT financial statements filed with China's State Administration for Industry and Commerce ("SAIC") indicates that most of the revenue NQ reported receiving through YDT in 2012 is fraudulent. For example, for NQ to have generated the claimed $20.2 million in revenue from YDT in 2012, YDT itself would have had to have generated at least that much gross revenue itself because (i) NQ receives its revenue from YDT net of YDT's fees, and (ii) PRC GAAP standards require YDT to book as "revenue" all gross funds it receives from the carriers. *See* ¶¶49-50. As per its SAIC financials, however, YDT generated only $2.9 million in total gross revenue in 2012 – or only 14% of the $20.2 million that NQ fraudulently claimed to have generated from YDT in 2012. Moreover, YDT's 2012 SAIC financials reported that YDT had ***total*** "accounts payable" of ***$3.4 million*** as of 12/31/2012 – ***a figure that does not come close to agreeing with NQ's stated accounts receivable of $9.3 million from YDT alone as of that same date*** (as reported in NQ's 2012 Form 20-F), even if one assumed that all of YDT's reported accounts payable were owed to NQ. ¶51.

***NQ's Inflated 3rd-Party Payment and Prepaid Card Revenues***. Although NQ had stated that its combined third-party payment and prepaid card revenue was between $4 and $10 million in 2012, these figures were also overstated. For example, the Report detailed how Muddy Waters' own tests revealed serious problems with the systems needed to make payments to NQ

through China's two largest third-party payment services and several Chinese banks.  ¶¶63-64.

The Report further described how, based on Muddy Waters' field work, NQ generated at best only marginal revenue from its prepaid card channel because (1) NQ's prepaid cards are not widely available in China, and (2) sales were minimal at the few locations that actually sold them.  For example, when Muddy Waters initially asked NQ's customer service in 2013 to identify where one could buy prepaid NQ cards in Beijing, Shanghai, and Guangzhou, it replied that it did not even know if there were any card sellers in those cities, let alone who they might be.  When NQ finally identified a few vendors who did sell cards, those vendors confirmed the lack of any meaningful demand for them (with one vendor stating that he only stocked them because NQ personnel were "friends of the family" and he wanted to "help them out").  ¶¶65-69.

### (2)    NQ's Materially Inflated International (Non-China) Revenue

Although NQ reported international security app revenue of $35.7 million in 2012, the October 2013 Report disclosed that this figure was also "absurd[ly]" overstated.  For example, although NQ did not report its revenue by specific international markets, it had stated that most of its overseas revenue came from Southeast Asia and the Middle East.  However, NQ's Saudi Arabian website is NQ's only Arabic website, and even it did not appear to have been updated for several years, as it (i) featured an outdated version of NQ's antivirus software, (ii) used the old NQ logo that had been replaced more than two years earlier in June 2011, and (iii) had no news releases dated later than 2011.  Of NQ's "higher performing" SPs, located in seven Southeast Asian countries, only one of those countries (Vietnam) had an NQ website.  ¶¶72-73.

As for NQ's reported revenue from the U.S., this was also overstated.  For example, Muddy Waters' site visits and calls to 84 U.S. retail locations that purportedly sold NQ products showed that NQ's "attachment rates" (*i.e.*, the percentage of a retailer's phone-buying customers

who actually bought an NQ app) were only in the range of 2%-3%, with many such retailers reporting that no more than one customer a month actually bought any NQ products.  ¶76.

### (3)   The Phony Inflation in NQ's Reported Market Share

Although NQ claimed that its security apps were on roughly 55% of smart phones in China, the October 2013 Report eviscerated such claims, and presented new information from its own market survey that showed that NQ's market share *was likely less than 1%,* meaning that its paying user base in China was less than 250,000 versus the approximately six million claimed by NQ.  Specifically, the Report disclosed that Muddy Waters' own survey of over 800 respondents from five Chinese cities showed that three other companies accounted for over 94% of the China mobile security app market, with NQ at only 1.4% (with "all others" at 3.8%).  The Report's 800-respondent survey was large enough to reject with 95% confidence the hypothesis that NQ's market share was anywhere near what NQ indicated – especially since it was slanted in NQ's favor by focusing on cities where NQ should have been strongest.  ¶¶77-79.

The October 2013 Report also disclosed how Muddy Waters' separate retail site visits showed that NQ's reported market share figures were grossly inflated.  Indeed, its review of retailers across five Chinese cities showed that (a) NQ's share of pre-installed or "bundled" software was nearly non-existent, and (b) all but one of the handful of phones it found that did come with NQ's free software were ***also*** loaded with the free software of its vastly more popular rivals (making it most unlikely that users of such phones, if they ever upgraded to fee-based services at all, would choose NQ over one of its vastly bigger rivals).  ¶80.  Later reports from other sources have since confirmed that NQ has little, if any, market share.  ¶82.

### (4)   NQ's Materially Inflated Cash Balances

The October 2013 Report also concluded that NQ had materially overstated its reported

11

cash balances and that NQ had diverted a material portion of NQ's May 2011 IPO proceeds to friendly third parties to help conceal its revenue recognition fraud (*e.g.*, by "round-tripping" off-the-books cash payments that they received from NQ back to NQ in the form of phony "payments" for NQ services, which NQ then fraudulently reported as "revenue"). In particular, though NQ had previously claimed to have transferred roughly $47 million in IPO proceeds directly to its VIE (Beijing NQ Technology), the October 2013 Report found that such a transfer would contravene China's capital controls and that accordingly there would seem to be no reason for NQ to even try to do so unless it was to facilitate financial manipulations. ¶84.

NQ later tried to rebut the Report's allegations that it had inflated its reported cash and "short term asset" balances by producing "evidence" that its Chinese VIE affiliate, Beijing NQ Tech, held roughly $114 million (or ¥758 million) in funds that had been originally raised in the U.S. Specifically, NQ produced a list of 14 "term deposits" – by depositary bank, amount, interest rate, term length, and maturity date – that it had allegedly made with two banks in mainland China. However, as another source later reported in April 2014, the stated interest rates for five of the 14 deposits on NQ's list had anomalies strongly indicative of fraud. For example, the stated interest rate for five of the listed "term deposits" did not agree with the listed rates offered by the banks in question as of the dates on which the deposits were purportedly made. The same article also described how each of the two sample "term deposit" vouchers (one for each bank) that NQ made available on October 26, 2013 were highly irregular and appeared to be forgeries, and otherwise raised more questions than they answered. ¶¶85-87.[1]

### (5)    The Serious Undisclosed Vulnerabilities in NQ's Security Software

Finally, the October 2013 Report also disclosed that NQ's flagship security app

---

[1] As the Report observed, "[f]orging cash balances in China is shockingly common and easy," and Chinese bank employees have been co-opted into numerous frauds. *See* Musoff Ex. B at 48.

(Antivirus 7.0) was unsafe and is more aptly considered "spyware" than security software. Specifically, the Report stated that Muddy Waters had hired a software engineering firm to review the application's code, which found that the app actually **created** serious vulnerabilities that rendered users' phones prone to data compromise and cyber-attack by hackers and the Chinese government (*i.e.*, it made users' phones **less** secure than if they didn't have it at all). For example, NQ's "security" software transmits far more data than necessary to its server in China, including user-sensitive data, which is not sent securely despite passing through the Chinese government's firewall (which is believed to view and store all passing data). Downloads were even less secure with NQ, as its application did not require signatures, making phones using the app highly vulnerable to malware uploads. The reviewing engineers not only successfully staged such a malware attack, but found that the app's vulnerabilities could well be deliberate because the app's technology varied so widely from industry standards. *Bloomberg News* later reported that it had obtained a copy of the software engineers' report, prepared by Via Forensics, and confirmed that it had found that the "security [on NQ's app] is very poor." ¶¶88-90.

### C.    The Market's Swift Response to the October 2013 Report

In response to the Report's disclosures, on October 24, 2013 (the day it was issued) NQ shares plummeted $10.79 per share – equal to a stunning ***47% drop*** in one day – from $22.88 per share the previous trading day to $12.09, on record volume. Indeed, volume was so heavy (29.3 million shares) that the NYSE temporarily suspended trading in NQ shares. ¶92.

The next day, October 25, NQ issued a release denying that it had made any false or misleading statements, and held a conference call to falsely reassure investors that its previously reported results were reliable. For example, NQ's VP of Capital Markets stated that the October 2013 Report's findings regarding YDT's ghost addresses and SAIC financials were meritless,

and Defendant Khan appeared on *Bloomberg TV* to say that the Report's findings were "completely false."   NQ also announced that its Board had formed a "Special Committee," chaired by the head of its Audit Committee, to investigate the Report's findings.  Despite these efforts, when trading resumed in NQ shares later that day, NQ's share price fell a further 12% to $10.63 per share, ***representing a staggering two-day decline of roughly <u>56%</u>.***  ¶¶93, 131-33.

Over the following weeks and months, Defendants continued to try to assure investors that its previously reported financial results were accurate and reliable, that the October 2013 Report was without merit, and that NQ was continuing to generate "record" revenues.  ¶¶135-44.  Defendants also tried to restore investor confidence by falsely announcing that they would "use their personal funds" to buy up to $3 million worth of NQ shares over the next six months (they actually made no such purchases).  ¶¶7, 139.  In response to these and other false assurances, the price of NQ shares partially recovered and the fraud continued.  ¶7.

> **D.    NQ Fails to Issue Its Annual Report, Refuses PWC-ZT's Belated Demand that It Be Allowed to Expand the Scope of Its Audit Work, and Announces the Resignation of the Chair of NQ's Audit and Special Committee**

In the spring of 2014, further news as to the true state of NQ's affairs became public that further supported – and deepened – the market's concerns that NQ's reported mobile security revenue was largely illusory and that Defendants' denials were a sham.  For example, on Friday, April 11, 2014, NQ announced disappointing results for the fourth quarter of 2013.  Multiple analyst comments attributed these poor results to the increased scrutiny of NQ's behavior in the 4th quarter of 2013 – and to a resulting decrease in the amount of fraudulent revenue that NQ would have otherwise reported (as one analyst put it, "investors need to realize that prior audits of the company were likely not as rigorous, and the extra scrutiny made it harder to fake profits and cash flow in Q4").  In response, NQ shares fell from $15.99 on April 10 to close at $11.05

on April 14, representing a two-day decline of 28%, on heavy volume.  ¶¶8, 95-97.

Worse news, however, was yet to come.  On April 30, 2014, NQ announced that it would not timely file its annual report and audited financials for 2013 on Form 20-F, but stated that it would file them in 15 days.  ¶98.  On May 15, 2014, however, upon expiry of this 15-day period, NQ failed to file its Form 20-F or produce audited financials for 2013 – and was forced to admit that it was unable to announce a new schedule for when it might do so.  The market – which viewed NQ's inability to produce a timely annual report and audited financials for 2013 as confirmation that NQ's prior financials and reported results had been materially inflated and could not be relied upon – reacted swiftly: on May 15, 2014, the price of NQ shares fell a further 29%, from $10.23 to $7.27, on heavy volume of more than 20 million shares.  ¶¶9, 99.

On June 4, 2014, NQ stated that its Special Committee and its "Team" of consultants had purportedly found no evidence of fraud.  However, NQ admitted that the Team had found that it suffered from "lax internal controls and informal business practices," and further stated:

> Despite the [Team's] extensive review of documents and data provided by sources both within and outside [NQ], the … Team could not verify that the devices it collected and copied contained all responsive information at the time the copies were made.  ***On many devices, the Investigation Team observed indications that some information might be missing, and [NQ's] management and staff were unable to provide a credible explanation for what the … Team observed***.

¶100.  Moreover, NQ declined to produce the Special Committee's actual report (even in redacted form) – ***nor has NQ produced it as of the date of the filing of this brief***.  ¶¶10, 100.

With its 2013 Form 20-F still unfiled, on July 3, 2014 – the last day of the Class Period – NQ announced that its Audit Committee and Special Committee chair, Ying Han, was ***resigning*** from those positions and also stepping down from NQ's Board.  In the same release, NQ also announced that: (1) PwC-ZT had told NQ that it would have to perform additional audit procedures and expand the scope of its audit in order to complete its audit work on NQ's 2013

15

financial statements; and (2) NQ – rather than agreeing to its auditor's request – was merely

"considering" it.  In response to this news, which investors interpreted as confirmation of the

previously voiced concerns about the (un)truth and (un)reliability of NQ's prior reports of its

financial condition and performance, NQ shares fell a further 32% that day, from $6.76 to a new

all-time low of $4.58, on exceptionally heavy volume of over 35 million shares.  ¶¶11, 101.

> ### E.  Post Class-Period Events:  NQ's Chairman and Co-CEO, Two More Directors and NQ's CFO All Resign, and NQ *Fires* Its Auditors

On July 18, 2014, NQ announced that its Audit Committee (now conveniently headed by

a new chair) had fired PwC-ZT as auditor and replaced it with Marcum Bernstein Pinchuk LLP

("MBP") "with respect to the fiscal year 2013 and subsequent periods."  It also disclosed that:

> PwC[-ZT] advised [NQ] and the Audit Committee that the observations referred to in [NQ's] press release reporting on the Special Committee's Independent Investigation dated June 4, 2014 regarding questions related to electronic data collected by the Investigation Team would require it to expand the scope of its work and, if investigated further, ***may cause it to be unwilling to rely on management representations in connection with its audit work***.

> The Audit Committee has considered the additional procedures proposed by [PwC-ZT].  The Audit Committee notes that [PwC-ZT] informed the Company and Audit Committee that as part of those procedures it would seek among other things information that is not in the possession, custody or control of [NQ].  ***For example, [PwC-ZT] has requested that the Company provide [PwC-ZT] with access to multiple third parties' original bank statements and financial records***.

> Furthermore, [PwC-ZT] has advised [NQ] and the Audit Committee that, depending upon what [it] learns from the procedures performed pursuant to its expanded audit scope, ***there may be other or additional information that [PwC-ZT] would need***….

¶¶12, 102.  A month later (just after the Complaint was filed) Defendant Teo resigned as NQ's

CFO on August 15 for "personal reasons."  *See* Jasnoch Ex. A.

Since August 2014, three more senior NQ officials have resigned.  On December 10,

2014, NQ announced that Defendant Lin – NQ's Chairman and co-CEO – had resigned "for

personal reasons" (Jasnoch Ex. B), although press reports have attributed his departure to his

arrest as part of an anti-corruption crackdown by Chinese authorities.  *See* Jasnoch Ex. C.  A week later, on December 18, 2014, NQ announced that two more directors, James Ding (chair of NQ's corporate governance committee) and Xiuming Tao had resigned effective immediately, also purportedly for "personal reasons."  Jasnoch Ex. D at 12.[2]  In sum, in just the five and a half months from July to mid-December 2014: (a) NQ's co-CEO, Chair, and co-founder resigned; (b) three other NQ directors resigned (including the chairs of its Audit, "Special," and Corporate Governance Committees); (c) NQ saw **two** of its CFOs resign in less than a year; and (d) NQ fired its outside auditors.  Meanwhile, NQ shares have continued to languish, having closed at a new all-time low of only $3.38 per share on February 2, 2015.

## ARGUMENT

Under Rule 12(b)(6), Plaintiffs' allegations are accepted as true and all reasonable inferences must be drawn in their favor (*Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014)), and a complaint must not be dismissed if it states "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Thus, a plaintiffs' factual allegations need only be "enough to raise a right to relief above the speculative level," such that the claims cross the line "from conceivable to plausible." *Id.* at 555, 570.  Under §10(b), Plaintiffs must plead (1) a material misrepresentation or omission by the defendant (2) made with scienter (3) in connection with the purchase or sale of a security, plus (4) reliance, (5) economic loss, and (6) loss causation.  *Stoneridge Inv. Ptnrs. LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Here, Defendants attack the Complaint only on loss causation and scienter grounds, and on the novel grounds that it improperly relies on "information and belief" instead of "personal knowledge" in pleading misrepresentations and omissions.

---

[2] Because Jasnoch Exs. A-D reference facts that post-date the Amended Complaint, Plaintiffs request that they be treated as if they were part of a supplemental pleading under F.R.C.P. 15(d).

## I.      PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION UNDER RULE 8

Although plaintiffs must show that "defendant's misrepresentation … proximately caused [their] economic loss" (*Dura Pharma. Inc. v. Broudo,* 544 U.S. 336, 346 (2005)), at the pleadings the Supreme Court has made clear that loss causation allegations are governed by the notice pleading standards of Rule 8,  *id.* at 356, and a plaintiff need only provide "a defendant with ***some indication*** of the loss and the causal connection that the plaintiff has in mind," inasmuch as the loss causation requirement is "***not*** meant to impose a great burden."  *Id.* at 347.

The Complaint alleges how, in response to the publication on October 25, 2014 of corrective disclosures contained in the October 2013 Report, the price of NQ shares suffered an immediate one-day decline of 47% (or $10.79 per share) on record volume, and a further decline of 12% (or $1.46 per share) the next day – ***for a two-day decline of roughly 56%***.  ¶¶93, 131-33. Defendants thus do not dispute that Plaintiffs meet *Dura*'s standard of giving defendants "some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura,* 544 U.S. at 347.  Instead, Defendants assert there is no loss causation here because the disclosures contained in the October 2013 Report were allegedly no more than a "negative characterization of already-public information," and that the Report's contents therefore cannot form the predicate of loss causation allegations in a fraud-on-the-market case.  NQ Br. at 13, citing *Meyer v. Greene,* 710 F.3d 1189, 1197-98 (11th Cir. 2013) ("[c]orrective disclosures must present facts to the market that are new") and *In re Omnicom Grp., Inc., Sec. Litig.,* 597 F.3d 501, 512 (2d Cir. 2010).

To "prove" their assertion that the Report contained no "new information" beyond its author's "negative opinions," Defendants rely on boilerplate from the Report which states that "all information contained herein … has been obtained from public sources." NQ Br. at 14. Defendants, however, fail to read in full, or in context, what the Report actually says about its

sources.  Read in full, the relevant text of the Report states as follows:

> Our research and reports express our opinions, which we have based upon generally available information, ***field research,*** inferences and deductions through our due diligence and analytical process.  To the best of our ability, all information contained herein is accurate and reliable, and has been obtained from *public sources* we believe to be accurate and reliable, ***and <u>who</u> are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty … to the issuer***…

*See* Musoff Ex. B at 1.  In other words – and contrary to Defendants' baseless assertions – what is actually clear from the Report is that (1) its analysis reflected both "generally available information" ***and*** Muddy Waters' own "***field research***" (which is identified as a category of information separate and apart from "generally available information"), and (2) its reference to "public sources" was made in the context of confirming that Muddy Waters had not used any ***individuals*** as sources "***<u>who</u>***" had provided "insider" information in violation of the federal securities laws.  Needless to say, information is not "public" in the fraud-on-the-market (or efficient markets) context simply because it was not obtained from an insider's illegal "tips."

That the October 2013 Report did indeed disclose a large amount of material "new news" that the market was previously unaware of is also apparent from a review of the Complaint and the text of the Report itself (Musoff Ex. B).  For example, the Report describes how

- its disclosure that NQ's biggest customer, YDT, was a mere instrumentality of NQ that lacked *bona fide* physical operations of its own was based on Muddy Waters' ***independent field work***, including (1) its site visits to 10 locations across China where YDT claimed to have an office (¶54); (2) its finding that YDT and NQ shared the same email server; (3) its comparison of records from certain regional phone books and Chinese provincial records which showed the same contact person and phone numbers for both YDT and NQ; and (4) its discovery that the customer service number that YDT provided to China's Information Ministry ("MITI") was the same as NQ's customer service number – and that NQ customer service representatives (rather than anyone identified as being with YDT) answered that number when dialed. (¶58; *see also* Musoff Ex. B at 9-15);

- the Report's conclusion that NQ had vastly exaggerated its reported revenue from NQ's prepaid card channel was similarly based on Muddy Waters' ***independent inquiries and site visits***, which included both its questioning of NQ customer service

personnel (who were ultimately able to identify only a handful of such vendors in China's largest cities) and follow-up site visits to those vendors (which confirmed that even those few vendors sold only a pittance's worth of pre-paid NQ cards). (¶¶65-68; *see also* Musoff Ex. B at 17-23);

- the Report's finding that NQ had vastly inflated its reported revenues from the U.S. was again based on Muddy Waters' ***independent field work,*** including site visits and calls to 84 purported retailers of NQ products in the U.S.  ¶76.  Indeed, the Report annexed a summary of the previously undisclosed results of its survey of NQ retailers in the U.S. as an Appendix to the Report.  (*See* Musoff Ex. B at 38, 61-66);

- the Report's finding that NQ had grossly exaggerated its reported market share in China was, once again, based primarily on Muddy Waters' own ***independent field work,*** consisting of (1) its own previously unreleased survey of over 800 respondents from five Chinese cities (which concluded that NQ's market share was ***at best*** no more than 1.4%) and (2) its on-site examinations of 113 cell phones at various stores in those same cities.  (¶¶77-80; *see also* Musoff Ex. B at 25-29); and

- the Report's disclosure that NQ's flagship mobile security product, Antivirus 7.0, was unsafe and is more aptly considered spyware was, again, based on Muddy Waters' own ***independent analysis*** – specifically, the previously undisclosed results of a report that it had specially commissioned from a software engineering firm.  ¶¶88-90; *see also* Musoff Ex. B at 2-3, 33-36, 71-81).

This case is thus easily distinguished from *Meyer,* where the court, upon actually examining the report at issue there, found that it was "gleaned entirely" from the company's own public filings and other information that was "already public."  *Meyer*, 710 F.3d at 1198.

Without even trying to argue that any of the foregoing examples of new information had previously been disclosed to the market, Defendants instead (1) cite to a few pieces of other information in the Report which they claim were public, and then (2) ask this Court to infer, at the pleadings, that ***all*** of the market's sharp reaction to the Report (in the form of a ***56% decline*** in the value of NQ's shares) was due to the Report's "interpretation" of previously public information, and that ***none*** of that 56% stock decline, as a matter of law, can be attributed to the disclosure of any new information (such as the "new news" discussed in the bullet points above). NQ Br. at 14-15.  Defendants are wrong for at least two separate reasons.

20

First, Defendants ignore the rule in this Circuit that, at the pleadings, plaintiffs need not disaggregate the portion of a stock market drop that is due to "new news" from that portion, if any, that defendants might ultimately be able to attribute to the re-dissemination of "old news" or some other intervening cause.  As the Second Circuit has recently stated:

> Plaintiffs need not [show] on a motion to dismiss that the corrective disclosure was the ***only*** possible cause for decline in the stock price.  *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) ("[I]f the loss was caused by an intervening event…the chain of causation will not have been established. But such is a matter of proof at trial"); … *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.,* 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[At the pleadings], the [complaint] need not rule out all competing theories for the drop in . . . stock price; that is an issue to be determined by the trier of fact on a fully developed record.")

*Carpenters Pens. Tr. Fund of St. Louis v. Barclays PLC,* 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original) (reversing dismissal of §10(b) claims on loss causation grounds).

Second, even Defendants' cherry-picked examples of what they claim are the Report's mere characterizations of earlier-distributed "old news" do not support their argument, as they rely on an overbroad concept of what "public information" is in the fraud-on-the-market context. For example, Defendants note that ***part*** of the Report's conclusion that YDT (an NQ *customer*) was a shell entity was based on Muddy Waters' review of YDT's filings with China's SAIC (¶¶49-53) – but they cite no authority for the notion that efficient markets incorporate ***every*** piece of information about a publicly-traded company that is theoretically accessible to the public, let alone every such piece of information about that company's non-publicly traded ***customers***.

Instead, Second Circuit case law shows that, in the rare instances where cases have been dismissed at the pleadings on loss causation grounds, the company-specific information that was found to have been "publicly available" for fraud-on-the-market purposes was contained in either (a) the ***corporate defendant's*** own SEC filings or statements, or (b) analyst reports, broadly distributed newspaper or newswire outlets, journals that covered the defendant's industry, or

other materials regularly monitored by market professionals.  For example, in *Omnicom* (on which NQ heavily relies), the "public" information at issue involved an advertising company and had previously been published in both *Fortune* and *Advertising Age* (*Omnicom*, 597 F.3d at 505 n.1-2), and in the two cases that *Omnicom* relied upon the public facts at issue had previously been disclosed by the defendant *in its own prior SEC filings*.[3]  Similarly, the Supreme Court has recently confirmed that fraud-on-the-market doctrine is based ***not*** on the notion that markets are so "perfectly" efficient that they reflect all information that is theoretically within the public domain, but on the "fairly modest premise" that "market professionals generally consider most ***publicly announced*** material statements about [a] compan[y], thereby affecting stock market prices." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2403 (2014).[4]

In short, not only was there ***no*** prior disclosure of ***any*** of the "new news" noted in the bullets at p. 19-20 above, but NQ ***also*** fails to do more than raise a factual dispute, inappropriate for resolution at the pleadings, as to whether the other snippets of information they cite (NQ Br. at 14-15), such as *YDT's* SAIC filings and certain facts that Muddy Waters mined from the internet, qualify as "publicly announced" information concerning *NQ* that, under *Halliburton,* an efficient market would have necessarily ferreted out and processed prior to publication of the

---

[3] *See Teachers' Ret. Sys. of La. v. Hunter,* 477 F.3d 162, 187-88 (4th Cir. 2007) and *In re Merck & Co. Sec. Litig.,* 432 F.3d 261, 269-70 (3d Cir. 2005). Similarly, *Central States, SE & SW Areas Pens. Fund v. FHLMC,* 543 F. Appx. 72, 74-75 (2d Cir. 2013), also cited by NQ, simply held that there had been sufficient "public information" to put the market on notice of FHLMC's true condition prior to July 2008 based on FHLMC's ***own*** prior public announcements of increased losses and the release of a supplement to its own SEC-filed 2006 Annual Report.

[4] NQ's loss causation argument is akin to a "truth-on-the-market" defense as it argues, in substance, that "all of the concerns that plaintiffs say were omitted were, in fact, disclosed." *Plumbers & Pipef'rs Local No. 630 Pens.-Ann. Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 485-86 (S.D.N.Y. 2010).  But the defense is "intensely fact-specific," and only "rarely*"* warrants dismissal.  *Id.,* citing *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

October 2013 Report.[5]  NQ's cite to three articles by a large NQ investor (Toro Partners) also does not refute loss causation, as those articles simply argued that the October 2013 Report made incorrect (rather than "old") findings – and NQ cites *no* analysts for the view that the October 2013 Report contained no "new news."  *Cf. Omnicom,* 541 F. Supp. 2d at 550 (where this Court's finding *at summary judgment* that a *Wall Street Journal* article contained no "new news" was confirmed by multiple analyst reports which all agreed that it had "no new information").[6]

Moreover, to the extent NQ seeks to use the Toro articles (Musoff Exs. O, P & Q) to claim that the October 2013 Report was *untrue* or incorrect, this Court cannot consider them at all.  *See, e.g., In re Longwei Petro. Inv. Hldgs Ltd. Sec. Litig.,* No. 13-cv-214, 2014 WL 285103, at *6 (S.D.N.Y. Jan. 27, 2014) ("Defendants imply that [the shortseller] revelations [that plaintiff relies on] were in fact untrue, *but such a claim cannot be evaluated on a motion to dismiss*.").

In *Henning v. Orient Paper, Inc.,* No. 10-cv-5887, 2011 WL 2909322 (C.D. Cal. July 20, 2011), a strikingly similar case, investors also sued a Chinese company for fraud after its stock price fell sharply in response to contents of a Muddy Waters report, which the defendants characterized as "unsubstantiated rumor."  *Henning,* however, had no difficulty in upholding the complaint on loss causation grounds, finding that "Plaintiffs' losses stem from the Muddy Water report's revelation of the[] alleged frauds."  *Id.*, at *8.  This Court should plainly do the same. *See also Longwei, supra* (loss causation adequately pled where Chinese company's stock fell in response to analyst's report disclosing previously unpublished findings of its independent investigations and related site visits, which showed that defendant's oil storage facilities were

---

[5] Multiple cases have sustained §10(b) claims based on later analysis of a defendant company's (let alone its customer's) SAIC filings.  *See, e.g., Duoyuan Water,* 887 F. Supp. 2d at 568; *Brown v. China Integr. Energy,* 875 F. Supp. 2d 1096, 1116 (C.D. Cal. 2012); *see also* n.6, *infra.*

[6] One Toro report even undercuts NQ's view that YDT's SAIC filings are "public" in any real sense, as it notes that (unlike SEC filings) they "must be requested in person." Musoff Ex. Q at 1.

idle, and that company was therefore likely overstating its oil revenues); *In re Montage Tech. Grp Ltd. Sec. Litig.,* No. 14-cv-722, 2015 WL 392669 (N.D. Cal. Jan. 29, 2015) (loss causation adequately pled where Chinese company's stock fell in response to analyst report detailing the company's reliance on related-party transactions to inflate its revenues).

In a footnote, NQ also asserts there is no loss causation as to the sharp declines that NQ shares also suffered in response to (1) NQ's April 11, 2014 dismal 4th quarter earnings news (which the market largely attributed to NQ's decreasing ability to get away with generating phony revenue), ¶¶95-97; (2) the May 5, 2014 news that NQ would not meet its already extended deadline for filing its 2013 annual report, ¶99; and (3) the July 3, 2014 news that the chair of NQ's Audit and Special Committees had resigned, and that NQ's auditors wanted to expand the scope of their audit (news that, like the April and May disclosures, the market also viewed as further substantiating its concerns that NQ's prior results had been inflated).  ¶101.  NQ asserts these disclosures were not corrective because they "revealed no information relevant to alleged 'fraud.'"  NQ Br. at 17 n.7.  However, "market[s] may learn of possible fraud [from various] sources," including "analysts' questioning financial results [and] resignation of CFOs or auditors."  *E.g., In re Winstar Commc'ns,* No. 01 CV 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006), quoting *In re Enron Corp. Sec., Deriv. & ERISA Litig.,* No. MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005).  NQ cites *Police & Fire Ret. Sys. of Detroit v. SafeNet, Inc.,* 645 F. Supp. 2d 210, 229 (S.D.N.Y. 2009) to argue that investors would not view news of the departure of a company official or auditor, without more, as indicative of fraud.  But *SafeNet* is easily distinguished because (a) there had been no prior fraud allegations at the time the CFO left (and hence no reason to believe that the market viewed the CFO's departure as confirming prior fears of fraud), and (b) the court clearly believed that the stock drop at issue

was due not to the CFO's departure, but to unrelated news that a major SafeNet corporate deal had collapsed. *Id.* at 229. No such intervening or "confounding" news occurred here. *See also Pub. Empl. Ret. Sys. of Miss. v. Amedisys, Inc.,* 769 F.3d 313, 323-25 (5th Cir. 2014) (reversing district court decision cited by NQ, and holding that multiple alleged partial disclosures, even if inadequate standing alone, adequately pled loss causation when viewed collectively).

## II.   PLAINTIFFS ADEQUATELY PLEAD FRAUD UNDER RULE 9(b)

Under Rule 9(b), Plaintiffs need only "(1) specify the statements that … were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why [they] were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Similarly, the PSLRA simply requires a complaint to "specify each statement alleged to have been misleading" and the "reasons why [it] is misleading" – and expressly permits "allegation[s] regarding [such] statement[s]" to be made on "information and belief," provided only that "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u–4(b)(1).

Here, Plaintiffs plainly allege the "who, what, when, where and how" of the alleged fraud under Rule 9(b) and the PSLRA. For example, the Complaint identifies each of Defendants' fraudulent statements, when they were made, and who made them. *See* ¶¶46, 104, 106, 108, 110, 113, 115-18, 121-23, 127, 129, 131-33, 135-36, 139-42 & 149-53. Similarly, Plaintiffs also plead in detail why each such statement was materially false and misleading. *See* ¶¶47-90, 105, 107, 109, 111, 114-15, 119-20, 125-26, 128, 130, 134, 137-39, 143-44 & 154-59.

Defendants nonetheless assert that the Complaint is defective because it relies "solely" on "secondhand information" from the October 2013 Report, rather than on "Plaintiffs' own knowledge." Securities fraud plaintiffs, however, may – and invariable do – rely on hearsay at the pleadings, including analyst reports (*e.g., Inst. Inv. Grp v. Avaya, Inc.,* 564 F.3d 242, 248 (3d

Cir. 2009)), news articles (*e.g., Litwin v. Blackstone Grp, L.P.*, 634 F.3d 706, 718 (2d Cir. 2011)), and even unsigned internet postings (*e.g., In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-CV-397, 2009 WL 1410961, at *1 (D.N.J. May 19, 2009)).  Indeed, efforts by Chinese companies to dismiss claims based on reports by Muddy Waters – the same analyst that NQ attacks here – have been uniformly rejected.  *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547 (S.D.N.Y. 2012) (sustaining §10(b) claims); *Henning,* 2011 WL 2909322, at *4 (same, and adding that "the truth of the Muddy Waters report . . . is a factual dispute not appropriate for resolution at [the pleadings]); *McIntire v. China MediaExpress Hldgs., Inc.,* 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (same); *accord Longwei,* 2014 WL 285103, at *4 (courts "frequently accept allegations based on short-seller reports at [the pleadings]").

By contrast, none of Defendants' cases come remotely close to holding that securities fraud plaintiffs may not base "information and belief" allegations on the contents of specifically identified "hearsay" sources such as analyst reports, or that evidentiary facts concerning fraud in a fraud-on-the-market case (where the plaintiffs have had no direct dealings with the defendants) are not "peculiarly" within the defendants' knowledge.  For example, in *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 357 F. Supp. 2d 712 (S.D.N.Y. 2005) and *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997 (2d Cir. 1988), the claims asserted were dismissed not because the facts alleged came from analyst reports, but because they were conclusory and unsupported by ***any*** meaningful statement of non-conclusory factual allegations.  Similarly, *Campo v. Sears Holdings Corp.,* 635 F. Supp. 2d 323, 330 (S.D.N.Y. 2009) and *Janbay v. Canadian Solar, Inc.,* No. 10 cv 4430, 2013 WL 1287326, at *13 (S.D.N.Y. Mar. 28, 2013) simply hold that an *unnamed* informant must be described with sufficient particularity to support the probability that someone in the informant's position would possess the information alleged.  But as noted above, claims based on facts

sourced to a specifically identified analyst (here, Muddy Waters) are well-pled.  *See also In re China Educ. All., Inc. Sec. Litig.,* No. CV 10-9239, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011) (plaintiff may rely on facts from identified shortseller report) (citing *Henning*).[7]

Tellingly, NQ ultimately concedes that plaintiffs may properly rely on "third-party reports" (NQ Br. at 19 n.8), but suggests that this is permissible only where such reports are corroborated by other sources.  Defendants, however, cite no authority for their position, nor can they, as it is hornbook law that at the pleadings courts must accept as true ***all*** of plaintiffs' factual allegations (rather than only those that are supported by multiple sources).  In any event, NQ's claim that Plaintiffs' fraud claims rely "entirely" on reports from Muddy Waters is also false. *See, e.g.,* ¶¶55-56 (citing 11/3/13 *Bloomberg* article stating that YDT's "main operating facility" had no listing for YDT, that the security desk at the site had "never heard of [YDT]," and that photos of YDT's purported "office" showed no telephones or filing cabinets, but only a few "employees" staring into blank computer screens within another company's office); ¶60 (citing NQ's reversal of its own prior story about its relationship with YDT's owner); ¶61 (citing 11/3/2013 *Phoenix New Media* article as to NQ director Zhou Xu's role in controlling both NQ and YDT); ¶68 (citing NQ's refusal to identify more than 15 of the "5000 stores" that it had claimed were sellers of prepaid NQ cards); ¶¶86-87 (citing 4/7/2014 *Seeking Alpha* article supporting claims that NQ had overstated its cash deposits); ¶90 (citing 11/4/2013 *Bloomberg* article confirming existence of software engineering firm's evaluation of NQ's security apps that

---

[7] NQ also cites *Toussaint v. JJ Weiser & Co.,* No. 04 CV 2592, 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005), but it only confirms that fraud claims ***can*** be based on "information and belief" where, as here, they are accompanied by "a statement of facts upon which the belief is founded."  *Id.,* at *10.  *Pirelli Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F. 3d 436, 443 (7th Cir. 2011) – an ***individual*** action brought by a third-party payor of medical benefits – is to the same effect, except that it dismissed the claims because the plaintiff failed to explain why it did not base its claims on its ***own*** reimbursement data from its dealings with Walgreen.  *Id.* at 444.

was cited in October 2013 Report, and quoting that firm's R&D director as confirming that "security [on NQ's app] is very poor"); ¶¶98, 101-02 (citing NQ's own statements regarding its inability to timely file financial statements, the resignations of its Audit Committee chair, and its dismissal of its auditors following their requests to expand their audit scope).[8]

## III.    PLAINTIFFS ADEQUATELY ALLEGE SCIENTER

Finally, NQ asserts that Plaintiffs fail to plead the requisite "strong inference" of scienter under the PSLRA.  To determine if this standard is met, Plaintiffs' factual allegations must be reviewed ***in their totality,*** rather than parsed in piece-meal fashion.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 323 (2007).  The inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"; instead, the inquiry is:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id*. at 326.

Viewed in their totality, Plaintiffs easily plead a strong inference of scienter.  *See* ¶¶182-85, 186(a-i).  As shown below, not only do Plaintiffs allege the NQ Defendants' motive to commit fraud, but also allege a host of additional factors giving rise to strong circumstantial evidence of their scienter.  Indeed, it defies credulity that its senior officers were unaware of the phony nature of the "revenue" that YDT purported to generate for NQ (or of YDT's status as an shell instrumentality and related party of NQ), or that NQ's touted "pre-paid card" channel was virtually non-existent, or that its share of the Chinese market was roughly 1/50th of what it touted, or that its foreign revenue was grossly inflated, or that its flagship security software was basically spyware.  Nor can it deny that three of the individual defendants (two CFOs and a co-CEO, Chairman, and co-Founder) and three other senior directors have all resigned, all in the

---

[8] NQ's regurgitated argument (NQ Br. at 19) that the information in the Muddy Waters Report did not reveal any information that was not already "public" is addressed at §I above.

28

wake of findings (in an internal NQ report that has yet to be released) that company data was missing without adequate explanation, and in the wake of NQ's decision to *fire* its outside auditors rather than agree to their demands to expand the scope of their audit work.  A larger, more pervasive cloud of fraud touching virtually every aspect of NQ's core mobile security business could hardly be imagined, and in such circumstances the individual defendants' demands for "more specificity" as to why they should have been aware of fraud rings hollow. *See, e.g., In re L&L Energy, Inc.,* No. C11-1423, 2013 WL 6244654, at *3-4 (W.D. Wash. Dec. 3, 2013).  Indeed, inasmuch as defendants do not challenge the Complaints' allegations of falsity, each defendant's post-October 2013 public denials of fraud are also fraudulent.[9]

### A.  Plaintiffs' Motive Allegations Further Support a Strong Inference of *Scienter*

As a threshold matter, although not required to plead motive at all, *see Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011), Plaintiffs allege how Defendants had unusually strong incentives to inflate NQ's share price during the Class Period to facilitate NQ's efforts to raise $172 million in October 2013 from an offering of NQ notes (which were convertible into NQ shares), and to facilitate an extraordinary series of corporate acquisitions in which the Defendants used roughly 50 million NQ shares (worth additional hundreds of millions of dollars) as inflated "currency" to acquire over a dozen companies.  ¶184.

"[A]rtificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter," *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000), and although the "simple purchase of one company by another" may not adequately allege a motive to commit

---

[9] Although NQ attempts to introduce its six-months' late Form 20-F and accompanying press release from October 2014 to try to argue that there was no fraud (*see* Musoff Exs. T and U), none of these materials were cited in the complaint, and its efforts to raise a factual dispute through such self-serving materials is improper.  *See, e.g., In re Longwei,* 2014 WL 285103, at 6 ("Defendants' imply that [the short-seller's] revelations were in fact untrue, but such a claim cannot be evaluated on a motion to dismiss"), *Henning,* 2011 WL 2909322, at *4 (same).

fraud, allegations of a "sustained and extensive plan to grow by acquisition, particularly through scores of acquisitions paid for with a company's stock, as alleged here, may." *In re Interpublic Secs. Litig.*, No. 02-cv-6527, 2003 WL 21250682, at *11 (S.D.N.Y. May 29, 2003). Defendants' use of 50 million NQ shares to acquire (in whole or substantial part) no fewer than *12* other companies plainly alleges use of inflated shares as part of a "sustained and extensive plan to grow by acquisition." *Cf. id.*; *see also In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 293 (S.D.N.Y. 2008) (use of company's inflated shares as currency to acquire other entities supported strong inference of scienter); *In re Omnicom Grp, Inc. Sec. Litig.*, No 02-cv-4483, 2005 WL 735937, at *13 (S.D.N.Y. Mar. 30, 2005) ("allegations of motive based on acquisitions of other companies through Omnicom stock are sufficient to raise a strong inference of scienter").

### B.      NQ's Related-Party Transactions with YDT Shows Defendants' Scienter

NQ's reliance on revenue from its extensive related-party dealings with YDT strongly supports the inference that the NQ Defendants acted with scienter. *See In re Medicis Pharma. Corp. Sec. Litig.,* No. 08-cv-1821, 2010 WL 3154863, at *5-*6 (D. Ariz. Aug. 9, 2010) ("simplicity and obviousness" of related party dealings gave rise to strong inference of scienter).

First, NQ's reported revenue from YDT was significant, as it accounted for $20.2 million (or roughly 70%) of its 2012 carrier billing revenue. For NQ to have derived the claimed revenue from YDT, however, YDT would have needed to generate at least that much revenue – and YDT's SAIC filings show that YDT generated only 14% of the revenue that NQ claimed to have later received from YDT. ¶¶49-50. Moreover, YDT's reported accounts *payable* figures cannot be reconciled with NQ's reported accounts *receivable* figures from YDT. ¶51. Courts in other Chinese fraud cases have held that similar allegations support a strong inference of scienter. *See Scott v. ZST Digital Networks, Inc.*, No. 11-cv-3531, 2012 WL 538279, at *8 (C.D.

Cal. Feb. 14, 2012) ("marked disparity" between figures reported to SEC and SAIC regulators suffised to plead strong inference of scienter); *China Educ. Alliance*, 2011 WL 4978483, at *6 (significant disparities between revenue figures reported in China and the U.S. gave rise to strong inference of scienter); *Brown v. China Integr. Energy, Inc.,* 875 F. Supp. 2d 1096, 1122 (C.D. Cal. 2012) (such "obvious" discrepancies "give rise to a strong inference of corporate scienter.").

Second, as site visits by Muddy Waters and *Bloomberg* and even a photo from an NQ sympathizer all confirmed, YDT was a shell entity that was owned and managed by a former NQ executive that lacked any meaningful physical operations (let alone sufficient staff and facilities to process millions of transactions for NQ).  For example, when *Bloomberg* visited what YDT's majority owner and former NQ executive Xu Rong stated was YDT's "main operating facility," it found only 15 purported YDT "employees" who were purportedly "sharing space" at the offices of a different company – and tellingly, the building's directory contained no listing for YDT, and building officials advised that "they'd never heard of [YDT]."  ¶55.  That YDT was a mere instrumentality of NQ is further shown, *inter alia,* by the fact that: (i) YDT and NQ share the same email server; (ii) China Mobile phone listings show that YDT and NQ shared the same office, phone number, and contact person; (iii) YDT and NQ gave the same customer service phone number to MIIT (and NQ staff, not YDT personnel, answered the number when dialed); (iv) YDT and NQ both gave the same person with the same NQ phone number as their official contact in a Zhejiang government registry; and (v) YDT listed a person with an NQ email address (xuying@netqin.com) as YDT's email contact in YDT's SAIC filings.  ¶58.

That any NQ Defendants could have been somehow unaware of the true nature of the NQ-YDT relationship is further belied by the fact that (1) not only was YDT's "Potemkin office" "based" at the offices of another company co-owned by former NQ executive Xu Rong, but (2)

Zhou Xu – one of NQ's three "co-Founders" (with Defendants Lin and Shi) and a controlling shareholder and director of NQ – also maintains an office at the 9H facility where YDT's "main facility" is purportedly housed.  That NQ has repeatedly lied about its relationship with Xu Rong[10] also only further strengthens the inference of scienter. *See Brown*, 875 F. Supp. 2d at 1124 ("evidence of concealment is strongly indicative of scienter").

Related-party transactions are viewed by courts with "extreme skepticism."  *S.E.C. v. China N.E. Petro. Hldgs Ltd.,* No. 12-cv-8696, 2014 WL 2767121, at *6 (S.D.N.Y. Mar. 27, 2014), citing *McCurdy v. S.E.C.,* 396 F.3d 1258, 1261 (D.C. Cir. 2005).  "Common sense dictates that [a related-party transaction] is material information and indeed, Regulation S–K devotes an entire section and notes that it is one of the core disclosures that companies have to report."  *Snellink v. Gulf Res., Inc.,* 870 F. Supp. 2d 930, 941 (C.D. Cal. 2012), citing 17 C.F.R. §229.404; *see* 17 C.F.R. §229.10(f); *see also Stratte-McClure v. Morgan Stanley,* No. 13-cv-0627, 2015 WL 136312, at *6 (2d Cir. Jan. 15, 2015) (failure to make disclosures required by Reg. S-K may serve as basis for §10(b) claim); *China NE,* 2014 WL 2767121, at *6 (where defendant raises shareholder money using misleading documents and then engages in series of undisclosed related-party transactions, inference that defendant did so with fraudulent intent is "inescapable"), citing *In re Adv. Battery Techs., Inc. Sec. Litig.,* No. 11-cv-2279, 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012).  When faced with similar related-party transactions, it is thus not surprising that courts routinely hold that scienter has been adequately pled.  *See Snellink,* 870 F. Supp. 2d at 940-41 (citing cases finding a strong inference of scienter when

---

[10]  In 2011, NQ identified YDT's owner, Xu Rong, as a mere NQ "consultant" for the period 2006 and 2007, and similarly confirmed in July 2013 that she had been an NQ "advisor" for "less than six months before leaving [in 2007] and buying her interest in YDT."  It was only after the October 2013 Report was published, however, that NQ finally admitted that Xu Rong had been an ***employee*** of NQ for ***more than two years***, through the end of 2008.  *See* ¶¶60, 186(d).

U.S.-listed Chinese companies overstated their financials in SEC filings and failed to disclose related party transactions); *see also China Educ. Alliance*, 2011 WL 4978483, at *5-*6; *Henning*, 2011 WL 2909322, at *6-*7; *Dean v. China Agritech, Inc.,* No. 11-cv-1331, 2011 WL 5148598, at *4 (alleged related party transactions supported strong inference of scienter); *In re Montage*, 2015 WL 392669, at *8 (finding strong inference that senior officers of Chinese company were aware that their "largest distributor" was a related party).

### C. NQ's Unexplained Data Deletions and the Firing of Its Auditor, Plus the Resignations of Multiple Top NQ Officers and the Chairs of Its Audit, "Special" and Corporate Governance Committees, Further Supports a Finding of Scienter

When NQ released the results of its own Special Committee investigation into the alleged fraud, NQ admitted that its team "could not verify that the devices it collected and copied contained all responsive information at the time the copies were made," that on "many devices," the investigation found that "information might be missing" – and that NQ "management and staff were unable to provide a credible explanation for [the missing information]." ¶10. Shortly thereafter, PwC-ZT was forced to advise NQ that it would need to perform additional procedures and expand the scope of its audit work before it could issue any opinion on NQ's as-yet unissued 2013 financial statements, and warned that it might no longer be able to rely on management representations in connection with its audit work. ¶11. Case law is clear that "[a]llegations relating to document destruction and concealment of the alleged fraud are relevant to scienter." *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 2003 WL 230688, at *16 (S.D. Tex. Jan. 28, 2003). Similarly, an outside auditor's unwillingness to rely on management's representations also supports the inference that corporate officers acted with scienter to misrepresent or conceal the truth. *In re Maxwell Tech., Inc. Sec. Litig.,* 18 F. Supp. 3d 1023, 1039-40 (S.D. Cal. 2014) citing *In re Am. Apparel, Inc. S'holder Litig.,* 855 F. Supp. 2d 1043, 1083 (C.D. Cal. 2012).

Here, moreover, rather than agree to its auditors' request to expand their audit work, NQ *fired* them.  ¶12.  In analogous cases where auditors resigned (instead of being fired) after raising concerns about audit scope and their ability to rely on management, courts have also found support for a strong inference of scienter.  *See, e.g.*, *Hall v. Children's Place Ret. Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 418 (S.D.N.Y. 2007); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 17 (D. Mass. 2000).

Scienter is further supported here by the departures of a half-dozen of NQ's most senior officials, including two of its CFOs and its Chairman and co-CEO.  Specifically, just before the October 2013 Report was published, Defendant Ji abruptly resigned as CFO without explanation. ¶186(h).  On July 3, 2014, the same day that NQ announced that PwC-ZT was seeking to expand the scope of its audit, the chair of NQ's Audit Committee and "Special Committee" resigned from those positions and left NQ's board.  ¶11.  Thereafter, (a) Defendant Teo resigned as CFO for "personal reasons" in August 2014; (b) Defendant Lin, NQ's co-founder, Chairman, and co-CEO, resigned on December 10, 2014 amid reports that he had been implicated in an anti-corruption crackdown by Chinese authorities; and (c) a week later NQ disclosed that two more NQ directors, including the chair of its Corporate Governance Committee, had also resigned for "personal reasons."  *See* Jasnoch Exs. A-D.

Courts repeatedly recognize that multiple resignations of key corporate officials supports a finding of scienter.  *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 163 (D. Conn. 2007), *aff'd*, 312 F. Appx. 400 (2d Cir. 2009) (resignations of multiple corporate officers while company was conducting its own investigation "add one more piece to the scienter puzzle"); *Hall,* 580 F. Supp. 2d at 233 (CEO's resignation added to overall pleading of scienter); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (resignations

supported strong inference of *scienter*); *Fouad v. Isilon Sys. Inc.,* No. C07-1764, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (same); *In re Par Pharm. Secs. Litig.,* No. 06-CV-3226, 2009 WL 3234273, at *10 (D.N.J. Sept 30, 2009) (same), citing *Avaya,* 564 F.3d at 272.

### D.   The Core Operations Doctrine Further Supports a Strong Inference of *Scienter*

During the Class Period, NQ's mobile security app business was NQ's core business. When senior officers make materially false or misleading statements regarding their company's core operations, this circumstance further supports a strong inference that they knew their statements were false or misleading when made.  *See Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) (imputing knowledge to defendants of facts concerning company's core operations that could negatively affect revenue projection); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. Appx. 10, 14 n.3 (2d Cir. 2011) (core operations doctrine may support finding of scienter); *In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("[k]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to [realize] that the company's financial statements were false when issued."); *In re Check Point Software Techs. Ltd. Sec. Litig.,* No. 03-cv-6594(RMB), 2006 WL 1116699, at *3-*4 (S.D.N.Y. Apr. 26, 2006) (dismissal denied where knowledge of the performance of the company's "most important product" related to "core business operations"); *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010) (citing *Atlas* with approval); *see also South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 785-86 (9th Cir. 2008) (under *Tellabs*, "core operations" doctrine should  be considered in a holistic scienter analysis**).**

### E.    The Fraud's Magnitude and Scope Further Supports Inferring *Scienter*

Finally, the sheer size and scale of NQ's fraud further strengthens the inference of

scienter. *See Katz v. Image Innov. H'ldgs*, *Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (magnitude of alleged fraud provides "additional circumstantial evidence of scienter"); *N.Y. City Employees' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 1001 (N.D. Cal. 2009) ("duration, magnitude and pervasiveness" support scienter); *In re Countrywide Fin'l Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1194 (C.D. Cal. 2008) ("issues were so fundamental to [the company] and on such a broad scale" that "it would be difficult to conclude [defendants] did not know what was going on"). *Scottish Re,* 524 F. Supp. 2d at 393–94 & n.174 (GAAP violations may support finding strong inference of scienter based on "the number, size, timing, nature, frequency, and context" of the violation); *Lewin v. Lipper Convertibles, L.P.*, No. 03 Civ. 1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (pervasiveness of fraud provides strong inference of scienter).

## IV.   THE COURT HAS JURISDICTION OVER DEFENDANT SHI BASED ON HIS ACTIONABLE MISCONDUCT DIRECTED TO NQ INVESTORS IN THE U.S.

Defendant Shi also argues that he should be dismissed for lack of personal jurisdiction because Plaintiffs do not allege that he "made any specific representations or engaged in any specific conduct" that form the basis of Plaintiffs' claims.  NQ Br. at 24.  Shi, a co-founder of NQ, was NQ's COO throughout the Class Period.  ¶24.  However, Plaintiffs expressly allege that Shi was announced to investors as being on NQ's October 25, 2013 conference call, at which other NQ officers categorically denied the findings of the October 2013 Report.  ¶133; *see also* Musoff Exh. I, at 3 (showing that Shi was introduced as a call participant).  Where a company officer participates on such a call, he "cannot sit quietly . . . knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, [he] is at fault for a material omission in failing to correct such statements in that context." *Freudenberg v. E*Trade Fin'l Corp.,* 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) (citing *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 655 (5th Cir. 2005)); *Plumbers Union Loc. No. 12 Pens.*

*Fund v. Ambassadors Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) (same).  Nor can Shi

plausibly deny that he knew the call was being held with, and was primarily directed to, market

participants based *in the U.S.*  This Court therefore has jurisdiction over Shi.

**V.      PLAINTIFFS ADEQUATELY ALLEGE §20(A) CLAIMS AGAINST PWC-IL**

Plaintiffs allege that PwC-ZT, which served as NQ's auditor throughout the Class Period

and is a member of the PwC-IL global "network" of accounting firms, violated §10(b) and

Generally Accepted Auditing Standards ("GAAS") by conducting a reckless audit of NQ's

financial statements for 2012 and issuing an unqualified opinion thereon.  The Complaint further

alleges that PwC-IL violated the "control person" liability provisions of §20(a), which provides:

> "Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter … shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such controlled person
> is liable … unless the controlling person acted in good faith…."  15 U.S.C. §78t(a).

**A.      Culpable Participation**

PwC-IL primarily argues that Plaintiffs' fail to plead its "culpable participation" in PwC-

Zt's underlying violation.  Plaintiffs recognize that this Court, and a majority of its sister courts

in this District, have held that a plaintiff must plead "culpable participation" to state a §20(a)

claim.  However, as Judge Scheindlin recently noted, the Second Circuit has yet to rule on the

issue, and a clear majority of circuits that have – including the Fifth, Seventh, Eighth, Ninth (en

banc), Tenth, and Eleventh Circuits – have held that plaintiffs need ***not*** plead culpable

participation to allege a §20(a) claim, and that §20(a) instead provides an affirmative defense of

"good faith" for a defendant to assert.  *See Carpenters Pens. Tr. Fund of St. Louis v. Barclays

PLC,* No. 12-cv-5329, 2014 WL 5334053, at *7 n.75 (S.D.N.Y. Oct. 20, 2014).[11]  This Court

---

[11] Citing *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 958 (5th Cir. 1981); *Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir. 1992); *Metge v. Baehler,* 762 F.2d 621,

should therefore follow the clear weight of circuit authority and find that "a plaintiff need not plead culpable participation by the control person in order to state a legally sufficient claim." *Dobina v. Weatherford In'l Ltd.,* 909 F. Supp. 2d 228, 256 (S.D.N.Y. 2012) (Kaplan, J.); *accord In re Tronox, Inc. Sec. Litig.,* No. 09 Civ. 6220, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010) (Scheindlin, J.) (burden of proving good faith is on defendant); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363-64 (S.D.N.Y. 2005) (same) (Sweet, J.); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003) (same) (Cote, J.).

In asking this Court to reconsider its prior contrary rulings, Plaintiffs note that Judge Scheindlin also initially took the contrary view (*see Indepen. Energy Hldgs PLC Sec. Litig.,* 154 F. Supp. 2d 741, 771 (S.D.N.Y. 2001)), only to reconsider in *In re IPO Sec. Litig.,* 241 F. Supp. 2d 281, 392-97 (S.D.N.Y. 2003) (adopting majority view that plaintiff need ***not*** plead culpable participation).   In so holding, Judge Scheindlin not only distinguished *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2d Cir. 1996) and *Suez Equity Inv., L.P. v. Toronto-Dom. Bank,* 250 F.3d 87 (2d Cir. 2001), relied on by PwC, but also found the statute's legislative history most persuasive. *IPO,* 241 F. Supp. 2d at 395, citing S. Rep. No. 73-792 (1934) at 22 & H.R. Conf. Rep. No. 73-1383 (1934) at 26.   And as Judge Scheindlin also noted, no less an authority than Justice (and former SEC chairman) Douglas similarly stated, in dissenting from a denial of certiorari, that:

> Section 20(a) provides that anyone who "controls" a person liable under the 1934 Act is equally liable, ***subject only to the defense of "good faith."***   The section is remedial and to be construed liberally.   It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable. . . The [Act's] purpose is to expand, not restrict, the public's remedies.

*Id.* at 395-96*,* quoting *Sennett v. Rodman & Renshaw,* 414 U.S. 926, 929 (1973).   In sum, PwC's view that Plaintiffs need to plead culpable participation should be rejected.

---

631 (8th Cir. 1985); *Hollinger v. Titan Cap. Corp.,* 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc); and *Brown v. Enstar Grp., Inc.,* 84 F.3d 393, 396 (11th Cir. 1996).

### B.   Control

Allegations of "control" under §20(a) "'are not averments of fraud and therefore need not be pleaded with particularity.'"  *Hall,* 580 F. Supp. 2d at 228, citing *In re Parmalat Sec. Litig.,* 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006); *Scottish Re,* 524 F. Supp. 2d at 386 (same).

Although PwC-IL labels Plaintiffs' control allegations as "conclusory," Plaintiffs allege, *inter alia,* how (1) PwC-IL and its member firms (including PwC-ZT) collectively market themselves worldwide under the "PwC" name, ¶37; (2) member firms assist each other, share resources, and advise each other, ¶43; (3) PwC-ZT's chair sits on the PwC "Network Leadership Team," which implements "policies and initiatives to achieve a common coordinated approach" to "strategy, brand, and risk and quality" for the firm worldwide, ¶37; (4) PwC-IL creates and enforces policies and standards that PwC-ZT must conform to, ¶38; (5) the audit quality of all PwC member firms is managed "top down," ¶39; and (6) "certain audit activities" conducted by the member firms take place at PwC-IL's centralized service centers, ¶42.  Such allegations more than suffice to adequately allege control.  *See, e.g., STMicroelectronics v. Credit Suisse Grp.,* 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (under §20(a), "control *requires only the ability to direct the actions of the controlled person*, not the active exercise thereof.").

PwC cites *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391 (S.D.N.Y. 2003), a case where the complaint was "bereft" of control allegations and "***at most***" alleged that the alleged  control person set "professional standards and principles."  Here, while Plaintiffs do allege that PwC-IL sets the standards that PwC-ZT is required to follow, they also allege other factors alleging control.  Indeed, given that NQ's audits had to be prepared under ***U.S***. GAAP, it is hard to believe that PwC-ZT did not in fact turn to PwC-IL and its "centralized service centers" for aid in auditing NQ.  ¶42. In addition, PwC-ZT's chair sits on the PwC Network

Leadership Team.  *In re Parmalat Sec. Litig.*, which sustained control person allegations where plaintiffs alleged overlap in audit partners between the controlling and controlled entity, is thus more apposite.  *See* 594 F. Supp. 2d 444, 458-59 (S.D.N.Y. 2009).  Similarly, PwC's reliance on *Floyd v. Lichtung*, No. 10 Civ. 4254, 2013 WL 1195114, at *6 n.15 (S.D.N.Y. 2013) is unavailing, as it dismissed the §20(a) claims given the lack of an underlying violation.

Finally, because the question of whether an entity is a control person is a "fact-intensive inquiry," it "generally should not be resolved on a motion to dismiss."  *See, e.g., Katz v. Image Innov. Hldgs, Inc.,* 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008).  PwC's motion should be denied.

### C.     Underlying Violation of §10(b)

PwC-IL requests that briefing be deferred on whether PwC-ZT has committed an underlying §10(b) violation until PwC-ZT is served.  Plaintiffs do not dispute that this may be more efficient, ***provided*** that deferring decision on the issue does not impair Plaintiffs' ability to proceed with the litigating any of the other issues and claims in this case.   In the meantime, for all of the reasons set forth in the Complaint, and including the magnitude and pervasiveness of the alleged fraud, Plaintiffs respectfully submit that they have more than adequately alleged that PwC-ZT acted at least recklessly, if not knowingly, in issuing two clean audit and internal control opinions for NQ's fiscal years 2011 and 2012 (*see, e.g.,* ¶¶155-74), and reserve all their rights with respect to rebutting any arguments concerning the alleged lack of an underlying §10(b) violation until such time as any PwC Defendant actually advances such arguments.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' respective motions to dismiss should be denied.[12]

---

[12] Alternatively, were this Court to find that the Complaint is deficient in any respect, Plaintiffs request leave to amend to cure any such deficiencies, including by adding the supplemental factual allegations referenced at p. 17 n.2 above.

DATED:  February 11, 2015                    */s/ William C. Fredericks*
                                             William C. Fredericks (WF-1576)
                                             Joseph P. Guglielmo (JG-2447)
                                             SCOTT+SCOTT, Attorneys at Law, LLP
                                             The Chrysler Building
                                             405 Lexington Avenue, 40th Floor
                                             New York, New York 10174
                                             Tel: (212) 223-6444
                                             Fax: (212) 223-6334
                                             wfredericks@scott-scott.com
                                             jguglielmo@scott-scott.com

                                             John T. Jasnoch
                                             SCOTT+SCOTT, Attorneys at Law, LLP
                                             707 Broadway Suite 1000
                                             San Diego, CA 92101
                                             Tel: (619) 233-4565
                                             Fax: (619) 233-0508

                                             David R. Scott
                                             SCOTT+SCOTT, Attorneys at Law, LLP
                                             156 South Main Street
                                             Colchester, CT 06415
                                             Tel: 860-537-5537
                                             Fax: 860-537-4432
                                             david.scott@scott-scott.com

                                             *Lead Counsel for Plaintiffs*

                                             Gregory M. Nespole
                                             WOLF HALDENSTEIN ADLER
                                             FREEMAN & HERZ LLP
                                             270 Madison Avenue
                                             New York, New York 10016
                                             Tel: (212) 545-4600
                                             Fax: (212) 545-4653
                                             nespole@whafh.com

Charles Piven
Yelena Trepetin
BROWER PIVEN, A PROFESSIONAL
CORPORATION
1925 Old Valley Road
Stevenson, Maryland 21153
Tel: (410) 332-0030
Fax: (410) 685-1300
piven@browerpiven.com
yelena@browerpiven.com

*Additional Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on February 11, 2015          */s/ William C. Fredericks*
                                       William C. Fredericks
                                       SCOTT+SCOTT, Attorneys at Law, LLP
                                       The Chrysler Building
                                       405 Lexington Avenue, 40th Floor
                                       New York, New York 10174
                                       Tel: (212) 223-6444
                                       Fax: (212) 223-6334
                                       wfredericks@scott-scott.com